UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                              :

      - v. -                                        :

ROBERT EGAN,                                          :
                          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

BANK OF AMERICA, N.A.,                                :

CLOTHING EMPORIUM, INC.,                              :

DEPT. OF VETERANS AFFAIRS FEDERAL CREDIT UNION,       : 10 Cr. 191 (JFK)

MONEYGRAM INTERNATIONAL, INC.,                        : ECF Case

MONEY SPOT, INC.,                                     :

TRANS FAST REMITTANCE, LLC.,                          :

THOSE INTERESTED UNDERWRITERS WHO SUBSCRIBED TO:
THE POLICIES/CERTIFICATES OF INSURANCE NUMBERED
B0702BB008120Y AND UM00018767SP09A, AS SUBROGEES      :
AND ASSIGNEES OF U.S. BANCORP,

                                       :

XL SPECIALTY INSURANCE COMPANY AND STARNET
INSURANCE COMPANY, AS SUBROGEES AND ASSIGNEES         :
OF WILMINGTON SAVINGS FUND SOCIETY,
                         Claimants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
### MOTION TO DISMISS CLAIMANTS' PETITIONS FOR AN ANCILLARY HEARING

                                  PREET BHARARA
                                  United States Attorney for the
                                  Southern District of New York
                                  Attorney for the United States of America

David I. Miller
Antonia Apps
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    MVMC's Business and Egan's Arrest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    The Full Nature of the Criminal Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    D.    The Seizure and Egan's Guilty Plea.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    E.    Claims of Specific Petitioners. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        1.    Petition of Bank of America, N.A. ... . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        2.    Petition of Clothing Emporium, Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        3.    Petition of Dept. of Veterans Affairs Federal Credit Union . . . . . . . . . . . . . . 9

        4.    Petition of Moneygram International, Inc.. . . . . . . . . . . . . . . . . . . . . . . 10

        5.    Petition of Money Spot, Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        6.    Petition of Trans Fast Remittance, LLC.. . . . . . . . . . . . . . . . . . . . . . . . 11

        7.    Petition of Those Interested Underwriters Who Subscribe to the Policies/Certificates of Insurance Numbered B0702BB008120Y and UM00018767SP09A, as Subrogees and Assignees of U.S. Bancorp. . . . . . . . 12

        8.    Petition of XL Specialty Insurance Company and Starnet Insurance Company, as Subrogees and Assignees of Wilmington Savings Fund Society.. . . . . . . . . . . . . . . . . . . . . . 13

    F.    Restoration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**TABLE OF CONTENTS (CONT'D)**

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    THE PETITIONERS DO NOT STATE A PLAUSIBLE
    CLAIM FOR RELIEF AND THUS DO NOT ESTABLISH STANDING. . . . . . . . . . . . . . 15

    I.    Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        A.    The Preliminary Order of Forfeiture. . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        B.    Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        C.    Legal Standards for a Motion to Dismiss. . . . . . . . . . . . . . . . . . . . . . . . 17

    II    Each Petitioner Fails to Establish a Legal
        Interest in a Specific *Res* from the Seized Funds. . . . . . . . . . . . . . . . . . . . . . . . . 19

        A.    Petitioners' Segregation and Bailment Claims Are Baseless. . . . . . . . . . . . . 20

        B.    Petitioners' Specific Relationships with MVMC/AMS Further
            Demonstrate that They Can State No Plausible Claim for Relief. . . . . . . . . . 24

            1.    ATM Replenishment Customers. . . . . . . . . . . . . . . . . . . . . . . . . . . 24

            2.    Money Processing Customers. . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            3.    Delayed Delivery Customers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            4.    Wire Transfer Customers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            5.    Federal Reserve Customers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        C.    Petitioners Differ Fundamentally from the
            Non-Victim Settlement Petitioners. . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        D.    The Timing of the Seizure Does Not Confer Standing. . . . . . . . . . . . . . . . 30

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in support of its motion

to dismiss the following petitions:

1. Bank of America, N.A., filed on December 13, 2010 ("Bank of America Petition") (Docket Number 103[1]);

2. Clothing Emporium, Inc., filed on November 22, 2010 ("Clothing Emporium Petition") (Docket Number 82);

3. Department of Veterans Affairs Federal Credit Union, filed on December 2, 2010 ("VA Credit Union Petition") (Docket Number 92);

4. Moneygram International, Inc., filed on December 14, 2010 ("Moneygram Petition") (Docket Number 108);

5. Money Spot, Inc., filed on November 24, 2010 ("Money Spot Petition") (Docket Number 89);

6. Trans Fast Remittance, LLC., filed on November 15, 2010 ("Trans Fast Petition") (Docket Number 79);

7. Those Interested Underwriters Who Subscribed to the Policies/Certificates of Insurance Numbered B0702BB008120Y and UM00018767SP09A, As Subrogees and Assignees of U.S. Bancorp, filed on December 13, 2010 ("Underwriters Petition") (Docket Number 105); and

8. XL Specialty Insurance Company and Starnet Insurance Company, As Subrogees and Assignees of Wilmington Savings Fund Society, filed on December 13, 2010 ("XL Petition") (Docket Number 104).

(collectively, the "Petitions" or "Petitioners").

In this criminal forfeiture matter, the Petitioners claim that forfeiture of the monies seized

by the Federal Bureau of Investigation ("FBI") on February 11 and 12, 2010, is not permitted

because the armored car service with which they contracted never had any right, title or interest

---

[1] Documents cited in this Memorandum are available among those filed electronically in this action.  For the Court's reference, the Docket Number is provided the first time a document is referenced.

in the monies they picked up.  Additionally, some Petitioners also claim that their interest in specific funds seized by the FBI on February 11 and 12, 2010 is entirely separate from the fraudulent conduct that led to the recovery of more than $19 million in connection with the same seizure.  As explained below, however, Petitioners fail to state a claim upon which relief may be granted because the key allegation upon which their claim rests – namely, that their funds were not part of the fraud perpetrated by defendants Robert Egan ("Egan") and Bernard McGarry ("McGarry") – is based on implausible speculation and conclusion.  Furthermore, even if the Petitioners are able to identify that their particular funds were seized by the FBI, they cannot now benefit from fortuitous timing of this seizure because they previously received fraud proceeds. Petitioners cannot, therefore, adequately allege the legal interest in the seized funds required to establish standing to pursue their claims under the applicable criminal forfeiture statute.

Simply stated, Petitioners have no legal or factual basis for elevating their interest in the seized funds above that of the many other similarly-situated victims who lost funds that were involved in Egan and McGarry's fraud.  Moreover, the allegations and legal conclusions upon which the Petitioners rely, particularly with respect to the disposition of the specific property to which Petitioners claim, are unsupported by the facts.  Accordingly, for the foregoing reasons and as discussed in more detail below, the aforementioned Petitions should be dismissed.

## BACKGROUND

### A.      Procedural History

Robert Egan was the principal and owner of a New York cash management company called Mount Vernon Money Center Corporation ("MVMC").  Bernard McGarry was the Chief Operations Officer for MVMC.  On March 10, 2010, a grand jury sitting in this District returned

a seven-count Indictment (the "Indictment") against defendants Egan and McGarry (collectively, the "Defendants"), charging them with one count of conspiracy to commit bank and wire fraud, in violation of Title 18, United States Code, Section 1349, and six counts of bank fraud, in violation of Title 18, United States Code, Section 1344. *See United States v. Robert Egan and Bernard McGarry*, 10 Cr. 919 (JFK) (Docket Number 12). The Indictment set forth the details of the Defendants' fraudulent scheme, described below.

B. **MVMC's Business and Egan's Arrest**

MVMC, through various operating entities, engaged in several cash management businesses, including, among others: (1) check cashing businesses, with store locations in New York, New Jersey and Connecticut; (2) an automated teller machine ("ATM") replenishment business; (3) a traditional armored transportation business; and (4) onsite payroll services for companies and entities seeking to provide immediate cash availability to employees in exchange for their paychecks. In connection with these businesses, MVMC owned and operated several cash vaults in which MVMC and its affiliated operations stored and processed cash collected from and distributed to customers and cash depositories. (Indictment ¶¶ 1-2).

MVMC received tens of millions of dollars a week from its ATM customers for the purpose of replenishing their ATMs, and represented that it would only use the funds of the ATM owner or bank to fill that ATM customer's ATMs. (*Id.* ¶ 6). Moreover, from at least in or about 2007, up to and including in or about February 2010, MVMC, through an entity called "Armored Money Services" ("AMS"), provided armored transportation services to various customers. (*Id.* ¶ 9). AMS collected millions of dollars of cash every day from AMS customers located in New York, New Jersey, and Connecticut. (*Id.*).

3

On or about January 29, 2010, the FBI received a report from an investigator acting for a customer of MVMC's ATM replenishment business, Webster Bank ("Webster"), that MVMC had misappropriated approximately $12 million from Webster.  Following further investigation, Egan was arrested on or about February 8, 2010 on bank fraud charges for his role in defrauding Webster Bank.  He was presented before this District that same day and released on bail.

**C.     The Full Nature of the Criminal Conduct**

After Egan's arrest, the Government learned that the Defendants' fraud extended far beyond just Webster Bank.  The Government was contacted by numerous purported victims who believed that their funds had been stolen, and subsequently learned the full scope of the Defendants' criminal conduct.

As described in the Indictment, from at least in or about 2005 up to and including in or about February 2010, the Defendants solicited and collected hundreds of millions of dollars from MVMC's various customers on false representations that they would safeguard the funds entrusted to them, and would not commingle customer funds or use funds for purposes other than those specific in the various contractual relationships between MVMC and its customers.  (*Id.* ¶ 11).  In truth and in fact, however, the Defendants misappropriated much of their customers' money and used it to fund tens of millions of dollars of operating losses in MVMC's businesses and to enrich themselves at their customers' expense.  (*Id.*).  As a further part of the fraudulent scheme, the Defendants engaged in a practice known as "playing the float," by which they relied upon the continual influx of tens of millions of dollars in funds – *to be paid out at a later date* – in order to misappropriate those funds for their own use.  The Defendants would use these funds

4

either to cover operating expenses for MVMC operating entities, or to repay prior obligations to MVMC's customers, frequently as a result of earlier misappropriations or for their own personal enrichment.  (*Id.* ¶12).  Additionally, the Defendants commingled customer funds from various sources in MVMC's vaults, despite their contractual obligation to keep each customer's cash separate or segregated from the cash being held for any other party.  (*Id.* ¶ 13).  As set forth in the Indictment, "when cash arrived [at one of MVMC's vaults,] . . . from sources such as the Federal Reserve or some other designated cash provider, vault personnel . . . [would take] that cash and, without regard to ownership or source," use it as needed to replenish ATM's scheduled to be filled the next day.  (*Id.*).  Furthermore, any residual cash from customers was "typically not kept segregated for each customer; rather the residual cash was commingled with other customers' residual cash."  (*Id.* ¶ 14).  "Even in the few instances where residual cash was kept in segregated trays or bins, if vault personnel had insufficient cash to fill the next day's ATM loads for a customer or customers . . . the vault personnel took the residual cash that was in another customer's tray or bin in order to fill the next day's ATM loads."  (*Id.*).

In addition to the details of Defendants' fraudulent scheme set forth in the Indictment, Special Agent James H. Hilliard, the FBI agent who participated in the seizure of the Seized Funds on February 11 and 12, 2010, submitted a declaration to this Court on October 18, 2010 (the "First Hilliard Declaration," Docket Item 72) that describes key aspects of the fraud and how it affected particular groups of victims.  In particular, the First Hilliard Declaration highlights the degree to which customers who retained MVMC or AMS for money processing or ATM replenishment services continually had their funds integrated into the fraud as far back as 2005. (First Hilliard Declaration, ¶ 8(a)-(i)).

5

This fraudulent scheme did not relate, however, to those monies that were picked up from the individual banks of various check cashing businesses, held overnight and then delivered ***the very next day*** to the customer's designated facilities.[2]  A very small and distinct subset of MVMC and AMS customers fit into this "one-way" courier category.  As set forth in the January 31, 2011 Declaration of FBI Special Agent James Hilliard (the "Second Hilliard Declaration," Docket Item 115) there are three petitioners[3] in this case in which "there is no evidence that (i) [the] defendants . . . ever commingled [the funds of those petitioners] . . . or (ii) that AMS violated the terms of their contracts."  (Second Hilliard Declaration ¶ 8).  Accordingly, because the Settlement Petitioners never had their funds commingled or utilized as part of the Defendants' fraudulent scheme, they are not victims of the fraud and the Government agreed to settle with those Petitioners.  On March 8, 2011, the Court approved the settlement stipulations.

### D.        The Seizure and Egan's Guilty Plea

On February 11, 2010, three days after Egan's arrest, the Government and Egan and MVMC, through their counsel, signed a Consent Order for Restraint and Seizure of Property pursuant to 18 U.S.C. § 982(b)(1) and 21 U.S.C. §§ 853(e) and (f) (the "Consent Order for Restraint," Docket Number 8), which the Honorable Richard M. Berman, sitting in Part I, approved.  The Consent Order for Restraint authorized the FBI and the United States Marshals

---

[2] This exception to the fraud for one-way, unprocessed, overnight transfer from a customer's bank does ***not*** apply to customers who had monies picked up from the Federal Reserve Bank in sealed trays or bins.  As discussed herein, MVMC/AMS employees routinely commingled customer funds picked up from the Federal Reserve and shifted or combined the monies stored in those bins and trays to fill other customers' orders.  (Indictment ¶¶ 13-14).

[3] These petitioners are: (1) Granite Check Cashing Service, Inc.  / James Lieto; (2) B&H Check Cashing Services of Brooklyn, Inc. / Mark Barberan; and (3) NY Community Financial, LLC and R.D.C. Payroll Services, Inc. (hereinafter, the "Settlement Petitioners").

Service ("USMS") to take custody of all cash, currency, and other monetary instruments stored in the MVMC cash vaults located at two of the company's offices.  The Consent Order for Restraint further directed the USMS to "maintain custody of the Seized Assets pending resolution of this criminal case."

Pursuant to the Consent Order for Restraint, law enforcement seized approximately $19,288,702.72 in United States currency (the "Seized Funds"), on or about February 11, 2010 and February 12, 2010, from two MVMC operating locations.  On April 13, 2010, the Government filed a Bill of Particulars (Docket Number 23) providing notice that the Government was seeking forfeiture of the Seized Funds, as well as other properties, in the criminal action.

On September 15, 2010, Egan pled guilty to Counts One through Seven of the Indictment. Following Egan's guilty plea this Court entered a Consent Order of Forfeiture (the "Forfeiture Order," Docket Number 67) that acknowledged, among other things, Egan's consent to the forfeiture of the Seized Funds.  The Seized Funds previously referenced in the Consent Order for Restraint is referred to in the Forfeiture Order as the "Specific Property," and is defined as:

> Approximately $19,288,702.72 in United States currency, seized on or about February 11, 2010 and February 12, 2010, from Mount Vernon Money Center locations at 44 N. Saw River Road, Elmsford, NY and 403 East 3rd Street, Mount Vernon, NY.

(Forfeiture Order at 2).

### E.   Claims of Specific Petitioners

#### 1.   Petition of Bank of America, N.A.

On December 13, 2010, Bank of America, N.A. ("Bank of America") filed a petition, pursuant to 21 U.S.C. § 853(n), asserting an interest in and requesting the return of a portion of

the Seized Funds, namely $4,042,020 in United States currency.  In its petition, Bank of America

claims that it, along with Cardtronics USA, Inc. f/k/a Card Pro ("Cardtronics"),[4] entered into a

contract with MVMC in September of 2009, wherein MVMC was to provide "ATM services to

Cardtronics including, without limitation, ATM balancing, cash replenishment and reporting

services for ATMs owned by Cardtronics."  (Bank of America Petition ¶ 8).  Bank of America

further asserts that pursuant to that same agreement, MVMC was responsible for picking up

Bank of America currency, storing that currency in MVMC vaults, and processing and delivering

said currency to various Cardtronics ATMs.  (Bank of America Petition ¶ 8).  Moreover, in

addition to delivering the currency to the Cardtronics ATMs, MVMC was also contractually

required to remove "any residual currency in the Cardtronics ATMs and store[] such residual

currency in the inventory of [Bank of America] ATM cash at the vaults at MVMC's premises."

(Bank of America Petition ¶ 8).

　　　　According to Bank of America, MVMC never obtained an ownership interest in any of

the monies MVMC, AMS or their affiliates picked up, delivered, or stored on behalf of Bank of

America and therefore Bank of America has a superior interest in the funds seized.  Bank of

America alleges that $4,042,020 of Bank of America monies were in MVMC's vaults at the time

of the February 11 and 12, 2010 seizures.  (Bank of America Petition ¶¶ 12-21).

_____

　　　　[4] Cardtronics owned or leased the actual ATM machines that were replenished by
MVMC.  Bank of America provided the monies to be used in the replenishment of the
Cardtronics ATMs.  The Bank of America petition does not specify the exact relationship
between Bank of America and Cardtronics but asserts that there was a contract between MVMC,
Cardtronics and Bank of America that provided for the replenishment, etc. of Cardtronics ATMs
with Bank of America monies.

### 2.   Petition of Clothing Emporium, Inc.

On November 22, 2010, Clothing Emporium, Inc. ("Clothing Emporium") filed a petition, pursuant to 18 U.S.C. § 982 and 21 U.S.C. § 853, and Memorandum of Law seeking Summary Judgment against the United States (Docket Number 84).  In its petition and Memorandum of Law, Clothing Emporium asserts an interest in and requests the return of a portion of the Seized Funds, namely $106,320.35 in United States currency.  (Clothing Emporium Petition ¶ 1).  Clothing Emporium alleges that it entered into a contract with AMS wherein AMS was to "collect cash receipts at retail locations operated by . . . [Clothing Emporium]."  (Clothing Emporium Petition ¶ 4).  Clothing Emporium further claims that MVMC and Egan never obtained any ownership interest in the $106,320.35 and therefore Clothing Emporium has a superior interest in the funds claimed.  (Clothing Emporium Petition ¶¶ 2 and 8).

### 3.   Petition of Dept. of Veterans Affairs Federal Credit Union

On December 12, 2010, the Department of Veterans Affairs Federal Credit Union (the "VA Credit Union") filed a petition, pursuant to 21 U.S.C. § 853(n), asserting an interest in and requesting the return of a portion of the Seized Funds, namely $155,194 in United States currency.  The VA Credit Union alleges that it entered into a contract with MVMC in January of 2002 wherein MVMC was to provide "armored car transportation services through its subsidiary, AMS, for the VA Credit Union." (VA Credit Union Petition ¶ 4).  The $155,194 being sought is allegedly comprised of two separate pickups from two different dates – one on February 2, 2010 for $194.00 and one on February 9, 2010 for a total of $155,000.  (VA Credit Union Petition ¶¶ 5-6).  According to the VA Credit Union, the monies that were picked up by AMS on February 2

9

and 9, 2010 were "never wired or otherwise deposited . . . into the VA Credit Union's bank account."  (Id.)

The VA Credit Union asserts in its petition that because the $155,000 was "seized following Egan's arrest, . . .  there can be no nexus between his criminal activities and the sum of $155,000 belonging to the VA Credit Union."  (VA Credit Union Petition ¶ 10).  It also asserts that MVMC and AMS never retained an ownership interest in the $155,194 and thus the Government is not in a position to seize the monies because they never belonged to Egan.  (VA Credit Union Petition ¶¶ 9, 12).

4.    Petition of Moneygram International, Inc.

On December 14, 2010, Moneygram International, Inc. ("Moneygram") filed a petition, pursuant to 21 U.S.C. § 853(n), asserting an interest in and requesting the return of a portion of the Seized Funds, namely $6,796,542.84 in United States currency "derived from pick ups conducted by AMS on February 4, 2010 through February 8, 2010."  (Moneygram Petition ¶ 13). Moneygram alleges that it entered into a contract with MVMC in October of 2007 wherein "MVMC agreed to pick up, from agent-owned and MGI-owned store location, MGI-owned currency and coin." (Moneygram Petition ¶ 11).  In addition, Moneygram further alleges that its contract with MVMC provided that "[u]pon receipt of MGI's funds at its vault, MVMC was required under the Contract to 'segregate' MGI's funds, verify and report the amount of deposits to MGI and wire transfer the funds to MGI." (Moneygram Petition ¶ 17).

Moneygram asserts in its petition that the $6,796,542.84 is not forfeitable because the Government has not established a "nexus between the . . . [Seized Funds] and the crime." (Moneygram Petition ¶ 21).  Additionally, Moneygram further alleges that MVMC never

10

obtained an ownership interest in the $6,796,542.84 and thus Moneygram has a superior interest in the funds. (Moneygram Petition ¶¶ 18 and 25).

### 5.   Petition of Money Spot, Inc.

On November 24, 2010, Money Spot, Inc. ("Money Spot") filed a petition, pursuant to 21 U.S.C. § 853(n), asserting an interest in and requesting the return of a portion of the Seized Funds, namely $170,000 in United States currency.  Money Spot alleges that on February 8, 2010, it "authorized . . . [its] Bank, First Central Savings Bank, to debit . . . [its] account and transfer by wire the sum of $170,000 to AMS' Signature Bank Account."  (Money Spot Petition ¶ 3).  Money Spot further alleges that the $170,000 transferred from its bank account to AMS's account are or may be part of the Seized Funds. (Money Spot Petition ¶ 5).

### 6.   Petition of Trans Fast Remittance, LLC

On November 15, 2010, Trans Fast Remittance, LLC ("Trans Fast") filed a petition, pursuant to 21 U.S.C. § 853(n), asserting an interest in and requesting the return of a portion of the Seized Funds, namely $102,281.91 in United States currency.  Trans Fast alleges that it entered into a contract with AMS in August of 2006 wherein American Armored[5] was to "pick up . . . sealed packages of currency, coin, checks and/or other valuables from designated Trans Fast remittance agents and . . . transport and . . . deliver[] ... those packages to Trans Fast's bank or other designated facility." (Trans Fast Petition ¶ 14).  The $102,281.91 being sought by Trans Fast is allegedly comprised of monies from eight separate pickups that occurred over between February 1, 2010 and February 3, 2010. (Trans Fast Petition ¶¶ 16-18).  Trans Fast further alleges

---

[5] American Armored was purchased by MVMC and subsequently changed their name to Armored Money Services ("AMS").

11

that its contract with American Armored did not vest in American Armored any right or title to the $102,281.91, nor was American Armored or Egan permitted to use or dispose of the property in any way.  (Trans Fast Petition ¶ 21).

### 7.  Petition of Those Interested Underwriters Who Subscribe to the Policies/Certificates of Insurance Numbered B0702BB008120Y and UM00018767SP09A, as Subrogees and Assignees of U.S. Bancorp

On December 13, 2010, those interested Underwriters who subscribe to the policies/certificates of insurance numbered B0702BB008120Y and UM00018767SP09A, as subrogees and assignees of U.S. Bancorp ("Underwriters") filed a petition, pursuant to 21 U.S.C. § 853(n), asserting an interest in and requesting the return of a portion of the Seized Funds, namely $3,310,000 in United States currency.  "Underwriters insured U.S. Bancorp for . . . losses in connection with the loss of monies entrusted to . . . [MVMC] due to the criminal conduct of defendant Robert Egan." (Underwriters Petition ¶ 1).  Underwriters allege that pursuant to their insurance policy with U.S. Bancorp, Underwriters paid U.S. Bancorp the full amount of its loss claim of $17,973,722, which was entrusted to MVMC but stolen by Egan.  (Underwriters Petition ¶ 2).

As alleged in the petition, U.S. Bank[6] had entered into various contracts with MVMC from 2008 to 2009, wherein MVMC would provide "cash provisioning" services to U.S. Bank in which MVMC would "service ATM owners' ATMs, including picking up cash from primarily the Federal Reserve Bank, transporting the cash to ATM sites, and replenishing the ATMs with the cash."  (Underwriters Petition ¶¶ 13-15).  Underwriters further allege that U.S. Bank's

---

[6] According to the petition, "U.S. Bancorp is a diversified financial services holding company and the parent company of U.S. Bank National Association, the fifth largest commercial bank in the United States (collectively 'U.S. Bank')."  (Underwriters Petition ¶ 6).

contract with MVMC did not vest in MVMC any right or title to U.S. Bank's currency, nor was

MVMC or Egan permitted to use or dispose of the property in any way. (Underwriters Petition ¶

18). Underwriters contend that because the Seized Funds included at least $3,310,000 belonging

to U.S. Bank, such monies should be returned. (Underwriters Petition ¶¶ 45-52).

> **8.    Petition of XL Specialty Insurance Company and
> Starnet Insurance Company, as Subrogees and
> Assignees of Wilmington Savings Fund Society**

On December 13, 2010, XL Specialty Insurance Company and Starnet Insurance

Company ("XL and Starnet"), as subrogees and assignees of Wilmington Savings Fund Society

filed a petition, pursuant to 21 U.S.C. § 853(n), asserting an interest in and requesting the return

of a portion of the Seized Funds, namely $493,930 in United States currency. XL and Starnet

allege that they "insured Wilmington Savings Fund Society ("WSFS") for . . . loses in connection

with the loss of monies [entrusted] to . . . [MVMC] due to the criminal conduct of defendant

Robert Egan." (XL and Starnet Petition ¶ 1). XL and Starnet allege that, pursuant to their

insurance policies with WSFS, they paid WSFS the full amount of its loss claim of $4,741,440,

which was entrusted to MVMC but stolen by Egan. (XL and Starnet Petition ¶ 2).

As alleged in the petition, "[f]rom 2001 to . . . in or about February 2010, pursuant to

recognition and attornment agreements between WSFS, ATM owners and MVMC, WSFS cash

would be picked up by MVMC to be utilized in ATMs." (XL and Starnet Petition ¶ 12). XL and

Starnet allege that pursuant to those agreements, MVMC was to "load the WSFS monies it

picked up to replenish designated ATMs . . . by first removing any remaining cash from the

machine . . . then replenish the machine with a new cash canister . . . [and] [t]he monies that had

been removed from the machine . . . were to be returned to MVMC's vaults, deposited into an

MVMC account and then wired directly to a WSFS account." (XL and Starnet Petition ¶ 13). XL and Starnet further allege that WSFS's agreement with MVMC did not vest in MVMC any right or title to the monies they picked up for WSFS. (XL and Starnet Petition ¶ 12). XL and Starnet's petition seeks the return of $493,930 purportedly belonging to WSFS, and which was allegedly contained in MVMC's vault on the date of the FBI's seizure. (XL and Starnet Petition ¶¶ 35-42).

F.   **Restoration**

Section 853(i) of Title 21, United States Code, authorizes the Attorney General to transfer forfeited property to victims of crime. See 21 U.S.C. § 853(i)(1). In November 2002, the Attorney General issued a policy directive on restoration, Forfeiture Policy Directive 02-1, which delegates to the Chief of the Asset Forfeiture & Money Laundering Section of the Department of Justice the authority to apply forfeited property directly to a restitution order.

In this case, the United States Attorney's Office for the Southern District of New York intends to request that the Attorney General invoke his restoration authority and apply any property that is forfeited in this case to the Court's restitution order, on a pro rata basis according to each victim's loss.

## ARGUMENT

## THE PETITIONERS DO NOT STATE A PLAUSIBLE
## CLAIM FOR RELIEF AND THUS DO NOT ESTABLISH STANDING

**I.      APPLICABLE LAW**

**A.      The Preliminary Order of Forfeiture**

The criminal forfeiture proceedings in this case are governed by Federal Rule of Criminal Procedure 32.2 and 21 U.S.C. § 853.  *See* 28 U.S.C. § 2461(c).  Under Rule 32.2, once a criminal defendant is convicted of the offenses giving rise to the forfeiture allegations, either by trial or plea, the district court must enter a preliminary order of forfeiture.  The preliminary order divests the criminal defendant of any right in the property, and requires the Government to serve notice of its intent to forfeit finally the property on any potentially interested third parties.  *See* 21 U.S.C. § 853(n)(1); Fed. R. Crim. P. 32.2(b).   After the court enters a preliminary order of forfeiture, the court conducts a so-called "ancillary proceeding" in order to determine the interest of third parties in property that is subject to the order.  *See* 21 U.S.C. § 853(n).

**B.      Standing**

Section 853(n) of Title 21, United States Code, sets forth the procedures by which third parties may assert an interest in forfeited property after a preliminary order of forfeiture has been entered.  In order to contest the forfeiture, petitioners must first establish that they have a "legal interest in" the property, as required by § 853(n)(2).  This subsection states, in part:

> Any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may . . . petition the court for a hearing to adjudicate the validity of this alleged interest in the property.

21 U.S.C. § 853(n)(2).

It is well-established that general creditors of a defendant do not have standing under 21 U.S.C. § 853(n)(2).  *See DSI Assocs. LLC v. United States*, 496 F.3d 175, 184 (2d Cir. 2007); *United States v. Ribadeneira*, 105 F.3d 833, 837 (2d Cir. 1997).  This is because section 853(n) requires petitioners to show that they have an interest in the *res* – that is, the actual property that was forfeited – and general creditors do not have such an interest.  *See DSI Assocs. LLC*, 496 F.3d at 184 ("Without possessing such an interest 'in' a 'particular, specific asset' that is, or is part of, the forfeited property, [the petitioner] does not meet the statutory requirements for initiating an ancillary proceeding under section 853(n).") (citation omitted); *Ribadeneira*, 105 F.3d at 836 (person holding check drawn on defendant's forfeited bank account is general unsecured creditor with no interest in specific funds); *see also United States v. Schwimmer*, 968 F.2d 1570, 1580-81 (2d Cir. 1992) (general creditors lack standing under 18 U.S.C. § 1963(l)(6), RICO equivalent to 21 U.S.C. § 853(n)(6)); *United States v. Agnello*, 344 F. Supp. 2d 360, 364 (E.D.N.Y. 2004) (party's interest in property must be interest in particular, specific asset that has been ordered forfeited to Government).

Thus, the mere fact that a petitioner can trace its funds to a defendant's property is insufficient to create a legal interest in the property.  *See DSI Assocs. LLC*, 496 F.3d at 184 (because claimant did not retain secured interest in property that it sold to defendant, it lacked standing to contest forfeiture of that property in ancillary proceeding).[7]

---

[7] Establishing standing is only the first hurdle that petitioners must pass in order to contest forfeiture under section 853(n).  In order to prevail on the merits, petitioners must establish, by a preponderance of the evidence, that their alleged legal interest in the property satisfies one of the two alternative bases for recovery described in section 853(n)(6).  This subsection states:

**C.      Legal Standard for a Motion to Dismiss**

Federal Rule of Criminal Procedure 32.2(c)(1) authorizes the Government to move to

dismiss a petition for lack of standing or for failure to state a claim before the parties are

permitted to conduct discovery on the petition.  This subdivision states, in part:

> (A) In the ancillary proceeding, the court may, on motion, dismiss
> the petition for lack of standing, for failure to state a claim, or for
> any other lawful reason. For purposes of the motion, the facts set
> forth in the petition are assumed to be true.
>
> (B) After disposing of any motion filed under Rule 32.2(c)(1)(A)
> and before conducting a hearing on the petition, the court may
> permit the parties to conduct discovery in accordance with the
> Federal Rules of Civil Procedure if the court determines that
> discovery is necessary or desirable to resolve factual issues. . . .

Fed. R. Crim. P. 32.2(c)(1)(A) and (B).

---

> If, after the hearing, the court determines that the petitioner has
> established by a preponderance of the evidence that--
>
> (A) the petitioner has a legal right, title, or interest in the property,
> and such right, title, or interest renders the order of forfeiture
> invalid in whole or in part because the right, title, or interest was
> vested in the petitioner rather than the defendant or was superior to
> any right, title, or interest of the defendant at the time of the
> commission of the acts which gave rise to the forfeiture of the
> property under this section; or
>
> (B) the petitioner is a bona fide purchaser for value of the right,
> title, or interest in the property and was at the time of purchase
> reasonably without cause to believe that the property was subject to
> forfeiture under this section;
>
> the court shall amend the order of forfeiture in accordance with its
> determination.

21 U.S.C. § 853(n)(6).

17

A motion to dismiss a third-party petition in a criminal forfeiture proceeding prior to discovery or a hearing is treated like a motion to dismiss a civil complaint under Fed. R. Civ. P. 12(b).  *See, e.g., United States v. Mendez*, No. 07-CR-107 (ARR), 2009 WL 1706354, at *2 (E.D.N.Y. June 17, 2009).  A motion to dismiss under Rule 12(b)(6) seeks dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In two recent decisions, *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court revisited the pleading requirements necessary to survive a motion to dismiss.  Generally speaking, a Rule 12(b)(6) motion to dismiss should be granted if the complaint does not "contain sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570); *see also id.* at 1953 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . .") (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949; *accord Twombly*, 550 U.S. at 556.  "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555.

The Court need not, however, accept as true a legal conclusion or a legal conclusion couched as a factual allegation.  *See Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.")).  Ultimately, whether a

complaint states a plausible claim for relief is a context-specific determination that requires "the reviewing court to draw on its judicial experience and common sense," and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 129 S. Ct. at 1950 (citations omitted).

## II.    EACH PETITIONER FAILS TO ESTABLISH A LEGAL INTEREST IN A SPECIFIC *RES* FROM THE SEIZED FUNDS

Petitioners set forth certain allegations that the Court may accept as true in their individual Petitions for portions of the Seized Funds.  Petitioners may have factual support for claims of a contract with MVMC or any of MVMC's operating entities; the pickup of their funds in sealed, labeled bags; the arrival of their funds at MVMC's vault[8]; and the seizure of multiple victims' funds from those same vaults.  Petitioners, however, also levy a common assertion that they are entitled to recover portions of the $19 million seized based on the assumption that their contracts with MVMC and its affiliated entities – which required that Petitioners' funds be kept in sealed containers, or otherwise be segregated from all other customers' funds – were respected.  But Petitioners' common assertions that their contracts were honored and that their monies were segregated and distinguishable from each and every other victim in this matter is unsupported by the facts, based on pure speculation and conjecture, and should be rejected under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*.  Indeed, such claims are not plausible on their face as the gravamen of the fraud was that the contractual relationships were *not* respected.

---

[8] Money Spot is an exception to this assumption as there is no evidence that Money Spot's monies were ever in any MVMC vaults on the dates of seizure because its funds were wired directly to a bank account owned by MVMC.  (*See* Money Spot Petition ¶ 3).

Moreover, the Petitioners cannot obtain a legal interest in the funds they identify as being present in MVMC's vault at the time of the FBI's seizure – funds that had been provided to MVMC/AMS in the days and weeks before the seizure – because even if those funds were not commingled before the FBI's seizure (an implausible assumption for these Petitioners), they should not benefit from such fortuitous timing when they had unwittingly received fraud proceeds in the past. Thus, as demonstrated below, Petitioners cannot set forth sufficiently plausible facts to sustain their claim beyond their bare conclusory assertions, and consequently cannot establish the legal interest in the specific *res* required to establish standing under section 853(n).

### A.    Petitioners' Segregation and Bailment Claims Are Baseless

Petitioners' common assertion that their funds had always remained discrete and untouched simply ignores the nature of the criminal conduct in this case. The proceedings in this matter have established that the funds of *all victims*[9] – notwithstanding contracts they may have had with MVMC, AMS, or any other related entity – were systematically commingled and misappropriated, in furtherance of the Defendants' fraudulent enterprise. On a continual basis, tens of millions of dollars in United States currency were lumped together in MVMC's vaults, stored unceremoniously in trays, and drawn upon as needed to cover the Defendants' tracks and perpetuate their scheme of "playing the float" for personal gain. Petitioners have no plausible claim that their funds were any exception, regardless of any provision of their contracts with MVMC or any labeling on the bags or trays in which the monies were received.

---

[9] For purposes of this motion, the term "victims" refers to the eight Petitioners listed above. The Settlement Petitioners are not included because they are not and never were victims of the Defendants' fraud.

The First Hilliard Declaration, in fact, contains first-hand details of the Seized Funds and the condition in which the cash and other items were found.  As set forth in the First Hilliard Declaration, the FBI seized cash and coins from MVMC's vaults on February 11-12, 2010, and escorted MVMC armored cars to a Brinks facility in Brooklyn, New York, where the money was counted.  (First Hilliard Declaration ¶ 10).  Special Agent Hilliard stated that the bulk of the cash seized by the FBI was contained in trays that were not segregated into customer bins, consistent with MVMC's practice of commingling its customers' funds.  (First Hilliard Declaration ¶ 10a).[10]  With respect to the seized bags, Special Agent Hilliard states:

> There were also bags seized from the vaults on February 11 and February 12 that contained cash and checks.  We have been unable to determine with certainty which of the bags collected were in fact processed by MVMC in the manner described above (that is, the money was taken out of the bags, commingled with other customers' money, and the bags were refilled by MVMC employees with cash) [Footnote omitted].  The seized bags had certain identifying information on them, which is listed in Exhibit E [Footnote omitted].  Note that Exhibit E does not purport to verify the accuracy of the information on the outside of the bags; it simply lists information on the outside of the bags . . . Brinks did not count the cash in each bag separately (as opposed to counting the total cash collectively) to confirm the accuracy of the information on the outside of the bags.

(First Hilliard Declaration ¶ 10b).  Simply put, neither the FBI nor the Brinks employees who counted and inventoried the Seized Funds have any means of determining which containers were intact and which were commingled, nor can they confirm what the actual contents of the containers were at the time of seizure.  Likewise, Petitioners do not know – and will not be able to determine through discovery or otherwise – what happened to the cash that was in the bags

---

[10] The First Hilliard Declaration contains two paragraphs numbered "10."  This citation and those that follow come from the second paragraph 10, which starts on page 12 of the Declaration.

labeled with their names between the time that they were picked up by AMS, MVMC or their related entities and the time that the FBI seized them.

Despite their lack of first-hand knowledge, or any basis whatsoever, the Petitioners each make the purely speculative claim that their funds, including those funds purportedly part of the Seized Funds, had not been commingled, even in the period preceding the seizure.  In order to maintain their claims, Petitioners *need* this assumption to be true because without it they are no better off than the other victims in the case whose funds Egan and McGarry misappropriated or spent.  The Petitioners also further allege that their funds are easily distinguishable from the other monies in the MVMC vaults because they allegedly were always held in sealed tamper-proof bags or numbered Federal Reserve trays, as provided by contract.  Thus, the critical elements that Petitioners assert as facts in their Petitions are merely fanciful assumptions about how their funds *should* have been handled.  Unfortunately, as the criminal case demonstrated, this was just not true.

Furthermore, Petitioners attempt to differentiate their funds by specifically invoking bailment language with respect to their relationship with MVMC, AMS and related entities, and claim that they never transferred ownership or control of the Claimed Funds.  (*See, e.g.,* Trans Fast Petition ¶¶ 19, 21; Bank of America Petition ¶ 9; Clothing Emporium Petition ¶¶ 2-5; VA Federal Credit Union Petition ¶ 9, XL and Starnet Petition ¶12; Underwriters Petition ¶¶ 16-18, 50; Money Gram Petition ¶18.).  While such a no-ownership-transfer claim may have weight in a traditional bailor/bailee scenario, this claim once again ignores that the Defendants used Petitioners' funds as instrumentalities of their fraudulent scheme.  When the Defendants' agents unsealed bags and commingled funds of their victims, they effectively wrested control of those

funds from their owners and breached any bailment arrangement.  (Indictment ¶¶ 11-13).  Thus, the existence of MVMC's, AMS's, or its affiliates' contractual obligations – which were clearly breached – do nothing but demonstrate the way the Petitioners' funds were *supposed* to be handled.

Notably, the Defendant's fraudulent scheme – the commingling of proceeds – continued from February 8, 2010, when Egan was arrested, until the FBI's seizures three to four days later. It was not until the days after Egan's arrest that the full scope of his and McGarry's fraudulent scheme began to reveal itself, during which time the fraud itself – which did not depend on Egan's continual presence or direction – continued.  Indeed, McGarry was not arrested until March 11, 2010.  This is particularly relevant as some of the Petitioners have alleged that the funds they seek returned were provided to MVMC after Egan's arrest but before the FBI's seizures.[11]

Accordingly, given the undisputed facts of the underlying criminal enterprise, the details of the seizure and the condition in which all of the Seized funds were found, Petitioners' bailment and contractual claims are precisely the "legal conclusion couched as a factual allegation" that the Court is not bound to accept as true in a motion to dismiss.  *See Iqbal*, 129 S. Ct. at 1949-50 (citation omitted).  Absent these legal conclusions, or any means of establishing the integrity of the claimed property – whose condition before and at the time of seizure was and will remain unknown – Petitioners cannot assert standing and thus cannot state a claim for relief.

---

[11]  Other petitioners baldly assert that they should be returned funds they entrusted to MVMC even over a week before the FBI's seizures.

**B.      Petitioners' Specific Relationships with MVMC/AMS Further
Demonstrate that They Can State No Plausible Claim for Relief**

From an examination of the Petitions and the Indictment itself, several subgroups of

victims – some distinct and some overlapping – emerge from the Petitions herein.  For each

subgroup, the existence or lack of certain key factors further renders a particular Petitioner's

claim untenable.  Among the subgroups discussed in further detail below are: (1) customers who

contracted with MVMC or its various entities for ATM replenishment services ("ATM

Replenishment Customers"); (2) customers who contracted with MVMC or AMS to provide

additional fund processing services beyond a "one-way" courier service ("Money Processing

Customers"); (3) customers whose funds were not delivered or deposited the same day or the day

following their arrival at MVMC's vaults ("Delayed Delivery Customers"); (4) customers who

wired money directly into a bank account of MVMC, AMS, or related entities and subsequently

had those wired funds delivered to their facilities ("Wire Transfer Customers"); and (5)

customers who contracted with MVMC or AMS to retrieve and process funds from the Federal

Reserve Bank ("Federal Reserve Bank Customers").

**1.      ATM Replenishment Customers**

Petitioners Bank of America, Underwriters, and XL and Starnet fall into the "ATM

Replenishment Customers" victim category.  (*See* Bank of America Petition ¶ 8; Underwriters

Petition ¶¶ 13-16; XL and Starnet Petition ¶ 12-13.).  The misappropriation and commingling of

the Petitioners' ATM funds was the kernel of the Defendants' fraud.  With respect to the ATM

Replenishment Customers, the Defendants would have monies picked up from locations

designated by the customers, such as the Federal Reserve Bank, and those monies would then be

24

brought to MVMC vaults, counted and reloaded into canisters for delivery to the customers ATMs. (Indictment ¶¶ 6-7). In addition to supplying money into the ATMs, MVMC employees would also remove old canisters with residual cash and bring those canisters back to the MVMC vaults. (Indictment ¶ 8). While that residual cash was supposed to be credited to the customer's account, the residual cash was routinely used by the Defendants in their fraud – *i.e.*, one customer's residual cash may have been used to fill another customer's canisters or to pay operating expenses for MVMC. And throughout the fraud period, the Defendants made "false representations that they would safeguard the funds entrusted to them, and that they would not commingle customers' funds or use the funds for purposes other than those specified in the various contractual relationships." (Indictment ¶ 13).

At bottom, and especially in light of the *Iqbal* and *Twombly* standards, the ATM Replenishment Customers cannot wish away the facts set forth in the Indictment and the First Hilliard Declaration. Consequently, the ATM Replenishment customers cannot plausibly claim a legal interest in a specific *res* of the Seized Funds.

Even assuming as true, however, the Petitioners' speculative allegations that, notwithstanding the ongoing fraud and the procedures Egan and McGarry effectuated, they can identify their specific funds (which they provided days and/or over a week before the seizure) in MVMC's vault on the date of the FBI's seizure, the Petitioners still have no plausible ownership claim in the specific *res*. As discussed more fully below, because the Petitioners benefitted from the fraud during the offense period by receiving funds from other customers to replenish the financial shortfalls created in their own accounts, the Petitioners do not get to recover their

purported, identified interest in the Seized Funds merely because the FBI happened to seize the vault on a particular day.

## 2.  **Money Processing Customers**

Petitioners Bank of America, Money Gram, Underwriters, VA Federal Credit Union, and XL and Starnet, contracted with MVMC or AMS to provide additional fund processing services. (*See* Bank of America Petition ¶ 8; Money Gram Petition ¶ 17; Underwriters Petition ¶ 14-15; VA Federal Credit Union Petition ¶ 4; XL and Starnet Petition ¶ 13.).  As with the ATM Replenishment Customers (some of which overlap with this category), there can be no argument that Money Processing Customers were victims of the Defendants' fraud.  The common element to the contractual arrangements between the Money Processing Customers on the one hand, and MVMC and AMS on the other, was that employees of the Defendants' companies were charged with processing funds at the request of customers, beyond a one-way, bank-to-Petitioner courier service.[12] (Indictment ¶ 9).  The funds processing could take several forms, including counting and reconciling funds, storing them, and preparing them for delivery to destination facilities, banks or the customers themselves.  (Indictment ¶ 9; First Hilliard Declaration ¶ 8(a)).

Petitioners that contracted with AMS or MVMC for money processing services agreed to permit AMS or MVMC to handle their funds.  The integrity of any shipping containers (e.g., bag, tray, cannister or the like) could not be maintained because such containers would, by contract, have to be opened to process the funds contained therein.  Consequently, these Petitioners' funds were easily commingled, shuffled and redistributed among the other funds being held or

---

[12]  As demonstrated below, the existence of a one-way, *bank-to-Petitioner* (as opposed to visa versa) relationship was among the factors relevant in assessing whether a petitioner was not a crime victim.

processed at MVMC's vaults.  Indeed, funds processing formed another indispensable source of

fraudulent profit for the Defendants as it allowed unfettered access to Petitioners' funds, at times

over a period of several days.  This funds processing, coupled with a delay between receipt of the

funds and subsequent delivery (discussed below), allowed the Defendants both access to funds to

convert to their own use, and sufficient time in which to replace converted funds with newer

funds from other victims.

As with the ATM Replenishment Customers, the Money Processing Customers (three of

which occupy both categories) cannot plausibly assert that they can identify their specific funds

as being part of the Seized Funds.  But even assuming as true that the funds seized on February

11-12, 2010 were somehow treated as they should have been under the contract, that fact does

not erase the countless past instances where the same Money Processing Customers' funds were

commingled – to their profit and detriment – with the funds of other victims.  And as described

below, for that reason, they should not get to jump to the head of the line.

### 3.    Delayed Delivery Customers

As set forth above, the Defendants used the delay between receipt of funds and their

obligation to forward those funds to effect their fraud.  Six Petitioners had funds transferred to

MVMC days before the seizure.  (*See* Trans Fast Petition (Eight separate pickups between Feb. 1

to Feb. 3, 2010),  ¶ 19); Bank of America Petition (Feb. 5, 2011, ¶13; Feb. 8-9, 2010, ¶ 16);

Money Spot Petition (Feb. 8, 2010,  ¶ 3); XL and Starnet Petition (Feb. 3, 2010, ¶ 17);

Underwriters Petition (Feb. 5, 2010,  ¶ 21); and VA Federal Credit Union Petition (Feb 2., 2010,

¶ 5; Feb. 9, 2010, ¶ 6)).  Some of those Petitioners argue that because defendant Egan was

arrested on February 8, 2010, and the seizure of funds from MVMC's vaults did not occur until

February 11-12, 2010, those funds could not be considered connected to the fraud and therefore not subject to forfeiture.  (*See, e.g.,* Bank of America Petition ¶ 17; VA Credit Union Petition ¶ 10.).  As discussed above, however, this reasoning fails completely.

These Delayed Delivery petitioners' funds were present in MVMC's vaults for several days during the ongoing fraud, at which time those funds could have been used to replenish shortfalls in other victims' accounts.[13]  Accordingly, the Delayed Delivery Customers cannot plausibly claim an ownership interest in the specific funds seized by the FBI.  Furthermore, as discussed below, even if those Petitioners were able to legitimately identify specific property found during the FBI's seizure, they are not entitled to a return of those funds.

### 4.   Wire Transfer Customers

Petitioner Money Spot occupies the unique position of being the only petitioner whose funds were not even present in MVMC's vaults during the seizure.  Rather, Money Spot had arranged for a wire transfer of $170,000 to AMS's Signature Bank Account, No 1500754377, on or about Feb. 8, 2010.  (Money Spot Petition ¶ 3).  Consequently, Money Spot cannot even trace its funds to the Seized Assets taken from MVMC's vaults, and on that basis alone its petition can be dismissed.  To the extent that other Petitioners wired money to MVMC in the past, and thus were one of MVMC's Wire Transfer Customers, such transfers would have become part of the overall fraud that affected all victims.

---

[13]  Moreover, gaps and delays in pickup, processing and delivery times – whether by contract or fraudulent design – existed throughout the ongoing fraud and provided ample opportunity for Petitioners' funds to be commingled, misappropriated and ultimately replaced during the terms of their respective contracts.  (Indictment ¶¶ 12-17; First Hilliard Declaration ¶¶ 8(a), (f) and (g)).

### 5.      Federal Reserve Customers

Pursuant to its contract with AMS, petitioner Underwriters' insured , U.S. Bank, had

funds from the Federal Reserve Bank transported to MVMC's vaults.  (Underwriters Petition  ¶¶

21, 24).  As set forth in the background section above, Federal Reserve Customers had their

funds used in the Defendants' fraud, particularly because of the ease and frequency with which

trays and drawers from the Federal Reserve Bank were commingled, despite any contractual

language to the contrary.  Accordingly, as a Petitioner for which MVMC processed Federal

Reserve Bank funds, Underwriters are similarly situated to the other petitioners who cannot

plausibly make a claim for a legal interest in the Seized Funds in order to establish standing.

### C.      Petitioners Differ Fundamentally from the Non-Victim Settlement Petitioners

Petitioners' relationships with MVMC, AMS and/or its affiliates differ greatly from that

of the non-victim, Settlement Petitioners in this case.  In the Second Hilliard Declaration, Special

Agent Hilliard set forth the combined factors that demonstrated why the Settlement Petitioners

were never crime victims, and thus entitled to retrieve their identified funds seized by the FBI:

(a) AMS never picked up money from any of the Settlement Petitioners' facilities; (b) AMS only

picked up money from their individual banks in sealed, tamper-proof bags; (c) AMS held the

Settlement Petitioners' bags overnight and delivered the same bags the very next morning to

Settlement Petitioners' facilities; (d) AMS never picked up money from the Federal Reserve

Bank for the Settlement Petitioners; (e) AMS was a "one-way courier" from the Settlement

Petitioners' banks to their designated facilities; (f) AMS never provided any other services (*e.g.*,

money processing, ATM replenishment, wire transfer of funds) for the Settlement Petitioners,

other than the one-way transport service; ***and*** (g) there is not evidence that the Settlement

Petitioners' bags were ever tampered with.  (Second Hilliard Declaration ¶ 8).

Consequently, the Settlement Petitioners were not within the categories of ATM

Replenishment Customers, Money Processing Customers, Delayed Delivery Customers, Wire

Transfer Customers, or Federal Reserve Customers.  In sum, they were never victims of the

Defendants' fraud.

        **D.**        **The Timing of the Seizure Does Not Confer Standing**

The Government has established that all of the Petitioners are victims of the Defendants'

fraud.  As shown below, even if the Petitioners are able to demonstrate that specific funds seized

on the date of the seizure were theirs, the Petitioners still cannot plausibly claim a superior legal

interest in that specific *res*.

The Petitioners attempt to capitalize on the notion that bags or trays marked as having

once held their funds were seized from MVMC within a relatively short time after those funds

allegedly arrived at the vault.   This fortuitous stroke of timing does not, however, entitle

Petitioners to any greater priority over other victims who, by chance, were not awaiting the

transfer or processing of funds at the time of the seizure.  The Defendants' fraudulent scheme,

while it lasted, resembled a game of financial "musical chairs," albeit one that the participants

were unaware they were playing.[14]   The accounting hole left by funds misappropriation was

_____

    [14]  The Defendants' fraud was in many ways akin to a classic "Ponzi scheme."  In a traditional Ponzi scheme, potential investors are lured by the promise of exceptional returns on their money, while in reality the earliest investors are paid their ostensible dividends by the flow of incoming funds from later investors, and so on down the investment chain.  *See, generally, Cunningham v. Brown*, 265 U.S. 1, 7-9 (1924) (describing original investment scheme of Charles Ponzi within context of bankruptcy preference avoidance claims for certain duped investors). The instant case presents a case of "playing the float," a variation on the Ponzi scheme, wherein

shifted and circulated from victim to victim until the music stopped, and someone was left

holding a loss.  Then, by playing the float, the Defendants could restart the music by

redistributing the loss from one victim to another so that the fraud could live another day.

Petitioners now complain that when the music stopped permanently, they were left without a

seat.  But in fact, they frequently sat comfortably throughout the fraud at the expense of other

victims.  By focusing on the endgame of Egan and McGarry's fraudulent scheme, Petitioners

selectively and conveniently disregard the degree to which they benefitted from the scheme while

it still operated.

Courts have rejected the kind of preferential musical-chair treatment the Petitioners seek

to obtain.  In *SEC v. Byers*, 637 F. Supp. 2d 166 (S.D.N.Y. 2009) (Chin, J.), *aff'd*, 2010 WL

4185097 (2d Cir. Oct. 25, 2010) (summary order), the Court approved a receiver's distribution

plan in a Ponzi scheme where the receiver rejected investor arguments that they should not be

subject to *pro rata* distribution because their money was still present in the accounts when the

SEC commenced the action.  In *Byers*, the SEC brought a civil enforcement action against two

individuals and five entities controlled by those individuals that operated a massive Ponzi

scheme, which defrauded more than a thousand investors of approximately $255 million.  *Id*.,

637 F. Supp. 2d at 168.  The entities had made three types of investments: (i) real estate; (ii)

commodity funds; and (iii) diamond mines.  *Id.* at 170-71.  After investigation, the receiver

determined that the receivership estates should be liquidated and proceeds distributed *pro rata* to

creditors and victims of the Ponzi scheme.  *Id.* at 170-72.

---

later-acquired funds are shifted and redistributed to cover the shortfalls created by the
Defendants' conversion of earlier-acquired customers funds.

As part of their objections to the receiver's plan, the investors were "attempting to assert a superior claim to the receivership *res* so that they can recoup their entire investment."  *Id.* at 176.  The Court began its analysis by quoting *SEC v. Credit Bancorp, Ltd.,* 290 F.3d 80, 89 (2d Cir. 2002), in noting that "'the use of a pro rata distribution has been deemed especially appropriate for fraud victims of a Ponzi scheme.'" *Byers*, 637 F. Supp. 2d at 177 (quoting *Credit Bancorp*, 290 F.3d at 89).  In upholding the fairness of a *pro rata* distribution, *Byers* looked to the *Credit Bancorp* test of whether (i) "investors' funds must have been commingled," and (ii) whether the victims were "similarly situated 'with respect to their relationship to the defrauders.'" *Byers*, 637 F. Supp. 2d at 177 (quoting *Credit Bancorp*, 290 F.3d at 89).  In finding that the investor money was commingled extensively, the Court held that:

> the argument, advanced by the Commodity Fund investors, that their money cannot have been commingled because, when the SEC commenced this action, the money was still there misses the mark.  Their argument presumes that the money in Commodity Fund accounts is 'their' money, when, in fact, given the commingling that occurred, in all likelihood it includes money transferred from an investor who never had any intention of investing in a commodity fund.

*Id.*  at 179.  Notably, in finding that the investors were similarly situated, the Court remarked that the Second Circuit has held that "'their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances.'" *Id.* at 180; *see In re Dreier LLP (Gardi)*, Nos. 10 Civ. 4758 (DAB), 10 Civ. 5669 (DAB),  2010 WL 3835179, at *4 (S.D.N.Y. Sept. 10, 2010) (affirming order of Bankruptcy Court denying applicant's relief from automatic stay, where applicant argued that he was uniquely situated to recover his funds because they were not directly linked to Ponzi scheme).

On appeal, one of the investors argued that the district court "erred in refusing to employ a 'last in, first out' tracing analysis to permit her to recover her full investment," instead of receiving a *pro rata* distribution.  *SEC v. Orgel*, No. 10-312-cv, 2010 WL 4185097, at *1 (2d Cir. Oct. 25, 2010).  In rejecting the investor's challenge, the Court noted that this Circuit "has upheld the district court's broad equitable authority to order a *pro rata* distribution even where some funds are traceable to specific claimants, noting that 'whether at any given moment a particular customer's assets are traceable is a result of the merely fortuitous fact that the defrauders spent the money of the other victims first.'" *Id.* (quoting *United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996)); *see Credit Bancorp, Ltd.*, 290 F.3d at 89 (quoting *Durham*, 86 F.3d at 72).

Similarly, the Fifth Circuit's decision in *Durham* is instructive.  In *Durham*, the Court affirmed the district court's decision not to impose a constructive trust on the portion of seized assets traceable to a specific claimant whose funds made up the majority of the seized assets. Importantly, the Court held that the lower court did not abuse its discretion in finding that "it seemed inequitable to allow [the victim] to benefit merely because the defendants spent the other victims' funds first."  *Durham*, 86 F.3d at 73; *see also United States v. Ramunno*, 588 F.Supp.2d 1360 (N.D. Ga. 2008) (refusing to impose constructive trust in forfeiture action for unsecured creditor victim – which would provide him more forfeited assets than other victims would receive – who happened to have been defrauded last), *aff'd*, 599 F.3d 1269 (11th Cir. 2010), *reh'g denied*, --- F.3d --- (11th Cir. 2010).

The Seventh Circuit's decision in *Commodity Futures Trading Commission v. Heritage Capital Advisory Services*, 823 F.2d 171 (7th Cir. 1987), also bears on this issue. In that case, the

Court rejected a victim's constructive trust claim – where the claimant could not show unjust enrichment or breach of fiduciary duty – it refused to grant priority even though the victim was able to trace its funds to the seized assets.  The Court concluded that "[t]he only thing that distinguishes [claimant] is its ability to trace its funds to the day the account was frozen.  This is not a sufficient reason to allow [claimant] to have a priority claim over other similarly defrauded investors."  *Id.* at 173.

Clearly, the Petitioners in this case previously had their funds commingled and are "similarly situated" under Second Circuit precedent.  As the case law above demonstrates, even if the Petitioners are plausibly able to claim that specific funds seized by the FBI on February 11-12, 2010 in MVMC's vaults were theirs – which, as shown above, they cannot under *Iqbal* and *Twombly* – they are not entitled to recover the full amount of those funds fortuitously in the vault when they had received fraud proceeds previously.  At bottom, Petitioners should not now recover beyond a *pro rata* distribution, to other victims' detriment, because the Petitioners happened to be "last in."

Indeed, it is not surprising that for the above reasons, the Second Circuit has approved of *pro rata* distribution for victims of fraudulent schemes, including Ponzi schemes.  *See, e.g., Credit Bancorp,* 290 F.3d at 88-89 (holding that shares of stock transferred to corporation that defrauded numerous victims could be included in corporation's receivership estate for *pro rata* distribution); *see also Dreier,* 682 F.Supp.2d at 422 ("There is nothing *per se* unfair about a *pro rata* distribution; the Second Circuit has endorsed this approach as particularly appropriate for frauds like [defendant's] involving a Ponzi scheme of the commingling of similarly situated victims' assets").

34

Consequently, Petitioners are nothing more than general creditors of the forfeited property.  As the Court in *United States v. BCCI Holdings (Lux.), S.A.*, 46 F.3d 1185 (D.C. Cir. 1995), held:

> [A] general creditor can never have an interest in specific forfeited property, no matter what the relative size of his claim vis-a-vis the value of the defendant's post-forfeiture estate.  Were it otherwise, the court litigating the forfeiture issue would be converted into a bankruptcy court and would not be able to grant forfeiture to the government until it determined that no general creditor would be unable to satisfy its claim against the defendant. That result appears patently at odds with the statutory scheme, which directs parties without an interest in specific property to seek relief from the Attorney General, not the court adjudging the forfeiture.  The Attorney General has authority to dispense confiscated funds 'to protect the rights of innocent persons,' 18 U.S.C. § 1963(g)(1), and general creditors seem precisely the type of innocent persons Congress had in mind.

*BCCI Holdings (Lux.), S.A.*, 46 F.3d at 1191-92; *accord United States v. Watkins*, 320 F.3d 1279, 1283 (8th Cir. 2003).

The Court should therefore reject Petitioners' ownership argument based merely on when the music last stopped in this multi-year fraud.

                    *       *       *

For the reasons set forth above, the Petitioners have failed to assert a plausible ownership claim in a specific *res* of the Seized Funds – thus failing to establish standing – and their Petitions should therefore be dismissed.  Should the Court rule in favor of the Petitioners on the instant motion, however, that decision would effectively turn the ancillary proceedings in this criminal forfeiture matter into a liquidation proceeding, in contravention of the statutory scheme that Congress established for the equitable distribution of property to victims.  The proper means

35

by which Petitioners can recover a portion of the Seized Funds is through the restoration or remission process established in section 853(i)(1), wherein these similarly-situated Petitioners would be able to seek their *pro rata* share of the Specific Property.  The instant Petitions are nothing more than a mechanism for victims, who lack standing in this proceeding, to "leap frog" their way over other similarly-situated victims to the detriment of all.  Accordingly, Petitioners' efforts to undermine the language and purpose of section 853 should be rejected.

## CONCLUSION

For the foregoing reasons, the Petitioners cannot adequately allege sufficient legal interests in the Seized Funds required to establish standing.  The allegations and legal conclusions upon which the Petitioners rely, particularly with respect to the disposition of the specific property to which Petitioners claim an interest, are unsupported by the facts and facially implausible.  Accordingly, the aforementioned Petitions should be dismissed in their entirety.

Dated: March 8, 2011
       New York, New York

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York


                    By:      _____/David I. Miller/_____
                             David I. Miller
                             Antonia Apps
                             Assistant United States Attorneys
                             One Saint Andrew's Plaza
                             New York, New York 10007
                             Tel. (212) 637-2484/2198
                             Fax (212) 637-0421