UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                    :

       -v.-                          :        10 Cr. 191 (JFK)

ROBERT EGAN and                              :
BERNARD MCGARRY,
                      :
        Defendants.
                      :
- - - - - - - - - - - - - - - - - -x


**GOVERNMENT'S SENTENCING MEMORANDUM**


PREET BHARARA
*United States Attorney for the*
*Southern District of New York*
*Attorney for the United States of America*


Antonia M. Apps
David Miller
*Assistant United States Attorneys*
  *Of Counsel*

**PRELIMINARY STATEMENT**

The Government respectfully submits this sentencing memorandum in advance of the defendants' sentencings scheduled for May 4, 2011, and in response to Robert Egan's sentencing Memorandum filed April 27, 2011 ("Egan's Mem.") and Bernard McGarry's sentencing letter filed April 13, 2011 ("McGarry's Ltr.").

Robert Egan was the principal and owners of a cash management business called Mount Vernon Money Center ("MVMC"). MVMC customers entrusted hundreds of millions of dollars to MVMC to perform various cash management services – from replenishing ATMs with cash to providing on-site payroll services to hospitals and universities in the New York area.  In truth and in fact, Robert Egan, with the assistance of Bernard McGarry, operated what was in effect a massive Ponzi scheme.  Egan solicited customer money on the false representations that he and his company would safeguard the funds entrusted to him and that he would not commingle or use those funds for purposes other than those specified in the various contractual relationships between MVMC and its customers.  Instead, Egan and McGarry misappropriated customer money to cover tens of dollars of operating losses in MVMC's businesses, and to enrich themselves and their customers' expense.

1

Robert Egan now challenges the scope of this fraud. He argues, among other things, that the number of victims and the amount of their losses for Sentencing Guidelines purposes (though not restitution purposes) should be limited to those victims with contracts that specifically prohibited the commingling of funds. As set forth below, this narrow reading of the fraud is inconsistent with the Indictment and ignores the principles of relevant conduct under Section 1B1.3(a) of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). Viewing Egan's fraud in its totality, the amount of losses suffered by his victims exceeds $60 million.

Egan seeks a below-Guidelines sentence on the ground that he did not "intend" to harm his victims, citing his efforts to sell various businesses or assets to cover the victim losses. However, Egan had been operating his businesses at a shortfall for at least 15 years, using customer money to cover that shortfall, and commingling funds to hide the fraud. Egan may not have wanted to harm his victims, but he surely knew that that was the inevitable consequences of his conduct.

Egan raises a number of arguments, including the claim that the loss Guidelines overstate the seriousness of the offense. Each of these arguments is addressed below.

Unlike Egan, McGarry does not challenge the scope of the fraud in this case. McGarry correctly argues that he has

played a lesser role in the offense than that of his co-defendant.

## BACKGROUND

**A.   Procedural History**

Egan was first arrested on February 8, 2010, on a Complaint charging him with bank fraud, in violation of Title 18, United States Code, Section 1344 and 1349, for his role in defrauding Webster Bank.  Shortly before his arrest, the FBI had received a report from an investigator acting for Webster Bank that MVMC had misappropriated approximately $12 million from Webster Bank.  Webster Bank had entrusted its money to Egan for the purposes of replenishing ATMs in the New York area.  That money had been misappropriated by Egan to cover operating losses in his businesses.

Shortly after Egan's arrest, the Government learned that there were numerous other customers of MVMC that were owed substantial sums of money.  Following a further investigation, on March 10, 2010, a grand jury sitting in this District returned a seven-count Indictment (the "Indictment") against Egan and McGarry, the Chief Operations Officer for MVMC, charging them with one count of conspiracy to commit bank and wire fraud, in violation of Title 18, United States Code, Section 1349, and six counts of bank fraud, in violation of Title 18, United States Code, Section 1344.  The gravamen of the charged conduct was that

3

the defendants solicited money on the false representations that they would safeguard customer money entrusted to them, and they would not commingle or use that money for purposes other than those specified in their contractual arrangements with customers. In truth and in fact, the defendants misappropriated customer money to cover operating shortfalls in the businesses and to enrich themselves at their customers' expense.  They were able to effect the fraud and conceal it from customers by commingling the money within and between MVMC's various businesses.

Robert Egan pled guilty pursuant to a plea agreement on September 15, 2010 to the seven counts in the Indictment.  The plea agreement contained the following Sentencing Guidelines Stipulation: a base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a)(1); a 2-level increase because the offense involved more than 10 victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(I); a 2-level increase because the defendant derived more than $1,000,000 in gross receipts from financial institutions, pursuant to U.S.S.G. § 2B1.1(b)(14)(A); and a 2-level increase because the defendant was an organizer, leader, manager, or supervisor, pursuant to U.S.S.G. § 3B1.1(c).  The parties did not agree as to loss, however.  The Government's position was that the offense involved a loss exceeding $50,000,000, and accordingly a 24-level increase is warranted, pursuant to U.S.S.G. § 2B1.1(b)(1)(M). The defendant disputed the Government's position regarding the

loss amount but agreed that the loss amount exceeds $20,000,000. Accordingly, the defendant reserved the right to argue at sentencing that the loss amount is between $20,000,000 and $50,000,000, which would result in a 22-level increase in the offense level pursuant to amount U.S.S.G. § 2B1.1(b)(1)(L).  The defendant was awarded three points for a acceptance of responsibility.  Thus, the Guidelines offense level will be 32 or 34, depending on the Court's rulings as to the applicable loss amount under U.S.S.G. § 2B1.1(b)(1).  Since the defendant had no criminal history, his Guidelines range was either as 151 to 188 months' imprisonment (at offense level 34), or 121 to 151 months' imprisonment (at offense level 32).  The defendant also agreed to a money judgment of $70 million (reserving his right to argue for a lesser loss amount), and that he would not appeal any restitution order that fell within the loss amount as determined by the Court.

McGarry pled guilty on October 13, 2010 to the seven-count Indictment pursuant to a plea agreement that contained the following Stipulation as to Sentencing Guidelines: a base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a)(1); and a 2-level increase because the offense involved more than 10 victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(I).  The parties similarly disagreed on loss, and the agreement contained the same carve-out provision on loss as in Egan's plea agreement.  McGarry was also

awarded three points for a acceptance of responsibility .  Thus, the stipulated Guidelines offense level will be 28 or 30, depending on the Court's rulings as to the applicable loss amount under U.S.S.G. § 2B1.1(b)(1).  The defendant agreed to forfeiture generally (with no amount specified) and agreed not to appeal any restitution order that fell within the loss amount, as determined by the Court.

Since the defendants' guilty pleas, there has been considerable litigation by the victims and the Government over the forfeiture of the funds seized from MVMC's vaults.

B.  **MVMC's Business and The Nature of the Fraud**

MVMC, through various operating entities, engaged in several cash management businesses, including, among others: (1) an automated teller machine ("ATM") replenishment business; (2) a traditional armored transportation business; (3) onsite payroll services for companies and entities seeking to provide immediate cash availability to employees in exchange for their paychecks; and (4) check cashing businesses, with store locations in New York, New Jersey and Connecticut.  In connection with these businesses, MVMC owned and operated several cash vaults in which MVMC and its affiliated operations stored and processed cash collected from and distributed to customers and cash depositories.  *See* Presentence Investigation Report ¶¶ 19, 21.

     <u>The ATM Replenishment Business</u>.  MVMC's customers of the ATM Replenishment business were either the owners of ATMs or third parties, such as banks, that supplied cash for the ATMs ("ATM customers").  As of February 2010, MVMC replenished over 5,300 ATMs.  MVMC represented to its customers that it would only use the funds of the ATM owner or bank to fill that ATM customer's ATMs.  MVMC received tens of millions of dollars a week from its ATM customers for the purpose of replenishing their ATMs.

     MVMC typically received the funds it used to fill the ATMs either through a wire transfer to a bank account controlled by MVMC, and/or by picking up cash from a cash provider designated by the ATM customer, such as the Federal Reserve.  After MVMC picked up the cash from the cash provider, MVMC took the cash to one of its cash vaults, where the cash was supposed to be loaded into canisters or bags to be delivered to each of the ATMs of the customer (referred to as the "loads"), on a rotating basis.  MVMC personnel then transported the canisters or bags of cash to the ATMs, and either inserted the canisters into the ATMs or filled the ATMs with additional cash.   After the canisters had been inserted into the ATMs and the existing canisters had been removed, MVMC employees transported the removed canisters back to MVMC's vault, where the cash was counted.  The cash that was in the canisters returned to the

vault was referred to as "residual cash."  In some cases, MVMC's contractual arrangements required residual cash to be returned to the customer after it was processed by MVMC; in other cases, the residual cash was to be utilized to fund that customer's subsequent ATM replenishment needs.

Contrary to its contractual obligations to keep each customer's cash separate or segregated from the cash owned by any other party, the cash kept in the vaults for ATM customers was commingled.[1]  Thus, when MVMC employees picked up cash from the Federal Reserve or some other cash provider designated by the ATM customer, vault personnel, acting at the direction of Egan and McGarry, took that cash and, without regard to ownership or source, filled whatever canisters or bags needed to be filled in

---

[1]     Egan contends that only a minority of contracts contained provisions prohibiting commingling of customer funds. Egan Mem. at 53-54; Exh. I.  However, Egan's chart does not accurately summarize the customer agreements.  For example, the first page of the defendant's Exhibit I erroneously suggests that the contracts between MVMC and Cardtronics/Bank of America do not contain anti-commingling provisions.  Section 4 of the Armored Carrier Agreement between MVMC, Cardtronics and Bank of America provides, in relevant part: "[MVMC] and any subcontractor(s) of [MVMC] shall not commingle the ATM Cash with any other cash they maintain for others, including [Cardtronics]."  In addition, Section 6 of the ATM Management Service Agreement between MVMC and Cardtronics provides: "[MVMC] shall hold . . . vault cash in accordance with the tri-party agreement (the "Tri Party Agreement") by and among [MVMC], [Cardtronics] and Bank of America, N.A . . . and shall not commingle such vault cash with [MVMC]'s funds.  These two contracts are attached hereto as Exhibit A.  Additional contracts for Signature Bank, U.S. Bank, ADP Federal Credit Union, and Actors Federal Credit Union which contain similar anti-commingling provisions are attached as Exhibit B.

order to replenish the ATMs scheduled to be filled the next day.
In other words, MVMC employees did not go through the process of
segregating an ATM customer's cash when it was picked up from the
Federal Reserve (or some other source); rather, it was
immediately used to fill the next day's ATM loads.  Similarly,
and contrary to MVMC's contractual obligations, after residual
cash was processed by MVMC employees, the residual cash was
typically not kept segregated for each customer; rather the
residual cash was commingled with other customers' residual cash.

A number of the ATM Replenishment customers conducted
audits of MVMC's vaults to ensure that their money was properly
segregated in MVMC's vaults.[2]  When customers arrived to conduct
those audits, they would typically have to wait a short time
before being given access to the vaults.  During that time,
McGarry would move the money around inside the vaults to ensure
that it appeared to the customer that the correct amount of money
that the customer was supposed to have in the vault was in fact
in the vault in a segregated bin or area.

The Armored Transportation Business.  In or about 2007,
MVMC acquired an armored courier services' company, which it
renamed "Armored Money Services" ("AMS").  AMS provided armored

---

[2]    McGarry claims that only two of MVMC's bank customers
conducted audits (U.S. Bank and Signature Bank).  However, many
of MVMC's bank customers conducted vault audits on a regular
basis.

transportation and related services to various customers,
including banks, money remitting services and retailers (referred
to herein as the "AMS customers").  MVMC collected millions of
dollars of cash every day from AMS customers located in New York,
New Jersey, and Connecticut.  With respect to most of the cash
delivered to the MVMC vaults, vault personnel counted the cash
overnight, and reported the totals to the customer.  Once the
cash was processed in this manner, it was commingled with other
customers' cash in the vault.  Money was returned to customers
either by wire through MVMC's various bank accounts, or was
delivered to a repository such as the Federal Reserve to an
account controlled by MVMC, or it was delivered to a third party
at the customer's request.

MVMC used the money from this line of business to "play
the float."  According to statements made by Robert Egan, the AMS
side of the business was a key factor in MVMC being able to play
the float.  For example, during 2008 and 2009, MVMC collected
tens of millions of dollars in cash on a monthly basis for
customers MoneyGram and La National, from their various retail
stores located in the New York area.  MVMC employees counted the
cash, and subsequently wired the money from MVMC bank accounts to
accounts belonging to MoneyGram or La National.  Because MVMC
took a few days to return the funds by wire, Egan had the use of
tens of millions of dollars of the customers' money over those

10

few days, which facilitated MVMC's ability to "play the float." According to Egan, it is in part because MVMC lost the LaNational business, and MoneyGram reduced its business with MVMC in 2009, that Egan was no longer able to hide his misappropriation of customers funds.  In short, the money used to "play the float," dried up, leaving MVMC unable to meet its customer obligations.

The Payroll Business. MVMC also provided onsite payroll services to various employers, including hospitals and universities ("Payroll customers").  As part of this business, employers wired money to a bank account controlled by MVMC. Subsequently, MVMC employees made cash available to the these Payroll customers' employees, typically on the premises of the Payroll customers, in exchange for the employees' paychecks.  At the direction of McGarry, who in turn received his direction from Robert Egan, the cash that was used for this purpose – that is, the cash that was taken onsite to the Payroll customers' workplace to pay their employees – was cash taken directly from the commingled funds kept in the vaults with ATM Replenishment customers and AMS customers.

Check Cashing Business.  MVMC operated a check cashing business through multiple stores located in the New York area. Funds that were earned in this line of business were transferred over to other lines of business on an as-needed basis – that is,

11

in order to facilitate the practice of "playing of the float" as described above.

## C.    The History Of MVMC's Fraud

        Shortly before Egan's arrest and in the months afterwards, Egan made several statements to witnesses and the Government about the history of his fraudulent scheme. Specifically, Egan admitted that his ATM Replenishment business and the on-site payroll business had been losing money for approximately 15 years, and that he had been commingling the management fees generated from the other businesses to help conceal the mounting losses.  Egan estimated that, by 1999, he had already accumulated a $15 million shortfall in operations. In or around 2003, he sold a series of check cashing stores for approximately $17 million.[3]  Egan used some of this money to repay the company's lender at the time (Citibank).  Even with this large sale of assets, however, the businesses still had a collective shortfall of about $4 to $5 million as of 2003.  By 2005, Egan admitted that his businesses had a collective shortfall of approximately $35 million.

---

[3]    Egan states in his Sentencing Memorandum that he sold 15 G&R check cashing stores in 2003 for $21.5 million.  Egan Mem. at 45.

**ARGUMENT**

**I.   THE SCOPE OF THE DEFENDANTS' FRAUD**

   A.   The Government's Theory Is Not Limited to Victims
        With Commingling Provisions In Their Contracts

        In an attempt to limit the scope of the defendant's

massive fraud, Egan argues that "the government's theory" of the

case is limited to those victims whose contracts contained anti-

commingling provisions.   Egan's attempt to define the fraud so

narrowly is contradicted by the Indictment and the evidence in

the case.   The Government's theory of the case was that the

defendants solicited money from customers on various false

representations: that they would safeguard money entrusted to

them, that they would not commingle funds, **or** use the funds for

purposes other than those specified in the various contractual

arrangements.   Some customers had contracts expressly prohibiting

the commingling of funds; other customers provided money to MVMC

on the express or implied understanding that their money would be

used only for the purposes for which it was given to MVMC, such

as delivery of money from one place to another.   This theory is

clearly set forth in the Indictment, which states:

>            [The defendants] solicited and collected
>      hundreds of millions of dollars from MVMC's
>      customers, including financial institutions,
>      money transmitting companies, retailers,
>      hospitals and universities, on false
>      representations that they would ***safeguard the***
>      ***funds entrusted to them***, and that they would
>      not commingle customers' funds ***or use the***

13

> ***funds for purposes other than those specified***
> ***in the various contractual relationships***
> between MVMC and its various customers.

Indictment ¶ 11 (emphasis added).

Instead of safeguarding customer money, Egan in fact used the customers' money to cover operating expenses of MVMC's businesses – which ran a shortfall of millions of dollars every year – and to enrich himself at his customers' expense. *See id*. ("In truth and in fact, EGAN and MCGARRY misappropriated their customers' money and used it to fund tens of millions of dollars of operating losses in MVMC's businesses and to enrich themselves at their customers' expense."). The way in which Egan was able to effect and conceal this massive fraud was through the commingling of funds within and between the various businesses – "playing the float." Thus, while misappropriation and commingling was the method by which Egan effected and concealed the fraud, it was not the exclusive basis of the representations that Egan made to his customers to induce them to give MVMC their money.[4]

At a more fundamental level, when Egan solicited business from customers, he represented to those customers that

---

[4]     Customer contracts typically set forth the purposes for which MVMC was hired.  Many contracts also contained provisions to the effect that MVMC was merely a bailee of funds delivered and did not take ownership of those contracts.  Egan violated these contractual provisions when he took customer money and used it for his own purposes.

he would perform the services for which his companies were hired.
Whether those representations are embodied in contracts or are
simply oral is irrelevant.  There is no requirement that
fraudulent representations be written or even express (as opposed
to implied).  And it defies commons sense to suggest that any of
Egan's customers would have done business with him if they knew
that his business was unsustainable and that they would be
subsidizing his business losses with their money.

      B.    Even If the Indictment Is Limited To Certain Victims,
            All Victims' Losses Would Be Included As Relevant Conduct

        Even if the Court were to conclude that the
Government's theory of the defendants' fraud in the Indictment is
somehow limited to victims with anti-commingling provisions in
their contracts – and it should not – the Court can properly
consider the losses of all of the victims of Egan's fraud under
the concept of relevant conduct.  Section 1B1.3(a) of the
Sentencing Guidelines directs a sentencing judge to determine the
base offense level (where the Guideline specifies more than one
base offense level) and specific offense characteristics based on
"all acts . . . committed . . . by the defendant" as well as "all
acts or omissions . . . that were part of the same course of
conduct or common scheme or plan as the offense of conviction."
U.S.S.G. §§ 1B1.3(a)(1)&(2).

        Acts are part of the "same course of conduct" when they
are "sufficiently connected or related to each other as to

15

warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, comment. (n.9(b)).  Acts are part of the same "common scheme or plan" when they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3, comment. (n.9(b)).

Significantly, the dictates of Section 1B1.3 command sentencing courts to consider the entire range of the defendant's conduct, "regardless of the number of counts that are alleged or on which a conviction is obtained." U.S.S.G. § 1B1.3, comment. (backg'd).  Even "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." *Id*.

The Second Circuit has recognized that the relevant conduct provisions contained in Section 1B1.3(a) are to be determined "broadly" to include, among other things: conduct for which the defendant was acquitted; conduct related to dismissed counts of an indictment; conduct that predates that charged in the indictment; conduct not charged in the indictment; conduct outside the statute of limitations; and conduct that violated state law. *United States* v. *Silkowski*, 32 F.3d 682, 688 (2d Cir. 1994) (citations omitted); *see United States* v. *Fitzgerald*, 232 F.3d 315, 320 (2d Cir. 2000) (upholding inclusion of state tax

16

losses when fixing total tax loss, and upholding consideration of
embezzlement losses although not part of count of conviction);
*United States* v. *Martin*, 157 F.3d 46, 50 (2d Cir. 1998) (holding
that "federal district court may consider any relevant conduct
when sentencing a defendant, whether or not the conduct is a
federal crime" and affirming consideration of possession of
stolen but un-transported property); *United States* v. *Bove*, 155
F.3d 44, 48 (2d Cir. 1998) (proper to include uncharged relevant
conduct in fixing tax loss).

In this case, regardless of the express provisions
contained in the contracts between MVMC and its customers, all of
the customers whose funds were commingled for purposes of
effecting this massive fraud are part of the same course of
conduct.  Those customers included not just the ATM Replenishment
customers, whose contracts more commonly contained anti-
commingling provisions, but customers of MVMC's courier and
payroll businesses as well.  Indeed, Egan has admitted in his
various statements that part of the reason he was able to "play
the float" for as long as he did was that he had contracts to
pick up tens of millions of dollars from money remitters such as
La National and Moneygram.  These customers were customers of
Egan's courier business, AMS.

In sum, whether or not MVMC's customers had contractual
provisions against commingling is beside the point.  The fact is

17

that most of MVMC's customers' money *was commingled*, which in turn, allowed Egan to fund operating shortfalls and conceal the fraud from his customers.[5]  Thus, all such customers and their losses should be considered relevant conduct under the Guidelines.

C.   <u>The Number of Victims</u>

At the time of the plea agreements in this case, the Government had identified approximately 44 victims of the defendants' fraudulent scheme.  The Court has asked the Government to report on the number of victims the Government is currently aware of, and that information is set forth below. However, the Government emphasizes that it does not now seek a sentence outside the Guidelines ranges set forth in the defendants' respective plea agreements.

To date, over 80 individuals and entities have notified the Victims' Coordinator in the United States Attorney's Office for the Southern District of New York that they are victims of Egan's fraud.  As of the filing of this Memorandum, the undersigned has been able to verify the victims and losses set forth in Exhibit C hereto (listing 59 victims).[6]  Additionally,

_____

[5]   As discussed below, in connection with the forfeiture proceedings in this case, the Government has identified three victims whose money was *never* commingled and therefore they should not be considered victims of the fraud.

[6]   The Government notes that it has until 90 says after

(continued...)

the Government understands from counsel in the related bankruptcy proceedings that 95 claimants have identified themselves as former "customers" of MVMC.  However, the claims process in the bankruptcy – and the verification of the claims in that proceeding – has not yet been completed.

Egan notes that the Government has taken the position, based on evidence submitted in connection with the forfeiture proceedings in this case, that three customers – B&H Check Cashing Services, Inc. ("B&H"), Granite Check Cashing Service, Inc. ("Granite"), and N.Y. Community Financial and R.D.C. Payroll Services, Inc. ("RDC") – are not victims.  The Government took this position because these were the only customers whose money was seized by the Government on February 11 and 12, 2010 and whose money was never commingled over the period of the fraud. These customers were customers of MVMC's courier business (AMS). Their bags of money were historically collected from a bank (Capital One), were sealed at the time of collection by MVMC, and were sealed at the time of delivery by MVMC to their destination.

---

[6](...continued)
sentencing to submit a final restitution list to the Court.  The list in Exhibit C will likely be modified before the Government's restitution list is submitted.  For example, there are a number of customers whose money was seized by the Government in February 2010 whose names do not appear on this list only because the Government is still in the process of verifying victims and their respective loss amounts.  In sum, the fact that a victim's name does not appear on the list should not be taken by the Court (or any victim) to mean that the Government has concluded that it is not entitled to restitution.

Unlike the bulk of AMS customers whose money was counted and commingled with other customer money on MVMC's premises, the evidence showed that these three customers never had their money commingled.  *See* Decl. Of James H. Hilliard In Support Of The Stipulations Of Settlement Of The Petitions Of B&H Check Cashing Services Of Brooklyn, Inc. And Mark Barberan; Granite Check Cashing Service Inc., And James Lieto; And NY Community Financial, LLC and R.D.C. Payroll Services, Inc. (dated Jan. 31, 2011).

Egan also argues that none of the victims whose money was identifiable in the funds seized by the FBI on February 11 and 12, 2010 should be counted as victims.  Egan Mem. 50-51.  However, as Egan well knows, the fact that **on the day of the FBI seizure**, MVMC employees had not yet managed to commingle the funds in the vaults provides no evidence that these customers' money was not commingled by MVMC employees as a matter of past practice.  On the contrary, the evidence, which included Egan's own statements, overwhelmingly demonstrated that – with the exception of the three victims identified above – all of the customers who had money in the vaults on the day of the FBI seizure had had their money commingled in the past.  The only reason the money in the Federal Reserve trays had not yet been unpacked and commingled for use in Egan's businesses was because many employees had already stopped coming to work (after Egan was

arrested) and because the employees could not continue their daily responsibilities while the FBI was collecting the funds from the vaults.

        To a certain extent, however, the number of victims at the time of the FBI seizure – the day the music stopped – is only a rough proxy for the magnitude of the fraud.  All but a small percentage of the customers of MVMC's various businesses were victimized at one time or another in Egan's fraud.  The number of victims – and which victims – have actually lost money in the fraud is in part of function of which customers placed cash with Egan in the days before the fraud imploded.  MVMC's pickups and deliveries may have been spread relatively evenly throughout the work-week, but it is not possible for the Government to know whether the number of victims would have been higher or lower if the fraud had unraveled a few days before or after it in fact did.[7]  It is for this reason, and because the defendants pled guilty at a time when the Government had only identified approximately 44 victims, that, regardless of the Court's finding as to the number of victims as of the date of sentencing, the Government does not seek a sentence outside the Stipulated Guidelines ranges in the plea agreements with the defendants.

---

        [7]    This is not true of the losses, of course, since they were mounting on a daily basis, as Egan continually ran an operations shortfall.  The day the music stopped would only affect which, and precisely how many, victims suffered losses.

21

D.    <u>The Amount of the Losses</u>

Egan cites to a $68.2 million figure from a Receiver report in support of his argument that losses in this case are between $20 million and $50 million rather than over $50 million. Egan Mem. at 55-56; Exh. P.  Egan claims that a December 10, 2010 report indicated that the total losses were $43.2 million, which is determined by subtracting the cash in the vaults and bank accounts from the total amount due to the customers as of the day of the seizure of funds.

Egan misreads the December 10, 2010 Receiver Report. That Report states that: "[p]ursuant to analyses performed and included in the Receiver's Report as of February 12, 2010 MVMMC owed $68.2 million to customers (Exhibit 5)." Exhibit 5, in turn, refers to the report of the Receiver filed with the Court on March 1, 2010.  Thus, the $68.2 million figure represents amounts due to customers based on information available to the Receiver **as of March 1, 2010**.  Since that time, the company was put into bankruptcy, and the claims process has not yet been completed.[8]  It has not been necessary for the Receiver – or the trustee in bankruptcy – to update the $68.2 million figure because, even with $68 million due to customers, and only $25 million in cash in the vaults and bank accounts, MVMC had a

---

[8]    As noted above, to date in the bankruptcy proceedings, some 95 claimants have identified themselves as customers with losses exceeding $86 million.

22

deficit of tens of millions of dollars, which was sufficient to establish MVMC's insolvency for bankruptcy purposes.

As set forth in Exhibit C, the Government has determined that the amounts due to the customers who were victims of the defendants' fraud (identified to date) exceeds $85 million.  Subtracting out the amount of cash in the vaults ($19.2 million) – less the $1.2 million that will be returned to the three non-victims identified above[5] – and subtracting the money in the bank accounts,[6] the total losses of the victims identified by the Government to date is approximately $61.3 million (that is, $85,147,721 - [$19,288,702 - $1,212,000 + $5,800,000]).  In sum, the losses from the defendants' fraud exceeds the $50 million threshold in U.S.S.G. § 2B1.1(b)(1).

---

[5]     Treating B&H, Granite, and RDC Payroll as non-victims reduces the number of victims, but does not reduce the amount of losses.  If these three customers are paid in whole (in the amount of $1,212,000), it means there is less cash to offset the losses to the remaining customers who were victims of the fraudulent scheme).

[6]     Egan contends that the Government will claim that the $5.8 million in the bank accounts should "be calculated in the loss amount."  Egan Mem. At 52.  The Government does not understand this argument.  The $5.8 million has always been viewed by the Government as an amount that should be credited against the outstanding amounts due to the customers, as demonstrated in the equation below.

**II.   SECTION 3553(a) FACTORS - ROBERT EGAN**

    A.   <u>Nature and Circumstances of the Offense</u>

        Egan argues that a below-guidelines sentence is warranted because Egan never intended to harm any of his customers, as demonstrated by the fact that he has sold businesses in the past to make up shortfalls in this business. But it is precisely because he had to sell business assets in the part to bring the operating shortfalls back to zero that Egan knew his customers would be harmed by continuing to operate his losing businesses.  According to Egan's own statements, his businesses had been operating at a loss for 15 years, and Egan was only able to conceal this fact from his clients by selling of assets to make up for the shortfall.  Even with largest asset sale to cover operating losses – the sale of 15 check cashing businesses in 2003 for approximately $17 to 20 million – Egan did not bring his business losses back to zero.  Egan told a customer's investigator shortly before he was arrested that this 2003 sale still left his businesses at a $4 to $5 million loss. Indeed, the Receiver determined as of March 1, 2010, that Egan had accumulated an operating loss of $37 million at that time. Since Egan was never able – for more than 15 years – to reduce his operating expenses, and was running out of assets to sell to cover the operating losses, it was inevitable that his customers

would be harmed by Egan continuing his business.[7]   Thus, Egan's
claim that he did not "intend" to harm his victims when he knew
it was the inevitable consequences of their conduct does not
merit a below-Guidelines sentence.

Similarly, Egan's arguments for leniency on the ground
that he was employing many individuals and supporting his family
rings hollow.  Egan was only able to retain employees by stealing
from his customers.  Moreover, Egan employed and supported family
members through this scheme.  According to MVMC's books and
records, in addition to his own salary of approximately $84,240
per year (as of 2010), Egan apparently also employed his wife,
Iris Egan, for approximately $97,084 a year.[7]

Egan seeks to minimize the fact that he took millions
of dollars of loans from the company on the ground that he sold
business assets and put the proceeds back into his businesses
rather than pocketing the proceeds himself.  However, Egan
clearly used the money in his businesses – which ultimately was
customer money – to enrich himself at customers' expense.  As
demonstrated by forfeiture related petitions filed by Egan, he

---

[7]   Egan's claims that he was in the process of selling his
businesses or could have recouped some of the losses if he had
been allowed to continue his businesses is entirely speculative.
A truthful disclosure about the lack in profitability of Egan's
businesses would presumably have warded off any potential
acquirers.

[7]   It is unclear from the business records when Iris Egan
worked for MVMC.

lived in expensive homes, had multiple luxury cars, and supported his family members.  Moreover, contrary to Egan's statements that if he were truly interested only in lining his pockets he could have kept the proceeds of the sales of various business assets for himself (Egan Mem. at 45), if he had not used those sales proceeds to prop up his business, he would not have been able to continue running his businesses and soliciting more money from unsuspecting customers for as long as he did.

Egan also argues that the fraud Guidelines are too harsh and often call for sentences that are manifestly unjust. Egan Mem. at 68-72 (citing cases).  Additionally, Egan points out that the loss tables in the Guidelines have increased sentencing exposure in the area of white collar fraud.  *Id*. at 71.  However, the Guidelines for white-collar crimes have been influenced by numerous formal statutory directives by Congress.  Id. at 21-22 n.17.  Over the years, Congress mandated adjustments of increasing severity to the fraud sentences in the Guidelines. Id. at 56; see, e.g., Pub. 17 L. No. 103-322, § 250003, 108 Stat. 1796 (Sept. 13, 1994) (directing the Commission to review and, if necessary, amend the Guidelines to ensure that sentence enhancements for frauds committed against the elderly were adequate); U.S.S.G. Manual, App. B (listing additional aggravating adjustments to the fraud Guidelines); U.S.S.G ., App. C, Amend. 617 (Nov. 1, 2001) (amendments under the "economic

crimes package" increased sentences for offenses involving large numbers of victims and larger monetary losses); see United States Sentencing Commission, Report to Congress, Increased Penalties under the Sarbanes-Oxley Act of 2002 (Jan. 2003) (amendments significantly increased guideline penalties under U.S.S.G. § 2B1.1 as directed by the Act).[8]

Finally, Egan argues that he is less culpable that defendants who have been engaged in Ponzi schemes.  Egan Mem. at 72.  However, Egan's fraud bears many of the hallmarks of a Ponzi scheme.  By soliciting money from customers on false representations that he would safeguard their funds, Egan effectively turned his customers into unwitting investors in his own losing business.  In that respect at least, his fraud was no different to the Ponzi scheme defendant who takes money from investors to invest in one joint venture but in reality places those investors' money in another, unauthorized, investment scheme or simply steals their money.

---

[8]     The Sarbanes-Oxley Act also prompted the Sentencing Commission to revise the white-collar crime Guidelines by stating that the Commission should ensure that the Guidelines "reflect the serious nature of [white-collar] offenses" and should consider whether the then-existing sentencing recommendations were "sufficient to deter and punish such offenses."  White-Collar Crime Penalty Enhancement Act of 2002, Pub. L. No. 107-204, tit. IX, §905(b)(1), 116 Stat. 804, 805.

B.   <u>History And Characteristics Of the Defendant</u>

The Government agrees that immediately prior to his arrest and in the months following it, Egan has repeatedly told the story of his past criminal conduct, and he deserves considerable credit for doing so.  He met with the Government without a proffer agreement and explained the manner in which the fraud operated.  As a result, Egan received three points for acceptance of responsibility.  It is also true, however, that he did much more for those three points than the average defendant who is not seeking cooperation.

Egan also points out that this is his first offense. While that it accurate, it is less compelling in light of the fact that Egan has been continuing his fraudulent scheme since at least the mid-1990s.  Further, Egan claims to have provided exceptional service to his customers over a 35 year history (Egan Mem. at 73).  In fact, Egan used his customers' money for his own purposes for a significant part of those 35 years.

C.   <u>Victim Impact Statements</u>

The Government has submitted to the Court under separate cover the numerous letters and statements from victims. The Government notes that Egan's fraud affected large and small victims alike, from small retailers and credit unions whose members (such as New Jersey firefighters) lost money, to large financial institutions like U.S. Bank and Bank of America.

28

## II.   SECTION 3553(a) FACTORS - BERNARD MCGARRY

If Egan was the architect of the fraud in this case, Bernard McGarry was Egan's right hand man.  Egan was primarily responsible for soliciting the business and money from the customers; McGarry was in charge of operations.  McGarry took actions to effect the fraud on a daily basis within MVMC, from controlling the flow of funds to moving money around in advance of customer audits of MVMC's vaults, so as to conceal Egan's fraud.  However, McGarry carried out these tasks at Egan's direction.

Nor did McGarry profit from the fraudulent scheme in the same manner as Egan.  McGarry earned a salary, which by 2010 was approximately $116,700 a year, but he did not take loans from the company or treat the company's assets as his piggybank.  He did not hold any ownership interest in the company.  He was, to his detriment, loyal to Egan, having worked with and for him for a number of decades.  While this does not excuse McGarry's conduct, his lesser role in the offense is appropriately reflected in the lower Guidelines range in his plea agreement.

29

## CONCLUSION

For these reasons, the Government respectfully submits that a sentence within the Guidelines ranges set forth in the defendants' respective plea agreements is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated:    May 1, 20, 2011
          New York, New York

                              Respectfully submitted,


                              PREET BHARARA
                              United States Attorney
                              Southern District of New York


                    By:  _____/s/_____
                              Antonia M. Apps/David Miller
                              Assistant United States Attorneys
                              212-637-2198/2484