# EXHIBIT A

# CARDTRONICS/BANK OF AMERICA CONTRACTS WITH MVMC

## ARMORED CARRIER AGREEMENT

This Armored Carrier Agreement is entered into this 30Tʰ day of September, 2009, by and among Mt. Vernon Money Center ("Armored Carrier"), Cardtronics USA, Inc. ("Client"), and Bank of America, N.A. ("Bank").

### RECITALS

WHEREAS, Bank and Client have entered into an ATM Cash Services Amendment dated as of August 2, 2004, as amended, (the "Amendment"), whereby automated teller machines owned or leased by Client and identified in Exhibit A, as amended from time to time, to the Amendment, ("ATMs") will be stocked with cash belonging to Bank ("ATM Cash");

WHEREAS, Bank has entered into an agreement with U.S. Bank National Association d/b/a Elan Financial Services, as successor and assignee to Palm Desert National Bank, ("Elan") to provide certain reconciliation services to and on behalf of Bank in connection with Bank's provision of services to Client pursuant to the Amendment;

WHEREAS, Client and Armored Carrier have entered into an agreement pursuant to which Armored Carrier provides ATM services to Client, including, without limitation, ATM balancing, cash replenishment and reporting; and

WHEREAS, Armored Carrier understands that the execution of this Agreement is a condition precedent to Bank's provision of services under the Amendment.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Armored Carrier, Bank and Client hereby agree as follows:

1. **ATM Locations**. Armored Carrier and any subcontractor(s) of Armored Carrier, if applicable, will have worked with Client and/or Elan to establish mutually agreeable service schedules for replenishing cash in the ATMs, at the locations set forth in Exhibit A, which is attached hereto and incorporated by reference herein, as amended from time to time; provided, however, that no such subcontractor(s) shall be utilized without Bank's prior written consent and, if Bank provides such consent, each such subcontractor shall execute such documents that Bank may request; and, provided, further, that Armored Carrier shall cause each such subcontractor to comply with all applicable obligations and other terms and conditions set forth in this Agreement. Exhibit A may be amended upon the consent of Client and Bank; provided, however, that Exhibit A shall be deemed to be amended in the event that Elan and Client agree to include any additional automated teller machines owned or leased by Client or delete any existing ATMs. Elan shall notify Armored Carrier of any such amendment. Armored Carrier and any subcontractor(s) of Armored Carrier acknowledge and agree that Elan, in acting under this Agreement, shall be acting on behalf of Bank.

2. **ATM Replenishments**. Bank shall furnish United States currency for the ATMs in the amounts, denominations and under the delivery schedules mutually agreed to between Client, Armored Carrier or any subcontractor(s) of Armored Carrier, as applicable, Bank and Elan. Pursuant to Bank's and/or Elan's instructions, Armored Carrier or any subcontractor(s) of Armored Carrier that has been approved by Bank shall pick up currency furnished by Bank from Bank's cash vaults and/or the vaults of Armored Carrier or a third party at which Bank maintains a cash inventory, prepare such currency for delivery to each ATM, and deliver such currency to the ATMs. The parties acknowledge and agree that Armored Carrier and any such subcontractor(s) shall be deemed to be Client's agent with respect to the possession, transportation and handling of ATM Cash. Armored Carrier and/or any subcontractor(s) of Armored Carrier, as applicable, shall provide to Elan written confirmation of each ATM replenishment. Notwithstanding the foregoing, in the event that Bank suspends its provision of services under the Amendment, Bank shall not be required to furnish currency pursuant to the terms of this Agreement during such suspension.

3. **Other Carrier Services**. In addition to replenishing cash in the ATMs, Armored Carrier and each subcontractor of Armored Carrier, as applicable, shall provide the following services relating to the ATMs: (i) balance each ATM at least once every thirty (30) days, or as otherwise requested by Elan; (ii) check each ATM for the sufficiency of ATM supplies furnished by Client, including journal rolls, EDC diskettes and paper receipts and replenish ATM supplies when needed, including replacing paper receipts when there is less than half a roll remaining;

(iii) complete logs, audit trail forms and such other documentation as may be requested by Elan; (iv) provide Elan with such reports and other information that Elan may request from time to time, in accordance with Elan's format requirements; (v) prepare daily vault registers for the ATM vaults and Armored Carrier's vaults or the vaults of any subcontractor(s) of Armored Carrier, as applicable; (vi) provide settlement services; and (vii) provide such maintenance and repair services that it has agreed to perform in its agreement with the Client. Armored Carrier and any subcontractor(s) of Armored Carrier shall deliver all such documents and information to Elan at such times, via such means and to such addresses as may be specified by Elan from time to time. Armored Carrier and any subcontractor(s) of Armored Carrier shall adhere to all security procedures communicated by Elan or Bank relating to the services provided by Armored Carrier or any subcontractor(s) of Armored Carrier.

4. **Ownership of ATM Cash**. Armored Carrier and each subcontractor of Armored Carrier acknowledge and agree that all of the ATM Cash is owned solely by Bank and shall be deemed to be the sole property of Bank from the time that it is picked up by Armored Carrier, or any subcontractor of Armored Carrier, as applicable, from Bank's cash vaults and/or the vaults of Armored Carrier or a third party at which Bank maintains a cash inventory, for delivery to an ATM, until such time as it is dispensed from any ATM in a cash withdrawal transaction; provided, however, in the event that any ATM Cash is retrieved from an ATM by Armored Carrier or any subcontractor of Armored Carrier, as applicable, pursuant to Bank's and/or Elan's instructions, such ATM Cash shall continue to remain the sole property of Bank and Armored Carrier or any subcontractor of Armored Carrier, respectively, shall immediately redeposit such ATM Cash in Bank's inventory at the vault specified by Bank. At no time shall the ATM Cash become subject to any manner of lien, security interest, attachment, levy or other process or agreement created by, for or on behalf of Armored Carrier or any subcontractor(s) of Armored Carrier. Armored Carrier and any subcontractor(s) of Armored Carrier shall take no action, or cause any action to be taken, which would cause the ATM Cash to be treated as the property of Armored Carrier, such subcontractor(s) or any person other than Bank and shall take all actions necessary or advisable to ensure that the ATM Cash remains Bank's sole and exclusive property until it is dispensed form the ATMs, including such actions as Bank may request. Armored Carrier and any subcontractor(s) of Armored Carrier shall not commingle the ATM Cash with any other cash they may maintain for others, including Client.

5. **Access to ATM Cash**. Armored Carrier and any subcontractor(s) of Armored Carrier that has been approved by Bank shall have access to the ATM Cash solely for the purposes of carrying out their obligations under this Agreement and shall not allow any other person (with the exception of Client's ATM service provider and any subcontractor of such service provider that has been approved by Bank for the sole purpose of servicing the ATM, Bank, or, upon Bank's written consent, Elan) to have any access to the drawer containing the ATM Cash or any of the ATM Cash. Upon Bank's request, Armored Carrier or any subcontractor of Armored Carrier, as applicable, shall give Bank and/or Elan, as applicable, access to the ATM Cash. Armored Carrier, each subcontractor of Armored Carrier and Client acknowledge and agree that Bank has the right to demand the return of the ATM Cash at any time.

6. **Confidentiality**. Armored Carrier and any subcontractor(s) of Armored Carrier shall maintain the confidentiality of and control over the master locks and ATM combinations for each ATM and shall prevent disclosure thereof to any person.

7. **Audit**. Upon Bank's request, Armored Carrier and any subcontractor(s) of Armored Carrier shall give Bank and/or Elan the right to audit their books and records, as well as their business operations with regard to their supplying of ATM Cash, to ensure their compliance with the provisions of this Agreement and the Amendment, including providing Bank and/or Elan with the necessary records and access to count and reconcile all of the ATM Cash in Armored Carrier's vault(s) the vault(s) of any subcontractor(s) of Armored Carrier and the ATM cash drawers. Bank shall not be required to give any advance notice of such an audit. Armored Carrier and any subcontractor(s) of Armored Carrier shall take such additional actions as Bank may request in order to enable Bank to inspect the ATMs and audit the ATM Cash. Armored Carrier and any subcontractor(s) of Armored Carrier shall provide Bank and Elan, at no expense to either of them, such clerical and other assistance as may be reasonably requested in connection with any such audit or inspection. Armored Carrier and any subcontractor(s) of Armored Carrier shall maintain complete and accurate records of all currency delivered to each ATM for a period of at least seven (7) years; provided, however, that the following records may be maintained for four (4) years from the date of each such delivery: delivery/pickup sheets, ATM balance manifests and ATM inventory reports; and, provided, further, that if any such records are required by law to be maintained for a longer time period, Armored Carrier and any subcontractor(s) of Armored Carrier shall maintain such records in accordance with such requirements. Absent manifest error, in the event of any discrepancy between Armored Carrier's records or the records of its subcontractor(s) (or Client's records), Bank's records shall prevail.

8. **Risk of Loss**. As between Bank, Armored Carrier and Client, all risk of loss and liability with respect to the ATM Cash shall be the responsibility of Client and Armored Carrier, and shall, in no event, be the responsibility of Bank. Client and Armored Carrier shall be jointly and severally liable to Bank for any and all losses with respect to the ATM Cash.

9. **Insurance**. Armored Carrier and any subcontractor(s) of Armored Carrier shall, at their own expense, obtain and maintain at all times the insurance described below to protect Bank from risk of loss. Armored Carrier and any subcontractor(s) of Armored Carrier shall provide Bank with certificates of insurance evidencing these coverages and, upon demand, certified copies of policies and endorsements. Armored Carrier and any subcontractor(s) of Armored Carrier shall name Bank as (i) an additional insured on their coverages described in Subsections (ii), (iii), (iv) and (v) below, using a form of endorsement that provides Bank with coverage coextensive to that obtained by them and all the insurers shall waive subrogation against Bank, in order to protect Bank from any and all expenses and/or liability, including, but not limited to, any and all of Bank's independent and/or vicarious liability, which arises out of or relates to, or allegedly arises out of or relates to, their acts, omissions, operations, services and/or products, and (ii) as loss payee, as Bank's interests may appear, on the their coverages described in Subsections (vi) below. All such insurance shall be in a form reasonably acceptable to Bank and with a company qualified to do business in the jurisdiction in which the ATM Cash Services will be performed and having a rating of A-VII or better in the current Best's Insurance Reports published by A. M. Best Company and shall require the insurers to provide Bank with at least thirty (30) days' prior written notice of any applicable cancellation, expiration or change in coverage under the policies. All insurance coverages and limits required to be maintained by the Armored Carrier and any subcontractor(s) of the Armored Carrier shall have a deductible and/or retention in an amount that is acceptable to Bank, and shall be primary and non-contributory to any insurance coverage maintained by Bank. The policies shall be written for the following insurance coverages and in an amount not less than the following coverage limits:

(i) Workers' Compensation Insurance, which shall fully comply with the statutory requirements of all applicable state and federal laws.

(ii) Employer's Liability Insurance, with a minimum limit of $500,000 per accident for bodily injury and $500,000 per employee/aggregate for disease.

(iii) Commercial General Liability Insurance, with a minimum combined single limit of liability of $1,000,000 per occurrence per location and $2,000,000 aggregate for bodily injury, death, property damage and/or personal injury. This shall include products/completed operations coverage and broad form contractual coverage specifically for this Agreement.

(iv) Business Automobile Liability Insurance covering all owned, hired and non-owned vehicles and equipment used with a minimum combined single limit of liability of not less than $1,000,000 for injury, death and/or property damage.

(v) Excess coverage with respect to (ii), (iii) and (iv) above with a minimum combined single limit of $5,000,000.

(vi) Cargo/Crime Insurance covering ATM Cash while in the care, custody or control of the Armored Carrier and any subcontractor(s) of Armored Carrier, whether located on or off Bank's premises or vaults and/or while such property is in transit (including "over the curb" coverage), pursuant to the terms of this Agreement against loss due to robbery, burglary, misplacement, mysterious unexplainable disappearance, damage or destruction, and fraudulent and dishonest acts of their employees, as well as loss from a variety of other crimes including theft, fraud, war risk and terrorism, strikes, riots, civil commotion, confiscation and expropriation. Unless otherwise agreed to in writing by Bank, the limit of insurance shall not be less than the greater of (i) $50,000,000 per occurrence or (ii) the maximum amount of currency possible in any one armored car and the maximum amount of currency that any one ATM can hold; provided, however, that the limit of insurance for ATM Cash located on the premises of Armored Carrier or any subcontractor(s) of Armored Carrier shall not be less than $500,000,000, unless otherwise agreed to in writing by Bank. Armored Carrier or any subcontractors of the Armored Carrier, as applicable, shall endorse such policy to include a "Client Coverage" or "Joint Payee Coverage" endorsement.

If Armored Carrier or any subcontractor(s) of Armored Carrier fail to obtain and maintain the insurance required, Armored Carrier and any subcontractor(s) of Armored Carrier shall be liable for any and all losses that the insurance listed above would have covered in the same manner and to the same extent as if the required insurance coverage had

been obtained. Armored Carrier and any subcontractor(s) of Armored Carrier shall remain liable for any and all expenses and/or liability, including, but not limited to, any vicarious and/or independent liability on Bank's part, which arises out of or relates to, or allegedly arises out of or relates to, the services and/or materials provided by Armored Carrier and any subcontractor(s) of Armored Carrier, to the extent that such expenses and/or liability are not covered by their insurance carrier for any reason whatsoever and Armored Carrier and any subcontractor(s) of Armored Carrier shall indemnify, defend and hold harmless Bank against all claims, damages, losses and expenses, whether direct, indirect or consequential, relating thereto.

Upon Bank's request, Armored Carrier and any subcontractor(s) of Armored Carrier shall provide Bank with such financial information as Bank may require, from time to time, in order to evaluate any credit or other exposure that Bank may have as a result of providing Client with the ATM Cash Services.

10. **Fees**. Client shall pay all fees for Armored Carrier services.

11. **Other Agreements**. Armored Carrier acknowledges and agrees that nothing contained in this Agreement conflicts with any provision of its contracts or agreements to provide ATM services to Client; provided, however, that such contracts or agreements may, as between Armored Carrier and Client, allocate a different risk of loss, so long as such allocation does not in any way limit Armored Carrier's and Client's liability to Bank pursuant to the terms of this Agreement.

12. **Indemnification**. Client, Armored Carrier and any subcontractor(s) of Armored Carrier shall jointly and severally indemnify and hold harmless Bank from and against any and all liabilities, claims, costs, expenses and damages of any nature (including, without limitation, allocated costs of staff counsel, other reasonable attorneys' fees and any fees and expenses) arising out of or relating to disputes or legal actions concerning the services provided in connection with this Agreement.

13. **Termination**. This Agreement may be terminated by any party upon thirty (30) days' prior written notice. Notwithstanding the foregoing, (i) Bank may terminate this Agreement immediately in the event Bank believes that immediate termination is necessary or appropriate in order to prevent a financial loss to Bank; and (ii) this Agreement shall terminate immediately upon the termination of the Amendment or the agreement between Armored Carrier and Client with respect to the provision of ATM services to Client. Upon termination, Armored Carrier and any subcontractor(s) of Armored Carrier shall take such actions as Bank may request in order to enable Bank to remove all ATM Cash from the ATMs. The termination of this Agreement shall not affect the rights and obligations of the parties that have accrued prior to such termination. Sections 4, 5, 6, 7, 8, 10, 12, 13, 18 and 20 shall survive the termination of this Agreement. Section 9 shall survive the termination of this Agreement until such time that all ATM Cash is returned to Bank.

14. **Waiver**. No delay or failure to exercise any right or remedy under this Agreement shall be deemed to be a waiver of such right or remedy. No waiver of a single breach or default under this Agreement shall be a waiver of any other breach or default. Any waiver under this Agreement shall be in writing.

15. **Entire Agreement; Amendments**. This Agreement constitutes the entire agreement among the parties hereto and supersedes all prior agreements, proposals and understandings, if any, relating to the subject matter of this Agreement. Notwithstanding the foregoing, the parties acknowledge and agree that they may have additional rights and obligations pursuant to separate bilateral agreements between them. This Agreement may be amended only by a writing signed by all parties hereto.

16. **Notices**. Any written notice to be given under this Agreement shall be hand-delivered, return receipt requested, or mailed, by certified mail, postage prepaid, return receipt requested to each party at its address set forth on the signature page of this Agreement or to such other address as a party may specify in writing to the other parties.

17. **Severability**. If any provision of this Agreement shall be determined by a court of competent jurisdiction to be invalid, unlawful, void or unenforceable, such provision shall be construed by the parties to be severed from this Agreement, and the remaining provisions of this Agreement shall remain in effect.

18. **Dispute Resolution**. Any dispute, controversy or claim arising out of or relating to this Agreement shall be decided by binding arbitration conducted in the United States of America (except as the parties may otherwise agree

in writing) in accordance with the United States Arbitration Act (Title 9, U.S. Code) under the Commercial Arbitration Rules of the American Arbitration Association.

19. **Law**. This Agreement shall be governed by and interpreted in accordance with the laws of Texas, without reference to that state's principles of conflicts of law.

20. **Limitation of Liabilities; Force Majeure**. Except as otherwise provided herein, Bank shall be liable only for actual damages incurred as a direct result of Bank's gross negligence or willful misconduct. Bank shall not be liable under any circumstances for any special, indirect, exemplary or consequential damages, including lost profits. Bank shall not be liable for and shall be excused from any failure or delay in performing its obligations under this Agreement if such failure or delay is caused by circumstances beyond Bank's reasonable control, including, without limitation, any natural disaster (such as earthquakes or floods), emergency conditions (such as war, riot, fire, theft or labor dispute), legal constraint or governmental action or inaction, breakdown or failure of equipment, breakdown of any supplier or any act, omission, negligence or fault of Client, Armored Carrier, any subcontractor(s) of Armored Carrier or Elan.

21. **Successors and Assigns**. This Agreement shall be binding upon the parties to this Agreement and their successors and assigns; provided, however, that Client and Armored Carrier shall not assign or transfer any of their rights or obligations without Bank's prior written consent.

22. **Counterparts**. This Agreement may be executed in multiple counterparts, each being deemed an original and this being one of the counterparts, but all of which shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, Armored Carrier, Client and Bank have caused this Armored Carrier Agreement to be executed as of the date first written above, by their respective officers, each duly authorized.

**Mt. Vernon Money Center**

**Armored Carrier**

By: _[signature]_
Name: Robert F. Egan
Title: President

Address for Notices:
403 E. Third St
Mt. Vernon, NY 10553
Attention: _____

**Cardtronics USA, Inc.**

**Client**

By: _[signature]_
Name: Michael H. Clinard
Title: President, Global Services

Address for Notices:
Cardtronics USA, Inc.
3250 Briarpark Dr., Suite 400
Houston, TX 77042
Attention: General Counsel

**Bank of America, N.A.**

**Bank**

By: _[signature]_
Name: SheriLynne C. Skelly
Title: VP, Contract Mgt.

Address for Notices:
Bank of America
700 Louisiana St.
Houston, TX 77002-2700
Attention: Carol Browder SVP
TX4-213-07-03

**Attachments:**
Exhibit A -- List of Locations

Approved
By
Cardtronics Legal Dept.
MK 9-30-09

- 5 -

## ATM MANAGEMENT SERVICE AGREEMENT

CARRIER: Mount Vernon Money Center  
CLIENT: Cardtronics, Inc.

Effective Date: October 1, 2008  
Initial Term Ends: December 31, 2010

This ATM Management Service Agreement (which together with the Exhibits, Service Schedule and other documents referred to herein constitute the "Agreement") is entered into and made effective as of the date shown above by and between Mount Vernon Money Center Corp. ,a New York corporation having its principal place of business at 403 East Third Street, Mount Vernon, New York 10553 (hereinafter referred to as the "Carrier") and Cardtronics, LP (hereinafter referred to as "Client") having an office located at 3110 Hayes, Suite 300, Houston, Texas 77082 for the purpose of providing certain services in support of the Automated Teller Machines (hereinafter referred to as "ATMs");

WHEREAS Carrier and Client agree that this Agreement supercedes the ATM Management Service Agreement effective September, 2004 and expiring August 31, 2006;

WHEREAS Carrier has represented that it is skilled and professional in the providing of settlement/cash replenishment services, daily deposit sweeps (if applicable) and First and Second Line maintenance services associated with the operational needs of the ATM's: and

WHEREAS in reliance of Carrier's representations as stated above and in Client's desire to have Carrier provide certain services as more fully described elsewhere herein, in connection with ATM's covered hereunder;

NOW THEREFORE, in consideration of the above and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Carrier and Client agree as follow.

1. Carrier shall provide scheduled settlement/cash replenishment/cash add services, First and Second Line Maintenance services and Vendor Escort services described in Exhibit A attached hereto, to each ATM identified in Exhibit B.

2. Carrier shall perform cash replenishment/cash add services for each ATM in accordance with the frequency as set forth under the "Replenishment/Settlement Frequency" heading in Exhibit B. Carrier shall follow the normal procedures of Client for the reporting of such settlements, as Client specifies such procedures to Carrier in writing.

3. Client shall provide Carrier with all supplies necessary for the proper operation of each ATM. Carrier shall advise Client in writing of needed supplies, and Client shall be responsible for all costs related to the shipment and/or delivery of such supplies.

4. Exhibit B may be amended from time to time by Client to add or delete ATMs; provided that the Settlement/Replenishment Frequency applicable to additional ATMs shall be determined by the mutual agreement of both parties.

5. If the Client's vault cash is to be used for replenishments, Client shall maintain an arrangement that will ensure the availability of an adequate supply of vault cash for the purpose of replenishing each ATM noted in Exhibit B. Client shall remit by wire transfer to Carrier's designated account an amount sufficient to cover the requested cash loads forty-eight (48) hours prior to the actual disbursements.

Page Two

6. Carrier shall hold such vault cash in accordance with the tri-party agreement (the "Tri-Party Agreement") by and among Carrier, Client and Bank of America, N.A. ("Cash Provider"), which is attached hereto as Exhibit D and shall not commingle such vault cash with Carrier's funds.

7. In the event Carrier's vault cash is used for replenishments, any shortage detected during settlement in any ATM shall be the responsibility of the Carrier unless, after investigation, such shortage is found to be the result of ATM hardware or software malfunction. Upon written request by Carrier, Client will conduct a thorough investigation of any such malfunction, the procedures for which shall be agreed upon by both parties hereto. All details of any such investigation shall be immediately made available to Carrier.

8. Carrier shall permit Client's audit personnel to visit Carrier's facility to perform audits upon 24 hours advanced notification. Further, Carrier shall permit prearranged external audits to be performed by qualified certified public accountants chosen by and paid for by the Client. Carrier shall cooperate in any other audit type procedures deemed necessary by Client, including without limitation, periodic attendance by Client personnel at any ATM during settlement to validate cash balances.

9. Carrier shall follow Client's standard operating procedures required to enter and exit each ATM location, as such procedures are specified in writing to Carrier, including making any required phone calls and completing and Client service logs.

10. Any loss, damage or liability resulting from any unlawful activity, embezzlement or theft by any employee of Carrier, from robbery or from any mysterious disappearance occurring during the performance by Carrier of the services described herein, or from the negligence of Carrier or any of its employees or agents, shall be the responsibility of the Carrier, and Carrier shall indemnify Client for all losses, damages and claims relating to any such loss, damage or liability.

11. Except as hereinafter provided, any loss of the contents of any ATM either occurring while Carrier personnel are not present at such ATM or in the event of an ATM break-in or any other unauthorized tampering to the ATM (by a third party not affiliated with Carrier), shall be the responsibility of the Client. If upon investigation, Client finds that Carrier was negligent in its duties to secure the premises by locks, alarms or any other security device provided by the Client at an ATM site where such a loss occurs, such loss shall be the responsibility of the Carrier.

12. Carrier shall not be liable for non-performance of services or delays not caused by its fault or neglect or for non-performance or delays caused by strikes, lockouts, riots, war, insurrection, acts of God or the public enemy, or other causes beyond its control. Nothing in this Section 12 shall relieve Carrier of liability of any Client's valuables in its possession at anytime.

13. Carrier will maintain "All Risk" the insurance coverage prescribed in the Tri-Party Agreement for the duration of this contract and any extension thereof. Carrier shall obtain a certificate of insurance naming the Client and the Cash Provider as an additional insured under such policy. Client and Cash Provider shall be notified in writing ten (10) days in advance of any cancellation by Carrier of such insurance, and shall be notified in writing not later than five (5) days after such cancellation by the issuer of such insurance.

14. Client or Cash Provider shall document any shortage or loss in writing and such documentation

shall be forwarded to Carrier in writing within ten (10) days from the time of discovery. Documentation of said shortage or loss shall include a letter of claim fully detailing the date of the shortage or loss, the location (designated by location, name and

### Page Three

address as well as by the applicable poll I.D. number) and the amount of the shortage or loss. In addition, the documentation shall include any applicable reports available to Client or Cash Provider from a law enforcement agency or merchant security department. Upon receipt of such documentation, Carrier shall, within ten (10) days, conduct its own investigation of said shortage and/or loss, and after completion of such investigation, if Carrier shall been at fault, make payment to the Cash Provider within (10) days after the completion of said investigation the amount of such shortage and/or loss. If after the completion of Carrier's investigation, Carrier shall not have been at fault, Carrier shall not make payment of the amount of said shortage and/or loss to Cash Provider and shall submit to the Client and the Cash Provider a written statement setting forth the reasons for such belief.

15. Carrier shall obtain the prior written approval of Client prior to entering into any subcontract agreement with respect to any services to be provided to the Client hereunder. Said approval shall not be unreasonably withheld.

16. For the services described herein, Client shall pay Carrier the amounts specified in Exhibit C upon monthly presentation of invoices.

17. This Agreement is effective as of the date set forth above, and shall continue for a period of 2 years and 3 months. Thereafter, it shall continue from month to month and may be terminated by either party by giving the other party thirty (30) days written notice of its intent to terminate.

18. Carrier may impose a fuel surcharge fee not to exceed 3% of each applicable fee charged to Client which relates to a service involving travel to an ATM.

19. In the event of a breach of this Agreement by either party, such party shall have ten (10) days within which to cure such breach after receipt of written notice thereof from the other party. If such breach is not cured within such period, the non-breaching party may terminate this Agreement.

20. In the event of a breach of this Agreement by either party, the party adjudicated to be in breach thereof by any court of competent jurisdiction shall pay all expenses, including reasonable attorney's fees, in connection with the enforcement by the other party of this Agreement. All overdue payments shall bear interest at the rate of one and one-half (1.5%) per month.

21. This Agreement shall be construed pursuant to the laws of the state of Texas; provided, however and such dispute involving the Cash Provider shall be resolved in accordance with the provisions set forth in the Tri-Party Agreement.

22. The terms and conditions of this Agreement are based on Carrier providing Client with the services outlined in Exhibit A to the ATM locations listed in Exhibit B or related addenda. Client has the right to add or delete ATM locations as provided for in para 4. above.

23. This Agreement contains the entire understanding of the parties hereto and cannot be modified or terminated unless in writing executed by both parties.

Page Four

24. Upon termination by either party, all sums due under this Agreement become immediately payable. Any cash or other property of Client in the possession of Carrier shall be returned immediately upon termination.

25. Attached hereto and incorporated into this Agreement, and specifically made a part of Exhibit A hereto, is a Service Schedule. In the event there are any terms or provisions in such schedule that are inconsistent or contradictory with any other terms or provisions of the Agreement, Exhibit A or any other exhibit hereto, then the terms and provisions of the Service Schedule shall prevail.

26. Client shall have the right to terminate this Agreement upon at least ten (10) days prior written notice to Carrier in the event of any one of the following occurrences: i) any default by Carrier under this Agreement which is not cured within the above notice period; ii) any change in control of Carrier; iii) bankruptcy filing, insolvency, or transfer of assets on behalf of creditors, by Carrier; or iv) any unlawful act or omission by Carrier or an affiliate, agent, employee or contractor of Carrier that has a material adverse effect on Client.

**Cardtronics, LP**

_[signature]_
Approved By – Signature

KEITH L. MYERS
Print Name

COO
Title

October 24, 2008
Date

**Mt. Vernon Money Center**

_[signature]_
Approved By – Signature

Robert F Egan
Print Name

President
Title

October 16, 2008
Date

APPROVED BY CARDTRONICS
LEGAL DEPT. MK 10-23-08

<u>Exhibit A</u>

<u>Breadth of Services</u>

1. <u>CASH REPLENISHMENTS/SETTLEMENTS</u>

   Carrier will load currency into cassettes in accordance with a predetermined schedule approved by the Client.

   Carrier will deliver sealed cassettes and or provide cash adds to the respective ATM"s in accordance with the cash replenishment/cash add schedule outlined in Exhibit B.

   Carrier will perform a settlement at the time of replenishment and retrieve the necessary documentation required by Client.

   Carrier will ensure that each ATM is fully operational prior to leaving the ATM site.

   Carrier will perform upon loading cassettes two (2) dispense tests and verify proper configuration of canisters.

   Carrier will replenish all necessary supplies as needed during each site visit (receipt and journal paper and ribbons).

   If Client's currency is used, Carrier will transport the empty or partially spent cassettes to Carrier's vault the same day of replenishment/settlement and transmit the necessary settlement documentation to Client the following business day.

   If Client's currency is used, Carrier will complete the actual cash verification before 12:00 P.M. the following business day after settlement and communicate any cash discrepancies to the Client upon completion of the verification process.

   If Client's currency is used, Carrier will place all unopened currency in Client's cash inventory in the Carrier's vault and shall not commingle such vault cash with Carrier's funds or funds of Carrier's other clients.

   If Client's currency is used, Carrier will transmit to Client a daily report of the cash position of Client's cash inventory maintained at Carrier's vaulting facility.

   If Client's currency is used, Carrier will deliver or cause to be delivered journal tapes and retained cards to the location identified by Client in accordance with a schedule mutually agreed upon by both parties.

3. <u>VENDOR ESCORT</u>

Carrier agrees to provide, if and when requested by Client, vendor escort service to mutually agreed upon locations to allow access to the respective ATM locations. Carrier agrees to stay on premise until Client's technicians have completed their maintenance responsibilities.

4. <u>Service Schedule</u>.

Attached hereto and incorporated into this Exhibit A is a Service Schedule. In the event there are any terms or provisions in such schedule that are inconsistent or contradictory with any other terms or provisions of this Exhibit A, then the terms and provisions of the Service Schedule shall prevail.