# EXHIBIT B

# SIGNATURE BANK CONTRACT

# ANTI-COMMINGLING PROVISION
## IS ¶ 6 on Page Two

**MVMM CORP. / Mt. Vernon Monetary Management Corp.**

*When it comes to MONEY, we deliver.*

403 East Third Street
Mt. Vernon, NY 10553
914-664-1667
Fax 914-664-2942

February 7, 2007

Mr. Kevin Rooney
Signature Bank
1177 Avenue of the Americas
12th Floor
New York, NY 10006

Dear Mr. Rooney:

Attached please find the ATM Management Service Agreement signed by Robert F. Egan for Signature Bank. Also attached is an additional copy for your records.

If you have any questions, please contact John Pratt at (732) 530-3498 or (914) 664-1667 x1145.

Regards,

Tomar A. Alexander
Executive Assistant to Robert F. Egan
Mount Vernon Monetary Management Corp.
(914) 664-1667 x1111

MVMC CORP.
MT. VERNON
MONEY CENTER CORP.

DISTRICT CENTRAL
STATION ALARM

MONTGOMERY
CHECK CASHING CORP.

*Service - Integrity - Reliability*

GNC
PAYROLL PLUS

CRYSTAL PUBLIC
COMMUNICATIONS INC.

PUBLIC ACCESS
NETWORK SERVICES CORP.

## ATM MANAGEMENT SERVICE AGREEMENT

**CARRIER:** Mount Vernon Money Center      **Effective Date:** January 1, 2007
**CLIENT:**   Signature Bank            **Initial Term Ends:** December 31, 2008

This ATM Management Service Agreement (which together with the Exhibits and other documents referred to herein constitute the "Agreement") is entered into and made effective as of the date shown above by and between Mount Vernon Money Center Corp., a New York corporation having its principal place of business at 403 East Third Street, Mount Vernon, New York 10553 (hereinafter referred to as the "Carrier") and Signature Bank (hereinafter referred to as "Client") having an office located 565 5th Avenue, New York, New York 10017 for the purpose of providing certain services in support of the Automated Teller Machines (hereinafter referred to as "ATMs")

WHEREAS Carrier has represented that it is skilled and professional in the providing of settlement/cash replenishment services, First Line Maintenance services and Administrative Support services associated with the operational needs of the ATM's; and

WHEREAS in reliance of Carrier's representations as stated above and in Client's desire to have Carrier provide certain services as more fully described elsewhere herein, in connection with ATM's covered hereunder;

NOW THEREFORE, in consideration of the above and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Carrier and Client agree as follow.

1. Carrier shall provide scheduled settlement/cash replenishment/cash add services, First Line maintenance services and Administrative Support services described in Exhibit A attached thereto, to each ATM identified in Exhibit B.

2. Carrier shall perform cash replenishment/cash add services for each ATM in accordance with the frequency as set forth under "Replenishment/Settlement Frequency" heading in Exhibit B, and as amended from time to time. Carrier shall follow the normal procedures of Client for the reporting of such settlements, as Client specifies such procedures to Carrier in writing.

3. Client shall provide Carrier with all supplies necessary for the proper operation of each ATM. Carrier shall advise Client in writing of needed supplies, and Client shall be responsible for all costs related to the shipment and/or delivery of such supplies.

4. Exhibit B may be amended from time to time by Client to add or delete ATMs; provided that the Settlement/Replenishment Frequency applicable to additional ATMs shall be determined by the mutual agreement of both parties.

5. If the Client's vault cash is to be used for replenishments, Client shall maintain an arrangement that will ensure the availability of an adequate supply of vault cash for the purpose of replenishing each ATM noted in Exhibit B . Client shall make available an amount sufficient to cover the requested cash loads forty-eight (48) hours prior to the actual disbursements.

**Page Two**

6.   Carrier shall hold such vault cash (if applicable) in trust for the Client and shall not commingle such vault cash with Carrier's funds. Carrier agrees that all residual cash removed from the ATM's shall be returned to Carrier's vault and held in trust for the Client until otherwise directed by Client.

7.   In the event Client's vault cash, held in Carrier's vault, is used for replenishments, any shortage detected during settlement in any ATM shall be the responsibility of the Carrier unless, after investigation, such shortage is found to be the result of ATM hardware or software malfunction. Upon written request by Carrier, Client will conduct a thorough investigation of any such malfunction, the procedures for which shall be agreed upon by both parties hereto. All details of any such investigation shall be immediately made available to Carrier.

8.   Carrier shall permit Client or other personnel authorized by Client to visit Carrier's facility to perform audits upon twenty-four (24) hours advanced notification. Further, Carrier shall permit prearranged external audits to be performed by qualified certified public accountants chosen by and paid for by the Client. Carrier shall cooperate in any other audit type procedures deemed necessary by Client, including without limitation, periodic attendance by Client personnel at any ATM during settlement to validate cash balances. Should Client determine, in its sole discretion, that its monies held in Carrier's vault may be at risk, Client shall have the authority to audit Carrier's vault(s) without prior notification.

9.   Carrier shall follow Client's standard operating procedures required to enter and exit each ATM location, as such procedures are specified in writing to Carrier, including making any required phone calls and completing any Client service logs.

10.  Any loss resulting from embezzlement or theft by any employee of Carrier, from robbery or from any mysterious disappearance occurring during the performance by Carrier of the services described herein, shall be the responsibility of the Carrier.

11.  Except as hereinafter provided, any loss of the contents of any ATM either occurring while Carrier personnel are not present at such ATM or in the event of an ATM break-in or any other unauthorized tampering to the ATM, shall be the responsibility of the Client. If upon investigation, Client finds that Carrier was negligent in its duties to secure the premises by locks, alarms or any other security device provided by the Client at an ATM site where such a loss occurs, such loss shall be the responsibility of the Carrier.

12.  Carrier and Client each shall not be liable for non-performance of services or delays not caused by its fault or neglect or for non-performance or delays caused by strikes, lockouts or other labor disturbances, riots, war, insurrection, acts of God or the public enemy, or other causes beyond its control. Nothing in this Section 12 shall relieve Carrier of liability of any Client's valuables in its possession at anytime.

13.  Carrier will maintain "All Risk" armored car cargo liability insurance in the amount of $50,000,000.00 for the duration of this contract and any extension thereof. Carrier shall obtain a certificate of insurance naming the Client as a loss payee under such policy. Client shall be notified in writing thirty (30) days in advance of any cancellation by Carrier of such insurance, and shall be notified in writing not later than five (5) days after such cancellation by the issuer of such insurance.

14.  Client shall document any shortage or loss in writing and such documentation shall be

### Page Three

forwarded to Carrier in writing within ten (10) days from the time of discovery. Documentation of said shortage or loss shall include a letter of claim fully detailing the date of the shortage or loss, the location (designated by location, name and address as well as by the applicable ATM I.D. number) and the amount of the shortage or loss. In addition, the documentation shall include any applicable reports available to Client from a law enforcement agency or merchant security department. Upon receipt of such documentation, Carrier shall, within ten (10) days, conduct its own investigation of said shortage and/or loss, and after completion of such investigation, if Client concludes that Carrier is at fault, or if fault is undetermined, Carrier shall make payment to the Client within ten (10) days after the completion of said investigation the amount of such shortage and/or loss. If after the completion of Carrier's investigation, Carrier is determined by Client to not have been at fault, Carrier shall not make payment of the amount of said shortage and/or loss to Client and shall submit to the client a written statement setting forth the reasons for such belief.

15.  This Agreement may not be assigned or subcontracted by Carrier.

16.  For the services described herein, Client shall pay Carrier the amounts specified in Exhibit C upon monthly presentation of invoices. All charges will be invoiced within thirty (30) days from the date of service. Any charges not invoiced within sixty (60) days are deemed to be waived with no recourse.

17.  This Agreement is effective as of the date set forth above, and shall continue for a period of two (2) years. Thereafter, it shall continue from month to month and may be terminated by either party by giving the other party ninety (90) days written notice of its intent to terminate.

18.  The rates for service set forth herein shall be increased by agreement of the parties hereto if there is a substantial change in economic conditions effecting fuel prices and which cause an increase of more than twenty percent (20%) in such prices. If economic conditions effecting these prices cause a decrease of more than twenty percent (20%) in such prices, such rates shall be decreased upon agreement by the parties hereto. Notwithstanding the above conditions, Carrier will notify Client of any proposed increase thirty (30) days in advance of the effective date of such increase and Client has thirty (30) days to accept the increase or terminate the Agreement.

19.  In the event of a breach of this Agreement by Carrier, Carrier shall have ten (10) days from receipt of written notice of the breach from Client, to cure such breach. If such breach is not cured or if a cure is not substantially underway within such period, the non-breaching party may, with sixty (60) days terminate this Agreement

20. In the event of a breach of this Agreement by either party, the party adjudicated to be in breach thereof by any court of competent jurisdiction shall pay all expenses, including reasonable attorney's fees, in connection with the enforcement by the other party of this Agreement. All overdue payments shall bear interest at the rate of one and one-half (1.5%) per month.

21. This Agreement shall be construed pursuant to the laws of the State of Oregon and all parties consent to the jurisdiction of the courts of the State of New York.

22. This Agreement contains the entire understanding of the parties hereto and cannot be modified or terminated unless in writing executed by both parties.

23. Upon termination by either party, all sums due under this Agreement become immediately payable. Any cash or other property of Client in the possession of Carrier shall be returned immediately upon termination.

**Page Four**

**Signature Bank**

Approved By -- Signature

_Kevin Rooney_
Print Name

_VP_
Title

_2/6/01_
Date

**Mt. Vernon Money Center**

Approved By -- Signature

_Robert F. Egan_
Print Name

_President_
Title

_2-7-02_
Date

# US BANK

# ANTI-COMMINGLING PROVISION
# IS ¶ 2.5 on Page Three
# (Bates No. USB 000078)

## THREE-PARTY ARMORED CARRIER SERVICE AGREEMENT

THIS TRI-PARTY ARMORED CARRIER SERVICE AGREEMENT (the "**Agreement**") is dated as of November 4, 2008, by and among Mount Vernon Money Center Corp.,("**CARRIER**"), a New York corporation and National ATM Capital, LLC.("**COMPANY**"), an New York corporation and U.S. Bank National Association, d/b/a Elan Financial Services ("**ELAN**"), each a ("**Party**" and collectively the "**Parties**") with reference to the following:

### RECITALS

WHEREAS, Carrier is in the business of transporting United States currency for financial institutions and other parties in a secure mode;

WHEREAS, Company proposes to install and operate automated cash machines ("**ATMs**") at various locations ("**ATM Sites**");

WHEREAS, ELAN has contracted with Company to provide United States currency ("**ATM Cash**") for certain ATM Sites under the terms of a separate Assignment Agreement contract dated December 3, 2006 (the **ATM Cash Agreement**);

WHEREAS, ELAN will, from time to time, enter into separate ATM Cash agreements with third party cash providers ("**Third Party Cash Providers**"), a list of which is contained on **Exhibit "A"** and subject to amendment at ELAN's sole discretion, whereby a Third Party Cash Provider may provide ATM Cash for certain ATM Sites operated by Company; and

WHEREAS, Company desires to utilize the services of Carrier to transport ATM Cash for ATMs to and from ATM Sites;

WHEREAS, this Agreement may be replaced by another agreement after legal review from U.S. Bank;

NOW, THEREFORE, for good and valuable consideration, the Parties hereto hereby agree as follows:

### AGREEMENT

**1.0   Term.** This Agreement shall take effect on the Effective Date and shall remain in effect for a period of thirty-six (36) months from such date. This Agreement will automatically renew for additional one (1) year periods, unless any Party to the Agreement gives the other Parties written notice that the Agreement is to be terminated at the end of the current term. Such written notice must be given and received at least thirty (30) days prior to the end of the initial thirty-six (36) month term or any subsequent renewal term.

**2.0   Services.** Carrier agrees to service Company's ATMs, such services to include picking up ATM Cash from ELAN, a Third Party Cash Provider, their correspondent bank(s), or the Federal Reserve Bank vault locations and transporting the ATM Cash to ATM Sites to replenish ATM Cash in the ATM, balancing ATMs and completing paperwork required by ELAN, checking and (if necessary) replenishing supplies furnished by Company, preparing daily vault registers, providing settlement services, adhering to all security procedures communicated by ELAN, and providing site maintenance and malfunction services. Company agrees to execute Carrier's standard service agreement(s) for the provision of each such service. ELAN will order ATM Cash for Company's ATM Sites and Carrier will service and balance each ATM at least once every thirty (30) days. Consistent with paragraphs 2.3 and 2.7 below, Carrier agrees to obtain ATM Cash, per instructions received from ELAN, and deliver to and place the ATM Cash in Company's ATMs at specified ATM Sites. Company shall be responsible for any ATM Cash placed in violation of these provisions.

Initials  *2C*   *d·A·*
Carrier  ELAN  Company
November 4, 2008
Page 1 of 17

**Confidential Commercial Information of U.S. Bank National Association**
**Produced Pursuant to Grand Jury Subpoena**
**FOIA Confidential Treatment Requested**

USB 000076

2.1   If Carrier is directed by ELAN or a Third Party Cash Provider to perform services or other activities with respect to the ATMs or ATM Sites, such direction will be also deemed to be that of Company.  Unless Company or Carrier has otherwise reached a written agreement with ELAN or a Third Party Cash Provider with respect to the payment of charges associated with such services or activities, the charges will be deemed undisputed.

2.2   The initial ATM Sites to be serviced under the terms of this Agreement are identified in **Exhibit "C"** attached hereto and made a part of this Agreement.  **Exhibit "C"** shall contain separate schedules, one for each of ELAN and each Third Party Cash Provider identified on **Exhibit "A."**  Carrier shall replenish each ATM with ATM Cash provided by ELAN or the Third Party Cash Provider in accordance with the schedules set forth in **Exhibit "C."**  ELAN can amend the allocation of the ATM Sites between and among the various schedules contained in **Exhibit "C"** at any time in its sole discretion; provided, however, such amendment may be subject to a change in fees charged by Carrier.  **Exhibit "C"** may be amended from time to time by the mutual agreement of the Parties and shall be deemed amended, and the terms of this Agreement shall apply to new ATM Sites, upon any of the following: (a) written notification by ELAN to Carrier and written confirmation from an authorized representative of Carrier of the addition of that ATM Site, or (b) the addition of the new ATM Sites by Carrier's completion of the first ATM Cash order initiated by ELAN for that ATM.  Any practice or custom of Company, ELAN or Carrier at variance with the provisions of this Agreement shall not constitute a waiver of such provisions unless such practice or custom shall be agreed upon in writing and such writing shall be made an amendment to this Agreement.

2.3   Where ELAN is responsible for resolving cardholder claims or in the case where there is a shortage that requires a journal to research and resolve such shortage, ELAN will request said journal from Company, and Company shall send requested electronic journal records (EDC diskettes) by email to ELAN's Claim Department in lieu of overnight delivery and Company shall send paper journals to ELAN's Claim Department within two (2) business days of each request.  ELAN has availability of electronic format for downloading detailed journal records, and will provide mutually agreed upon encryption software to protect PAN information to the Company at ELAN's expense.  Company will work collegially with ELAN to assure PAN numbers are transmitted in a suitable encrypted format to protect cardholder information.  ELAN's responsibility for claims resolution shall be dependent on timely receipt of journal information.  In the event journal records are not sent, responsibility for ATM Cash shortages will revert to the ATM Customer Cash agreement where ELAN and Company will be governed by that document.  Paper journals will be sent to the following address:

Elan Financial Services – Journals Department
Park Towers Building
400 East Kaliste Saloom Rd., Suite 5300
Lafayette, LA. 70508
Email: atmjournals@Elanfswest.com

Carrier agrees to notify ELAN of any ATM Cash discrepancies within one business day of discovery and to provide assistance in timely balancing/dispute resolution.

2.4   Carrier will complete a daily vault log in the electronic form in a format agreed to between Carrier and ELAN that will include all ATM activity and ATM balance information of ELAN's account with Carrier daily by 12:00 p.m. Pacific Time on the next business day.  ELAN reserves the right to continue charges to Company for ATM Cash in the event vault logs are not timely transmitted.  ELAN shall notify Carrier within two (2) business days if it has not received a daily vault log by the above deadline. Carrier will e-mail daily vault logs to ELAN's Vault Reconciliation Department to the following e-mail address:

Elan Financial Servcies – Balancing Department
Park Towers Building
400 East Kaliste Saloom Rd., Suite 5300
Lafayette, LA. 70508
Email: vaultlog@Elanfs.com.com

Initials _*ƠN*_ _____ _Ħ c Ơ_
Carrier  ELAN Company
November 4, 2008
Page 2 of 17

**Confidential Commercial Information of U.S. Bank National Association**
**Produced Pursuant to Grand Jury Subpoena**
**FOIA Confidential Treatment Requested**

USB 000077

2.5    Carrier will keep ELAN's ATM Cash and each Third Party Cash Provider's ATM Cash separate from each other's ATM Cash and from all other United States currency, and will cause its employees and agents to keep accurate records regarding the ATM Cash received and delivered by Carrier and any ATM Cash returned or retrieved from each separate ATM. Any ATM Cash that is retrieved from a Company ATM shall be re-deposited in the designated bank account(s) at the local branch or bank cash vault or appropriate vault inventory designated by ELAN within one (1) business day metro and two (2) business days rural unless ELAN specifies otherwise in writing. In the event a mistake is made in replenishment of an ATM due to Carrier's error (e.g., replenishing a different ATM, leaving ATM in service mode, replenishing a wrong amount or keying in an incorrect number), Carrier will promptly correct the mistake at no charge.

2.6    Carrier will cooperate with ELAN, Company and their service representatives to provide access to ATM vaults if necessary for repair and maintenance of any ATM. Carrier will cooperate with ELAN to provide access to ATM vaults for the audit of ATM Cash owned or managed by ELAN. Carrier acknowledges its responsibility to maintain the confidentiality of and to maintain control over the master locks and ATM combinations for each ATM and to prevent disclosure to third parties. Carrier shall be responsible for any loss caused by its failure to maintain control as herein provided subject to the limitations and conditions of Carrier's liability as set forth in this Agreement. In the event that an ATM combination or lock is lost by Carrier and it becomes necessary to replace in order to gain access to the ATM vault for replenishment or maintenance purposes, Carrier shall correct the problem at its expense. Access to the ATMs by any party other than Carrier shall be made under dual custody with Carrier present.

2.7    Carrier agrees to respond promptly, during business hours, for replenishment or malfunction repairs. Upon arriving at an ATM Site for replenishment, Carrier will notify site personnel upon arrival. Prior to leaving the ATM, Carrier will (a) confirm that the ATM vault is properly closed, with combination locked and "spun off" or cleared, (b) confirm that the ATM is functioning properly (by performing a dispense test if appropriate), and (c) advise ELAN verbally of any problems or unusual occurrences with regard to the ATM performance or the ATM Site.

2.8    Carrier will cooperate with ELAN to provide access to ELAN or its designated agent to Carrier vault(s) solely for the audit of ATM Cash owned or managed by ELAN. Carrier will provide ELAN with the necessary records and access to count and reconcile all of the ATM Cash in the Carrier's vault(s) to audit compliance with the provisions of paragraph 2.7

2.9    Carrier shall not have any obligation to any party or third party (including any Third Party Cash Provider) except as specifically set forth in this Agreement or in any service agreements signed by the Company and Carrier with respect to the ATMs. Without limiting the generality of the foregoing, Carrier shall not be responsible for (a) any financial or other obligation which ELAN owes to Company or which Company owes to ELAN, or (b) any breach of contract by ELAN or Company. Under no circumstances shall any payment to Carrier be offset or reduced for any reason.

**3.0    Ownership of ATM Cash.**  Carrier, Company and ELAN agree as follows:

3.1    ELAN or the Third Party Cash Provider, as the case may be, shall at all times be the sole owner of ATM Cash prior to its proper withdrawal by cardholders or consumers. Carrier and Company shall have no claim to ATM Cash. Third Party Cash Provider's or ELAN's ownership of, and right of access to, ATM Cash will not be subject to any claim, setoff or lien by Carrier, its subcontractors or agents; or by Company, its subcontractors or agents.

3.2    Neither a Third Party Cash Provider nor ELAN shall have any obligation under this Agreement except as specifically set forth herein. Without limiting the generality of the foregoing, neither a Third Party Cash Provider nor ELAN shall be responsible for any breach of contract by Company or Carrier.

Initials  _RK_   _H.A._
Carrier  ELAN Company
November 4, 2008
Page 3 of 17

**Confidential Commercial Information of U.S. Bank National Association**      **USB 000078**
**Produced Pursuant to Grand Jury Subpoena**
**FOIA Confidential Treatment Requested**

3.3     Notwithstanding anything in this Agreement to the contrary, Carrier agrees that, without the written approval of ELAN, on its behalf or on behalf of a Third Party Cash Provider, Company and its agents shall not be given access to keys, ATM combinations, vault combinations or alarm codes at any time by Carrier, its subcontractors or agents. All ATM Cash shall remain ELAN's or the Third Party Cash Provider's property while in the possession of Carrier, whether in Carrier's vault or in transit to or from ATMs, and while in ATMs at ATM Sites. Company agrees to turn over all keys and other access to the ATMs to CARRIER to ensure that there will be no compromise by ELAN or Company's employees and/or agents. ELAN and Company represent and warrant that they have not provided and will not provide any party other than Carrier with access to the ATMs during the term of this Agreement.

3.4     Company agrees that it and its employees and agents will not take possession of or have access to ATM Cash at any time, either directly or through a third party, without ELAN's prior written consent. With respect to the ATMs that are the subject of this Agreement, Company must not allow, suffer or contract with any ATM service provider (other than Carrier) to perform services at the ATMs without ELAN's written consent, which may be withheld in ELAN's sole discretion.

3.5     At ELAN's or any Third Party Cash Provider's request, ELAN, Carrier, Company and each of their subcontractors shall (a) grant ELAN, such Third Party Cash Provider or one of their designated agents with access to the requesting party's ATM Cash at the ATM Sites covered by this Agreement during the Carrier's normal business hours. Any such access must be under dual control. Any person entering Carrier's premises shall be subject to Carrier's security requirements, including, without limitation, verification of credentials and identification, escort and search of bags or packages; (b) promptly deliver and/or return all ATM Cash to ELAN or such Third Party Cash Provider (or to a third party designated by ELAN or the Third Party Cash Provider); (c) assist ELAN or such Third Party Cash Provider in removing its ATM Cash from some or all of the ATM Sites covered by this Agreement; and (d) provide ELAN or such Third Party Cash Provider and its regulatory agencies with ready access to the ATM Cash and ATM Cash records solely for audit and examination purposes. Under no circumstances will Carrier be responsible for Company's refusal or failure to grant access to an ATM Site.

3.6     While the Parties do not anticipate that it will be necessary for ELAN or a Third Party Cash Provider to obtain immediate access to their ATM Cash during the term of this Agreement, Carrier and Company understand and agree that ELAN or a Third Party Cash Provider must be given access to their ATM Cash so that it may, at any time, be available to satisfy claims by their depositors. Carrier will perform such service if required. ELAN shall pay the charge for such special service, which will be at the same rate as emergency cash fill.

3.7     Carrier and Company understand that ELAN and the Third Party Cash Providers shall be entitled to demand the return of its ATM Cash whenever any of them: (a) is directed to do so by a state or federal regulatory agency; (b) needs the ATM Cash to satisfy claims of its depositors; (c) has reason to believe that its ATM Cash may be subject to loss through fraud or other means; (d) has reason to believe its access to ATM Cash may be delayed or lost in transit (e.g., due to a threat of strike or labor dispute or other such cause); (e) is notified that Carrier or Company breach or terminate this Agreement; (f) is notified that Carrier or Company breach this or any other agreement with ELAN; (g) has reason to believe that ATM transactions will not be processed in a correct and timely fashion or that Company will not receive timely payment or reimbursement for ATM Cash disbursed to cardholders; (h) is notified that an ATM processor, maintenance company, or ATM Site owner/operator breaches its agreement with Company with respect to ATM Cash; or (i) is notified that ATM Cash is determined not to be vault cash for reserve purposes. Carrier will perform such service if required. ELAN shall pay the charge for such special service, which will be at the same rate as emergency cash fill. An additional charge may apply if such service requires Carrier to incur additional cost. Carrier may demand, in its sole discretion, advance payment or a written promise of payment prior to being obligated to perform such service.

3.8     Carrier agrees that directions for movement of ELAN's or a Third Party Cash Provider's ATM Cash shall come solely from ELAN and that Company does not have authority to contact and instruct Carrier to move ATM Cash without prior written authority from ELAN except as provided as follows; a Third Party Cash Provider may demand at any time, consistent with paragraph 3.7 above and with contemporaneous notice to Carrier and ELAN, that Carrier shall deliver all or any portion of the Third Party Cash Provider's ATM Cash to the Third Party Cash Provider.

Initials _____ _____
            Carrier  ELAN Company
            November 4, 2008
            Page 4 of 17

Confidential Commercial Information of U.S. Bank National Association          USB 000079
Produced Pursuant to Grand Jury Subpoena
FOIA Confidential Treatment Requested

3.9    Any cash movements or other service of Carrier directed by ELAN pursuant to paragraphs 3.5, 3.6 or 3.7 outside of the scope of scheduled replenishments shall be billable to Company at $150 per hour, with a two (2) hour minimum. If Company fails to pay Carrier for such services, then ELAN shall be responsible for payment to Carrier.

**4.0    Liability.** Carrier's responsibility for ATM Cash shall commence when received by Carrier. Carrier will be liable for all losses of ATM Cash to the extent such losses result from (a) kidnapping or robbery of Carrier employees while performing the services pursuant to paragraph 2.0 above or (b) the negligence and/or willful misconduct of Carrier's employees or agents, including failure to properly account for ATM Cash. Carrier's liability is limited to the terms of this Agreement, and ELAN and Company agree that Carrier does not undertake the obligation of an absolute insurer in the performance of this Agreement. In the event Carrier is found liable for a loss of ATM Cash, Carrier shall be responsible for the amount of actual cash shortage. In no event shall Carrier be liable for any incidental, consequential or punitive damages arising from loss of or damage to ELAN's or any Third Party Cash Provider's ATM Cash.

4.1    Except as set forth herein this Agreement, Carrier shall not be liable for losses from ATMs resulting from (a) ATM equipment hardware malfunction, unless Carrier's direct actions through 1st line service or set up, (b) currency dispensed due to mistake for fraudulent instruction manually or electronically transmitted to the ATM, (c) nominal unexplained, and non reoccurring currency shortages, defined as less than $101.00, which will not be investigated (shortages in excess of these amounts will be thoroughly investigated to determine Carrier's responsibility), (d) amounts said to be contained in sealed deposit envelopes opened by Carrier, a Third Party Cash Provider or ELAN and found to contain an incorrect amount (Carrier will verify amounts prior to replenishing the ATM and shall report discrepancies to ELAN within two (2) business days), (e) access to the ATM by third parties not granted by Carrier, (f) breaking or entering or burglary to the ATM, or (g) from any other causes not directly attributable to the error, negligence or willful misconduct of Carrier or its employees. Carrier agrees to notify ELAN within two (2) business days after any loss is discovered by Carrier and to cooperate with Company and ELAN for purposes of investigating a loss or making any insurance claim for any such loss.

4.2    Carrier shall be liable in the event of loss or destruction of any shipment of ATM Cash or instruments or part thereof, provided that in the event of loss or destruction of any shipment of ATM Cash or instruments or part thereof, ELAN agrees to use its best efforts to reconstruct and recover lost or destroyed items and to take action as may be necessary to assure the maximum amount of reconstruction and recovery of such items, including, without limitation, requesting depositors of any negotiable instrument, including checks, to seek the re issuance of duplicates thereof and in the event such depositor shall refuse to do so, then ELAN will be required to assert its proper legal and equitable rights, to the extent available. To the extent ELAN elects not to assert its legal rights, Carrier will not be held liable.

ELAN agrees to reconcile and balance each ATM and vault location within seven (7) business days of receipt of the applicable vault log and terminal detail report from Carrier. ELAN agrees to notify Carrier within forty-eight (48) business hours if it has not received vault logs, terminal detail reports, or other information required to reconcile and balance each ATM and vault location within the timeframes set forth herein. ELAN agrees to provide written notice (hereafter "Claim") to Carrier of any shortage at an ATM or vault location within the lesser of three (3) business days of discovery of the shortage by ELAN or thirty (30) calendar days from the actual ATM replenishment date or applicable vault date. If ELAN cannot balance an ATM or vault due to lack of information from Carrier, then ELAN shall file a Claim for the total amount of the unbalanced funds within thirty (30) calendar days of the actual replenishment date or applicable vault date. Failure of ELAN to comply with any of the foregoing shall relieve Carrier of any liability as outlined in this Agreement unless ELAN is able to show by clear and convincing evidence that Carrier is liable for such shortage. No action, suit or proceeding to recover for any such loss shall be maintained against Carrier unless written notice shall be given to Carrier as aforesaid and unless such action, suit or proceeding shall have been commenced within twelve (12) months of the delivery to Carrier of the funds, securities, instruments and/or valuable articles alleged to be lost. Within seven (7) days after the giving of written notice of any Claim for loss, ELAN shall furnish to Carrier detailed written proof of such loss in form reasonably satisfactory to Carrier, which proof of loss shall be substantiated by the books, records and accounts of ELAN and/or the Third Party Cash Provider, as applicable. Restitution for shortages payable by Carrier pursuant to the terms of this Agreement shall be made to ELAN within thirty (30) days of written proof of loss by ELAN as set forth in this Agreement. Any failure to timely resolve any outstanding claim by ELAN for

Initials   *RE*      *H.A.*
Carrier   ELAN Company
November 4, 2008
Page 5 of 17

**Confidential Commercial Information of U.S. Bank National Association**          **USB 000080**
**Produced Pursuant to Grand Jury Subpoena**
**FOIA Confidential Treatment Requested**

shortages within such thirty (30) days shall be immediately resolved pursuant to the terms of the ATM Cash agreement between ELAN and Company where ELAN and Customer will be governed by that document. When requested by Carrier, ELAN shall make available to Carrier during regular business hours all of ELAN's books, records and accounts which relate to the alleged loss and shall cooperate with and assist, and shall use its commercially reasonable efforts to cause its employees and agents to cooperate with and assist Carrier in the investigation of such loss including, without limitation, giving to Carrier all information that any such person may have concerning the alleged loss and the circumstances surrounding the same. In the event ELAN files a Claim, upon request by Carrier, ELAN shall provide to Carrier information on all potential overages which may potentially relate to the Claim.

4.3   Notwithstanding anything to the contrary herein contained, Carrier shall not be held liable for the loss of any funds, securities, instruments and/or valuable articles delivered to Carrier hereunder arising directly or indirectly from the following:

(a)   hostile or warlike action in time of peace or war, including without limitation, action in hindering, combating or defending against an actual, impending or expected attack (i) by any government or sovereign power (de jure or de facto), or by any authority or power maintaining or using Military, Naval or Air Forces, or (ii) by Military, Naval or Air Forces, or (iii) by an agent of any such government, power, authority or forces;

(b)   any weapon of war employing atomic fission or fusion or radioactive force whether in time of peace or war;

(c)   insurrection, terrorism, rebellion, revolution, civil war, usurped power, looting, rioting or other disorder;

(d)   any action taken by governmental or other authority in hindering, combating or defending against any actual or threatened disorder or other illegal or dangerous conduct, including actions relating to quarantine, customs regulation, confiscation, seizure, damage or destruction by order of any government or other authority, or any risks incurred with respect to contraband or illegal transportation or trade;

(e)   nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by the peril(s) against which Carrier assumes liability in this Agreement; or

(f)   acts of God.

In addition to the foregoing, Carrier shall not be liable for non-performance of Services, shortages, losses, damages or delays not caused by its fault or negligence, nor for non-performance or delays caused by events beyond its reasonable control, including, without limitation, strikes, or other labor disturbances, riots, war, insurrection, authority of law, acts of the public enemy, weather, road closures, general transportation delays, floods or storms.

4.4   If Carrier fails to provide ELAN with any information required by this Agreement and such failure causes ELAN to exceed the claim period within Section 4.2 above, and ELAN or a Third Party Cash Provider suffers an unrecoverable cardholder, processor claim or shortage as a direct result of such failure, then the parties shall waive the claim period set forth in Section 4.2 above and follow the claims procedure set forth therein to the extent ELAN notifies Carrier of such claim within thirty (30) days of discovery by ELAN and provided ELAN timely uses its best efforts to mitigate and minimize the amount of such Claim.

4.5   Carrier acknowledges that, to the extent it utilizes the services of subcontractors or agents in the performance of its obligations pursuant to this Agreement, Carrier remains liable to the same extent as if Carrier performed the services directly. Nothing in this Agreement shall be deemed an approval of such subcontracting or agency if the prior approval of Company or ELAN is otherwise required pursuant to the terms of any service or other agreement between Carrier and Company and/or ELAN.

Initials *CE*       *H.A.*
Carrier  ELAN  Company
November 4, 2008
Page 6 of 17

**Confidential Commercial Information of U.S. Bank National Association**
**Produced Pursuant to Grand Jury Subpoena**
**FOIA Confidential Treatment Requested**

**5.0   Insurance.**   Prior to performance of any service under this Agreement, Carrier shall purchase, maintain and provide Company, ELAN, and each Third Party Cash Provider with certificates of insurance with insurance companies that have an A.M. Best Rating of A, Class VIII or better or otherwise acceptable to ELAN. The insurance certificates shall include a provision whereby the insurance company is required to provide, directly to ELAN, thirty (30) days' advance written notice before termination, change or cancellation of coverage shall take effect for such policies evidenced on such certificate, regardless of whether cancelled by Carrier or the insurance company. Company, ELAN and any applicable Third Party Cash Providers will be named as additional insureds on all policies below except for Carrier's all-risk policy. Such insurance carried by Carrier shall be primary to any liability insurance carried by Company, ELAN or any applicable Third Party Cash Provider. Failure to maintain any required insurance or fidelity bond protection will constitute a material breach of this Agreement. Carrier will require any armored carrier or other person that it engages as a subcontractor or agent to provide services under this Agreement to be covered by Carrier's insurance or bond or to maintain insurance and bond protection in the same manner set forth herein.

(a)   Commercial general liability insurance coverage, including premises/operations, - products/completed operations, personal injury, blanket contractual liability and umbrella coverage for all obligations undertaken by Carrier under this Agreement. Such commercial general liability insurance shall provide for a minimum of $1,000,000 per occurrence, and $5,000,000 in the aggregate annually.

(b)   All-Risk insurance, including loss of ATM Cash and employee dishonesty/fidelity coverage for all Carrier employees, officers and agents, covering on-premises (inside the premises) loss and in transit (outside the premises) loss with a limit of at least $300,000 per ATM at each ATM Site serviced by this Agreement, and an aggregate coverage of at least $5,000,000.

(c)   Automotive liability insurance (including uninsured and underinsured) and umbrella coverage covering personal injury and property damage with combined limits of at least $1,000,000 per occurrence.

(d)   In the event the aggregate amount of ATM Cash covered pursuant to this Agreement exceeds $5,000,000, Carrier shall immediately inform ELAN of such occurrence and, unless waived by ELAN, Carrier shall ,as soon as reasonably practicable, obtain separate insurance riders for the All-Risk coverage required pursuant to subparagraph (b) above, reflecting the increased aggregate amount of ATM Cash in Carrier's possession or control and Company and/or ELAN shall be liable for any excess liability charges associated with the increased liability amount.

**6.0   Indemnification.**

6.1   Carrier covenants and agrees to indemnify and hold harmless Company and ELAN, their parents or affiliates, and their respective officers (excluding consequential damages), directors, employees and permitted assigns, from and against any and all direct or contingent liabilities, claims, damages, losses or expenses, including reasonable attorneys' fees, arising from any claim, demand or suit against Company and/or ELAN to the extent said liabilities, claims, damages, losses and expenses therefrom are a result of the negligence or willful misconduct of Carrier and it employees, agents and contractors. Carrier shall have no indemnification obligation hereunder to the extent of the negligence or willful misconduct of ELAN, Company or any Third Party Cash Provider and their respective employees and agents. In no event shall Carrier be liable for any incidental, consequential or punitive damages with respect to the ATM Cash.

6.2   ELAN covenants and agrees to indemnify and hold harmless Carrier and its affiliates, and its or their respective officers, directors, employees and permitted assigns, from and against any and all direct or contingent liabilities, claims, damages, losses or expenses, including reasonable attorneys' fees, arising from any claim, demand or suit against Carrier to the extent said liabilities, claims, damages, losses and expenses therefrom are a result of the negligence or willful misconduct of ELAN and its employees, agents and contractors. ELAN shall have no indemnification obligation hereunder to the extent of the negligence or willful misconduct of Carrier and its employees and agents. Company covenants and agrees to indemnify and hold harmless Carrier and its affiliates, and its or their respective officers, directors, employees and permitted assigns, from and against any and all direct or contingent liabilities, claims, damages, losses or expenses, including reasonable attorneys' fees, arising from any claim, demand or suit against Carrier to the extent said liabilities, claims, damages, losses and expenses

Initials  _VK_   _HLA._
Carrier  ELAN Company
November 4, 2008
Page 7 of 17

**Confidential Commercial Information of U.S. Bank National Association**   **USB 000082**
**Produced Pursuant to Grand Jury Subpoena**
**FOIA Confidential Treatment Requested**

therefrom are a result of the negligence or willful misconduct of Company and its employees, agents and contractors. Company shall have no indemnification obligation hereunder to the extent of the negligence or willful misconduct of Carrier and its employees and agents.

6.3   Each Party shall promptly notify the other of any claim, demand, suit or threat of suit of which that Party becomes aware (except with respect to a threat of suit one Party might institute against the other) which may give rise to a right of indemnification pursuant to this Agreement.

6.4   These indemnification provisions shall survive the termination of this Agreement.

## 7.0   Termination.

7.1   Any Party may terminate this Agreement in its entirety or as to any ATM Site(s), effective ten (10) days after giving written notice of intent to terminate, upon the occurrence of a material breach provided the material breach continues for more than ten (10) days after written notice describing the breach. If the breach is cured prior to the expiration of the ten (10) day period, or if the breach is of a type not capable of being cured within said then (10) day period, but the breaching party is diligently pursuing a cure, this Agreement shall continue in full force and effect as if no notice of breach had been given. Any Party may terminate this Agreement as to any specific ATM Site(s) immediately, upon notice to the breaching Party and without affording an opportunity to cure, if the breaching Party commits the same or a similar material breach within a sixty (60) day period for the specific sites or if the breaching Party purports to assign its rights or obligations in violation of this Agreement.

7.2   ELAN may terminate this Agreement between ELAN and Carrier as to any ATM Site upon ten (10) days' prior notice if ELAN terminates its cash management services with Company. ELAN may terminate this Agreement immediately upon giving notice in the event that the Office of the Comptroller of the Currency or other federal, state or local regulatory body, which has jurisdiction over operations, and activities of ELAN or a Third Party Cash Provider requires discontinuance of this Agreement. Any Termination by ELAN resulting from the above shall only terminate ELAN's and Carrier's obligations to each other as set forth in this Agreement and shall not terminate the obligations between Carrier and Company as set forth herein, and the terms of this Agreement relating to the Carrier and Company shall continue in full force after such termination. ELAN and Company may delete any ATM site(s) from the terms of this Agreement upon ten (10) days prior notice if Company's agreement to operate the related ATM(s) is terminated.

7.3   Any Party may terminate this Agreement immediately upon giving notice in the event another Party:

(a)  makes a general assignment for the benefit of creditors;

(b)  applies for the appointment of a trustee, liquidator or receiver for its business or property, or one is assigned involuntarily;

(c)  is subject to a proceeding for bankruptcy, receivership, insolvency, dissolution or liquidation and such proceeding is not dismissed within sixty (60) days;

(d)  is adjudicated insolvent or bankrupt; or

(e)  is unable to perform its obligations under this Agreement as a direct result of a force majeure cause for a period of seven (7) or more consecutive days.

Any Termination by ELAN resulting from the above shall only terminate ELAN's and Carrier's obligations to each other as set forth in this Agreement and shall not terminate the obligations between Carrier and Company as set forth herein, and the terms of this Agreement relating to the Carrier and Company shall continue in full force after such termination.

Initials _____  _____
Carrier ELAN Company
November 4, 2008
Page 8 of 17

**Confidential Commercial Information of U.S. Bank National Association**
**Produced Pursuant to Grand Jury Subpoena**
**FOIA Confidential Treatment Requested**

USB 000083

7.4 In the event of termination of this Agreement or portion thereof, Carrier will promptly (a) account for and cause all ATM Cash delivered to Carrier or its agents to be returned to ELAN or the Third Party Cash Providers, (b) return all documents and instruments belonging to ELAN or any Third Party Cash Provider, and (c) coordinate meetings at each ATM Site with persons designated by ELAN for the purpose of determining cash balances in ATMs and transferring vault combinations. If early termination is due to breach of Carrier, ATM Site meetings shall not be chargeable. If early termination of agreement is due to any reason other than breach, additional charges may apply if Carrier incurs additional costs. **If in the event ELAN orders removal of cash for regulatory or business reasons, ELAN will guarantee payment of Carrier costs should Company not pay for such removal pursuant to Section 8.0 of this Agreement.**

7.5 Company may during the term of this Agreement add ATM sites in accordance with this Agreement, and may delete any ATM sites which are permanently de-installed. Such changes may result in changes in Carrier's rates to Company.

**8.0   Payment**. Carrier will bill for all scheduled services monthly in advance; provided that Carrier will adjust retroactively for over or under charges Company will pay for service within thirty (30) days of the date of invoice. Compensation is as set forth in a separate agreement between Company and Carrier plus all other fees and charges provided herein. Federal, state and local taxes, where applicable, shall be added to and included in all accounts payable by Company hereunder. Company agrees to pay interest at the lesser rate of 1½ % per month or the highest rate permitted by applicable law, per month or fraction thereof on all invoice amounts not paid by the invoice due date. If legal action is instituted by Carrier to collect any amount due hereunder, Carrier shall also be entitled to recover all legal costs and reasonable attorney's fees incurred by Carrier. In the event Company does not pay for services on time as agreed, Carrier may cease all service to Company sites until all outstanding invoices are paid in full. In the event Carrier ceases service to Company sites for non-payment pursuant to the above, this Agreement will remain in effect and Company will remain responsible for all service fees pursuant to the Agreement for its full term as if Carrier was continuing to provide services. Notwithstanding anything to the contrary in this paragraph 8.0, any cessation of Carrier's services to Company shall not affect Carrier's obligations to ELAN pursuant to paragraph 3.0.

In the event Company fails to pay Carrier for any valid invoices when due, Carrier shall notify ELAN in writing and provide a copy of such unpaid invoices. Upon such notice and assuming ELAN has access to Company's funds, ELAN, after first collecting amounts currently due to ELAN, shall withhold any additional funds earned and payable to Company by ELAN up to an amount equal to the unpaid amount due to Carrier and shall promptly remit such amount to Carrier.

**9.0   Entire Agreement**. Except with respect to the ATM Cash Agreement, and/or related addendums, this Agreement constitutes the entire Agreement and understanding between the Parties with respect to the subject matter hereof and no representations, inducements, promises or agreements not embodied herein shall be of any force and effect. The terms, conditions and other matters set forth in any duly executed rider(s) between the Parties are a part of this Agreement. This Agreement shall be binding in accordance with its terms upon the Parties hereto and their respective permitted transferees, assigns and successors in interest. This Agreement may not be assigned by Carrier, Company, or ELAN without the prior written consent of the other Parties, which consent may not be unreasonably withheld. Assignment shall not relieve Carrier of its debts and other obligations under this Agreement. This Agreement may be altered, amended or superseded by writing as agreed to and signed by the Parties hereto.

**10.0   Acknowledgment of Regulatory and other Constraints**. The Parties hereto acknowledge that Company, ELAN, the Third Party Cash Providers, and Carrier are subject to the rules, regulations, orders and requirements that may be imposed by any regulatory authorities. In the event of any requirements imposed by those entities or agencies, the Parties agree that this Agreement shall be deemed modified to conform to such requirements. In addition, Carrier shall be obligated to promptly communicate to ELAN (who shall forward such communication onto any Third Party Cash Providers) any regulatory requirements that are imposed on any ATM Cash with respect to the ATM Sites subject to this Agreement, the Carrier's vault facilities, and the security of the ATM Cash and any record keeping or reporting requirements imposed on the ATM Cash owners relating to the ATM Cash, provided Carrier has received notice of any such requirements.

Initials _*GK*_   _*H.A.*_
Carrier ELAN Company
November 4, 2008
Page 9 of 17

**Confidential Commercial Information of U.S. Bank National Association**                    **USB 000084**
**Produced Pursuant to Grand Jury Subpoena**
**FOIA Confidential Treatment Requested**

**11.0** <u>Waiver</u>. None of the provisions of this Agreement shall be deemed to have been waived by any act or acquiescence on the part of any Party, their agents or employees, and may be waived only by instruments in writing signed by the authorized officer of each respective Party. No waiver of any provision or of the same provision on any occasion shall operate as a waiver on another occasion.

**12.0** <u>Notices</u>. Except to the extent specified elsewhere in this Agreement, any notices which may or shall be given hereunder shall be in writing and shall be delivered to the Party for whom intended by either (a) email with confirmation back of receipt (b) United States certified mail, return receipt requested, postage prepaid, or (c) nationally-recognized overnight courier (such as Federal Express), addressed to each Party as follows or to such other address as a Party may designate by notice hereafter:

To Carrier:    Mount Vernon Money Center Corp.
                  140 S. Columbus Ave.
                  Mount Vernon, NY 10553
                  Attention: Robert Egan
                  Telephone: 914-664-0111, x1110     Fax: (914) 241-1980
                  Email: regan@mvmc.com
With a copy to:

To Company:   National ATM Capital, LLC
                  984 Intervale Ave
                  Bronx, NY 10459
                  Attention: Hamid Saleh Ali
                  Telephone: (718) 860-6486
                  Fax: (718) 860-6487
                  Email: nationalatm@verizon.net

To ELAN:      Elan Financial Services
                  72-760 El Paseo
                  Palm Desert, CA 92260
                  Attention: Mark Holland
                  Telephone and Fax: 760-340-7585
                  Email: mholland@elanfswest.com
                  Cc: Sondre Bilet
                  Telephone and Fax: 760-340-7583
                  Email: sbilet@elanfswest.com

Notices shall be deemed to have been given or made on the date of the email, three (3) business days after deposit in the U.S. mail, or one (1) business day after delivery to the overnight courier service for next-day delivery.

**13.0** <u>Severability</u>. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions shall not in any way be affected.

**14.0** <u>Further Assurances</u>. Each Party shall upon request provide such further assurances and undertake such further acts or things as may be reasonably necessary or appropriate to effectuate the terms of this Agreement.

Initials *ax*        *M.A.*
        Carrier  ELAN Company
        November 4, 2008
        Page 10 of 17

**Confidential Commercial Information of U.S. Bank National Association**        **USB 000085**
**Produced Pursuant to Grand Jury Subpoena**
**FOIA Confidential Treatment Requested**

**15.0  Dispute Resolution**.  All disputes arising out of or relating to this Agreement will be settled by arbitration before a sole arbitrator, who is a former judge or an attorney with at least fifteen (15) years experience in the area of commercial law, under the then current Commercial Arbitration Rules and, if necessary, the Rules for Emergency Orders of Protection, of the American Arbitration Association.  The duty and right to arbitrate will extend to any employee, officer, shareholder, agent or affiliate of the Parties.

15.1    The choice of law provisions set forth in paragraph 16.0 below will govern the interpretation and enforcement of this Agreement; however, the Federal Arbitration Act will govern issues of arbitration.

15.2    Discovery of relevant and non-privileged information shall be permitted at the discretion of the arbitrator with an end to providing the arbitrator with relevant facts regarding the dispute. The testimony of any witnesses in arbitration shall be subject to cross-examination.  The arbitrator is directed to hear and decide disputes even where a Party refuses to participate or cooperate, and to rule on dispositive motions in advance of the hearing on the merits by applying the applicable law. Any arbitration award or part thereof, whether preliminary or final, shall be in writing signed by the arbitrator, and shall generally state the factual and legal reasons upon which the award is based. The decision and award of the arbitrator will be final and binding, and the award so rendered may be entered in any court having appropriate jurisdiction.

15.3    Any arbitration proceeding must be instituted: (a) with respect to any dispute arising out of the collection of any debt owed by a Party, within two years after the date of the last payment made or received by the instituting Party; and (b) with respect to any other dispute, within two years after the event giving rise thereto occurred, regardless of whether a Party knew of such event.  Failure to institute an arbitration proceeding within such a period will constitute an absolute bar and waiver of the institution of any proceedings.

15.4    The arbitrator will have no authority to award damages in excess of the limitations and exclusions set forth in this Agreement, or to otherwise grant relief inconsistent with the terms of this Agreement.

**16.0  Law**.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of California.  The venue for any legal proceeding arising out of this Agreement shall be in Riverside County, California.

**17.0  Attorneys' Fees**.  In the event of any arbitration or litigation between the Parties arising out of this Agreement, the prevailing Party shall be entitled to recover its reasonable attorneys' fees resulting from such proceedings (including appellate and bankruptcy proceedings) in addition to any other relief awarded.

**18.0  Confidentiality**.  Except as otherwise provided herein, the Parties each agree that all information communicated to it by another party, whether before the effective date or during the term of this Agreement, shall be received in strict confidence and shall be used only for the purpose of this Agreement.

**19.0  Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

**20.0 Third Party Beneficiary**.  Each Third Party Cash Provider shall be a third party beneficiary of this Agreement and shall be entitled to exercise at any time any or all of the rights granted to Third Party Cash Providers under this Agreement as if it were a party to this Agreement.  There are no other third-party beneficiaries to this Agreement.

Initials _ℓℓℝ_    _ℋ·𝒜_
Carrier  ELAN Company
November 4, 2008
Page 11 of 17

**Confidential Commercial Information of U.S. Bank National Association**
**Produced Pursuant to Grand Jury Subpoena**
**FOIA Confidential Treatment Requested**

USB 000086

**21.0 Carrier Information; Financial Statements**. Carrier shall provide ELAN with a completed Carrier Information Sheet in the form attached hereto as **Exhibit "E"** (need to see) to this Agreement.  In addition:

(a)  Carrier shall provide ELAN, initially, at least annually thereafter, and upon ELAN's request, with two (2) years' audited financial statements prepared by a qualified independent CPA of its parent company, AT Systems, Inc.. The financial statements shall contain such information as ELAN may reasonably request in order to confirm Carrier's and its principals' financial responsibility and its or their ability to perform in accordance with this Agreement.

(b)  Carrier shall submit, on an annual basis a completed insurance questionnaire form.

(c)  Carrier shall submit, on a monthly basis based on a calendar to be established by ELAN, a listing of total ATM Cash per each of Carrier's vaults.  Carrier agrees to provide the vault log information in the established electronic format, as specified by ELAN.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Initials _____  _____
Carrier  ELAN Company
November 4, 2008
Page 12 of 17

**Confidential Commercial Information of U.S. Bank National Association**
**Produced Pursuant to Grand Jury Subpoena**
**FOIA Confidential Treatment Requested**

USB 000087

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their duly authorized representatives.

**MOUNT VERNON MONEY CENTER CORP.**

By: _____

Title: _____

Date: _____

**NATIONAL ATM CAPITAL, LLC**

By: _____

Title: President

Date: 11-6-08

**ELAN FINANCIAL SERVICES**

By: _____

Title: Steve Gauger

Date: VP – Authorized Signer

Initials _____ _____
Carrier  ELAN Company
November 4, 2008
Page 13 of 17

**Confidential Commercial Information of U.S. Bank National Association**
**Produced Pursuant to Grand Jury Subpoena**
**FOIA Confidential Treatment Requested**                                    **USB 000088**

# ADP FEDERAL CREDIT UNION

# (Contract through Nationwide Money Services, Inc.)

# ANTI-COMMINGLING PROVISION IS ¶ 6 on Page Two

## ATM MANAGEMENT  SERVICE AGREEMENT

**CARRIER: Mount Vernon Money Center**
**CLIENT: Nationwide Money Services, Inc.**

**Effective Date:  November 1, 2006**
**Initial Term Ends: October 31, 2007**

This ATM Management Service Agreement (which together with the Exhibits and other documents referred to herein constitute the "Agreement") is entered into and made effective as of the date shown above by and between Mount Vernon Money Center Corp. ,a New York corporation having its principal place of business at 403 East Third Street, Mount Vernon, New York 10553 (hereinafter referred to as the "Carrier") and Nationwide Money Services, Inc. (hereinafter referred to as "Client") having an office located at 221 Ponte Vedra Park Drive, Ponte Vedra Beach, Florida 32082 for the purpose of providing certain services in support of the Automated Teller Machines (hereinafter referred to as "ATMs")

WHEREAS Carrier has represented that it is skilled and professional in the providing of settlement/cash replenishment services and First and Second Line maintenance services associated with the operational needs of the ATM's: and

WHEREAS in reliance of Carrier's representations as stated above and in Client's desire to have Carrier provide certain services as more fully described elsewhere herein, in connection with ATM's covered hereunder;

NOW THEREFORE, in consideration of the above and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Carrier and Client agree as follow.

1.  Carrier shall provide scheduled settlement/cash replenishment/cash add services and First and Second Line maintenance services described in Exhibit A attached thereto, to each ATM identified in Exhibit B.

2.  Carrier shall perform cash replenishment/cash add services for each ATM in accordance with the frequency as set forth under "Replenishment/Settlement Frequency" heading in Exhibit B.  Carrier shall follow the normal procedures of Client for the reporting of such settlements, as Client specifies such procedures to Carrier in writing.

3.  Client shall provide Carrier with all supplies necessary for the proper operation of each ATM. Carrier shall advise Client in writing of needed supplies, and Client shall be responsible for all costs related to the shipment and/or delivery of such supplies.

4.  Exhibit B may be amended from time to time by Client  add to or delete ATMs; provided that the Settlement/Replenishment Frequency applicable to additional ATMs shall be determined by the mutual agreement of both parties.

5.  If the Client's vault cash is to be used for replenishments, Client shall maintain an arrangement that will ensure the availability of an adequate supply of vault cash for the purpose of replenishing each ATM noted in Exhibit B .  Client shall make available for pickup at a bank(s) assigned by Client's vault cash provider currency in a sufficient amount to cover the requested cash loads  forty-eight (48) hours prior to the actual disbursements.

HAW

### Page Two

6.  Carrier shall hold such vault cash (if applicable) in trust for the Client and shall not commingle such vault cash with Carrier's funds.

7.  In the event Carrier's vault cash is used for replenishments, any shortage detected during settlement in any ATM shall be the responsibility of the Carrier unless, after investigation, such shortage is found to be the result of ATM hardware or software malfunction. Upon written request by Carrier, Client will conduct a thorough investigation of any such malfunction, the procedures for which shall be agreed upon by both parties hereto. All details of any such investigation shall be immediately made available to Carrier.

8.  Carrier shall permit Client's audit personnel to visit Carrier's facility to perform audits upon 24 hours advanced notification. Further, Carrier shall permit prearranged external audits to be performed by qualified certified public accountants chosen by and paid for by the Client. Carrier shall cooperate in any other audit type procedures deemed necessary by Client, including without limitation, periodic attendance by Client personnel at any ATM during settlement to validate cash balances.

9.  Carrier shall follow Client's standard operating procedures required to enter and exit each ATM location, as such procedures are specified in writing to Carrier, including making any required phone calls and completing and Client service logs.

10. Any loss resulting from embezzlement or theft by any employee of Carrier, from robbery or from any mysterious disappearance occurring during the performance by Carrier of the services described herein, shall be the responsibility of the Carrier.

11. Except as hereinafter provided, any loss of the contents of any ATM either occurring while Carrier personnel are not present at such ATM or in the event of an ATM break-in or any other unauthorized tampering to the ATM, shall be the responsibility of the Client. If upon investigation, Client finds that Carrier was negligent in its duties to secure the premises by locks, alarms or any other security device provided by the Client at an ATM site where such a loss occurs, such loss shall be the responsibility of the Carrier.

12. Carrier shall not be liable for non-performance of services or delays not caused by its fault or neglect or for non-performance or delays caused by strikes, lockouts or other labor disturbances, riots, war, insurrection, acts of God or the public enemy, or other causes beyond its control. Nothing in this Section 11 shall relieve Carrier of liability of any Client's valuables in its possession at anytime.

13. In the event Client's vault cash is used for replenishments, Carrier will maintain "All Risk" armored car cargo liability insurance in the amount of $10,000,000.00 for the duration of this contract and any extension thereof. Carrier shall obtain a certificate of insurance naming the Client as a loss payee under such policy. Client shall be notified in writing ten (10) days in advance of any cancellation by Carrier of such insurance, and shall be notified in writing not later than five (5) days after such cancellation by the issuer of such insurance.

14. In the event Client's vault cash is used for replenishments, Client shall document any shortage or loss in writing and such documentation shall be forwarded to Carrier in writing within ten (10) days from the time of discovery. Documentation of said shortage or loss shall include a letter of claim fully detailing the date of the shortage or loss, the location (designated by location, name and

**Page Three**

address as well as by the applicable poll I.D. number) and the amount of the shortage or loss.  In addition, the documentation shall include any applicable reports available to Client from a law enforcement agency or merchant security department.  Upon receipt of such documentation, Carrier shall, within ten (10) days, conduct its own investigation of said shortage and/or loss, and after completion of such investigation, if Carrier shall  been at fault, make payment to the Client within ten (10) days after the completion of said completion the amount of such shortage and/or loss.  If after the completion of Carrier's investigation, Carrier shall not have been at fault, Carrier shall not make payment of the amount of said shortage and/or loss to Client and shall submit to the client a written statement setting forth the reasons for such belief.  Shortages under $100.00 will be the responsibility of Carrier without a letter of claim submitted.

15.  Carrier shall obtain the written approval of Client prior to entering into any subcontract agreement with respect to any services to be provided to the Client hereunder.  Said approval shall not be unreasonably withheld.

16.  For the services described herein, Client shall pay Carrier the amounts specified in Exhibit C upon monthly presentation of invoices.

17.  This Agreement is effective as of the date set forth above, and shall continue for a period of one (1) year.  Thereafter, it shall automatically renew for an additional year unless a a non-renewal letter is sent sixty (60) days prior to the expiration of the Agreement by either party.

18.  The rates for service set forth herein shall be increased by agreement of the parties hereto if there is a substantial change in economic conditions affecting fuel prices and which cause an increase of more than twenty percent (20%) in such prices.  If economic conditions affecting these prices cause a decrease of more than twenty percent (20%) in such prices, such rates shall be decreased upon agreement by the parties hereto.  Carrier may increase the rates set forth in Exhibit C on the first (1st) anniversary of the term of this Agreement if the Agreement is longer than one (1) year, provided however, each such increase does not exceed the prior year's fees by more than the annual increase in the Consumer Price Index (Bureau of Labor Statistics, Consumer price Index, Cities, New York, Northern New Jersey, Long Island, Connecticut) plus three percent (3%), or  any comparable index; provided, however, such increase may not exceed six percent (6%) per annum.

19.  In the event of a breach of this Agreement by either party, such party shall have ten (10) days within which to cure such breach after receipt of written notice thereof from the other party.  If such breach is not cured within such period, the non-breaching party may terminate this Agreement.

20.  In the event of a breach of this Agreement by either party, the party adjudicated to be in breach thereof by any court of competent jurisdiction shall pay all expenses, including reasonable attorney's fees, in connection with the enforcement by the other party of this Agreement.  All overdue payments shall bear interest at the rate of one and one-half (1.5%) per month.

21.  This Agreement shall be construed pursuant to the laws of the State of New York and all parties consent to the jurisdiction of the courts of the State of New York.

22.  This Agreement contains the entire understanding of the parties hereto and cannot be modified or terminated unless in writing executed by both parties.

**Page Four**

23. Upon termination by either party, all sums due under this Agreement become immediately payable. Any cash or other property of Client in the possession of Carrier shall be returned immediately upon termination.

Nationwide Money Services, Inc.

_Heather L Webb_
Approved By – Signature

_Heather L Webb_
Print Name

_Director of ATM Operations_
Title

_11/15/06_
Date

Mt. Vernon Money Center

_Robert F Egan_
Approved By – Signature

_Robert F Egan_
Print Name

_President_
Title

_11/21/06_
Date

<u>Exhibit A</u>

<u>Breadth of Services</u>

1.   <u>CASH REPLENISHMENTS/SETTLEMENTS</u>

Carrier will load currency into cassettes in accordance with a predetermined schedule approved by the Client.

Carrier may store loose currency in an ATM with the prior approval of the Client.

Carrier will deliver sealed cassettes and or provide cash adds to the respective ATM's in accordance with the cash replenishment/cash add schedule outlined in Exhibit B.

Carrier will perform a settlement at the time of replenishment and retrieve the necessary documentation required by Client.

Carrier will ensure that each ATM is fully operational prior to leaving the ATM site.

Carrier will perform upon loading cassettes two (2) dispense tests and verify proper configuration of canisters.

Carrier will replenish all necessary supplies as needed during each site visit (receipt and journal paper and ribbons).

Carrier will transport the empty or partially spent cassettes to Carrier's vault the same day of replenishment/settlement and transmit the necessary settlement documentation to Client the following business day.

Carrier will complete the actual cash verification before 3:00 P.M. the following business day after settlement and communicate any cash discrepancies to the Client upon completion of the verification process.

Carrier will place all unopened currency in Client's cash inventory in the Carrier's vault and shall not commingle such vault cash with Carrier's funds.

Carrier will transmit to Client a daily report of the cash position of Client's cash inventory maintained at Carrier's vaulting facility within forty-eight (48) hours of any cash inventory change.

Carrier will deliver or cause to be delivered journal tapes and retained cards to the location identified by Client within ten (10) business days of cash load.

Carrier will redeposit any cash remaining once the ATM is loaded with new cash within twenty-four (24) hours of cash replenishment.

<u>EXHIBIT A.</u>
<u>(Con't)</u>

2.    <u>FIRST LINE MAINTENANCE SERVICE</u>

Carrier agrees to perform the following services in accordance with response times mutually agreeable to both parties.  Such response times will be two (2) hours unless otherwise noted.

Non-technical fixes include but are not limited to the following:

- Simple paper jams
- Card jams
- Currency jams
- Deposit jams
- Low currency conditions
- Receipt failures
- Journal failures
- Dispenser malfunctions
- Replenishment of consumables*

Note: *  Carrier will order all consumables in sufficient quantities to ensure inventory is never depleted.  The cost of these consumables will be passed on to the Client.

3.   <u>SECOND LINE MAINTENANCE</u>

Carrier agrees to provide second line maintenance service to the locations listed in Exhibit B  in accordance with the fee structure noted in Exhibit C. The fees noted in Exhibit C are exclusive of parts.  Second line maintenance services include the following.

- Correct hardware maintenance and return ATM to operational condition
- Coordinate, manage and perform preventative maintenance
- Install new or reconditioned parts
- Perform all engineering changes
- Comply with all governmental and regulatory agencies

**Exhibit B**

**Listing of Locations**

1.  ADP – Florham Park / TD230828
    71 Hanover Avenue
    Florham Park, NJ 07031

2.  ADP - Jersey City #1 / TD230829
    2 Journal Square Plaza
    Jersey City, NJ 07306

3.  ADP - Jersey City #2 / TD230830
    100 Burma Road
    Jersey City, NJ 07305

4.  ADP – Parsippany #1 / TD230832
    15 Waterview Boulevard
    Parsippany, NJ 07054

5.  ADP – Parsippany #2 / TD229076
    99 Jefferson Road
    Parsippany, NJ 07062

6.  ADP – Roseland #1 / TD230833
    1 ADP Boulevard
    Roseland, NJ 07068

7.  ADP – Roseland #2 / TD230834
    5 ADP Boulevard
    Roseland, NJ 07068

8.  ADP – Edgewood / TD230827
    51 Mercedes Way
    Edgewood, NY 11717

# ACTORS FEDERAL CREDIT UNION

# ANTI-COMMINGLING PROVISION
## IS ¶ 6 on Page Two

## ATM MANAGEMENT SERVICE AGREEMENT

**CARRIER:** Mount Vernon Money Center
**CLIENT:** Actors Federal Credit Union

**Effective Date:**  December 1, 2009
**Initial Term Ends:** November 30, 2014

This ATM Management Service Agreement (which together with the Exhibits and other documents referred to herein constitute the "Agreement") is entered into and made effective as of the date shown above by and between Mount Vernon Money Center Corp. ,a New York corporation having its principal place of business at 403 East Third Street, Mount Vernon, New York 10553 (hereinafter referred to as the "Carrier") and Actors Federal Credit Union (hereinafter referred to as "Client") having an office located at 165 West 46th Street – 4th Floor – New York, New York 10036  for the purpose of providing certain services in support of the Automated Teller Machines (hereinafter referred to as "ATMs")

WHEREAS Carrier has represented that it is skilled and professional in the providing of settlement/cash replenishment services and First and Second Line maintenance services associated with the operational needs of the ATM's: and

WHEREAS in reliance of Carrier's representations as stated above and in Client's desire to have Carrier provide certain services as more fully described elsewhere herein, in connection with ATM's covered hereunder;

NOW THEREFORE, in consideration of the above and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Carrier and Client agree as follow.

1. Carrier shall provide scheduled settlement/cash replenishment/cash add services and First and Second Line maintenance services described in Exhibit A attached thereto, to each ATM identified in Exhibit B.

2. Carrier shall perform cash replenishment/cash add services for each ATM in accordance with the frequency as set forth under "Replenishment/Settlement Frequency" heading in Exhibit B.  Carrier shall follow the normal procedures of Client for the reporting of such settlements, as Client specifies such procedures to Carrier in writing.

3. Client shall provide Carrier with all supplies necessary for the proper operation of each ATM. Carrier shall advise Client in writing of needed supplies, and Client shall be responsible for all costs related to the shipment and/or delivery of such supplies.

4. Exhibit B may be amended from time to time by Client  add to or delete ATMs; provided that the Settlement/Replenishment Frequency applicable to additional ATMs shall be determined by the mutual agreement of both parties.

5. If the Client's vault cash is to be used for replenishments, Client shall maintain an arrangement that will ensure the availability of an adequate supply of vault cash for the purpose of replenishing each ATM noted in Exhibit B . Client shall remit by wire transfer to Carrier's

Page Two

designated account an amount sufficient to cover the requested cash loads forty-eight (48) hours prior to the actual disbursements.

6.  Carrier shall hold such vault cash (if applicable) in trust for the Client and shall not commingle such vault cash with Carrier's funds nor commingle Client's vault cash with other client's funds or vault cash, nor commingle or use the vault cash for the Carrier's benefit, nor use the vault cash in any other manner except as provided for in this Agreement.

7.  In the event Carrier's vault cash is used for replenishments, any shortage detected during settlement in any ATM shall be the responsibility of the Carrier unless, after investigation, such shortage is found to be the result of ATM hardware or software malfunction. Upon written request by Carrier, Client will conduct a thorough investigation of any such malfunction, the procedures for which shall be agreed upon by both parties hereto. All details of any such investigation shall be immediately made available to Carrier.

8.  Carrier shall permit Client's audit personnel to visit Carrier's facility to perform audits upon 24 hours advanced notification. Further, Carrier shall permit prearranged external audits to be performed by qualified certified public accountants chosen by and paid for by the Client. Carrier shall cooperate in any other audit type procedures deemed necessary by Client, including without limitation, periodic attendance by Client personnel at any ATM during settlement to validate cash balances.

9.  Carrier shall follow Client's standard operating procedures required to enter and exit each ATM location, as such procedures are specified in writing to Carrier, including making any required phone calls and completing and Client service logs.

10.  Any loss resulting from embezzlement or theft by any employee of Carrier, from robbery or from any mysterious disappearance occurring during the performance by Carrier of the services described herein, shall be the responsibility of the Carrier.

11.  Except as hereinafter provided, any loss of the contents of any ATM either occurring while Carrier personnel are not present at such ATM or in the event of an ATM break-in or any other unauthorized tampering to the ATM, shall be the responsibility of the Client. If upon investigation, Client finds that Carrier was negligent in its duties to secure the premises by locks, alarms or any other security device provided by the Client at an ATM site where such a loss occurs, such loss shall be the responsibility of the Carrier.

12.  Carrier shall not be liable for non-performance of services or delays not caused by its fault or neglect or for non-performance or delays caused by strikes, lockouts or other labor disturbances, riots, war, insurrection, acts of God or the public enemy, or other causes beyond its control. Nothing in this Section 11 shall relieve Carrier of liability of any Client's valuables in its possession at anytime.

13.  In the event Client's vault cash is used for replenishments, Carrier will maintain "All Risk" armored car cargo liability insurance in the amount of $10,000,000.00 for the duration of this contract and any extension thereof. Carrier shall obtain a certificate of insurance naming the Client as a loss payee under such policy upon execution of this Agreement. Client shall be notified in writing thirty (30) days in advance of any cancellation by Carrier of such insurance, and shall be notified in writing not later than five (5) days after such cancellation by the issuer of such insurance.

14.  In the event Client's vault cash is used for replenishments, Client shall document any shortage or loss in writing and such documentation shall be forwarded to Carrier in writing within ten (10) days from the time of discovery. Documentation of said shortage or loss shall include a

## Page Three

letter of claim fully detailing the date of the shortage or loss, the location (designated by location, name and address as well as by the applicable terminal I.D. number) and the amount of the shortage or loss. In addition, the documentation shall include any applicable reports available to Client from a law enforcement agency or merchant security department. Upon receipt of documentation, Carrier shall, within ten (10) days, conduct its own investigation of said shortage and/or loss, and after completion of such investigation, if Carrier shall been at fault, make payment to the Client within ten (10) days after the completion of said completion the amount of such shortage and/or loss. If after the completion of Carrier's investigation, Carrier shall not have been at fault, Carrier shall not make payment of the amount of said shortage and/or loss to Client and shall submit to the client a written statement setting forth the reasons for such belief.

15. Carrier shall obtain the written approval of Client prior to entering into any subcontract agreement with respect to any services to be provided to the Client hereunder.

16. For the services described herein, Client shall pay Carrier the amounts specified in Exhibit C upon monthly presentation of invoices within thirty (30) days from the time of receipt less any penalties incurred by Carrier as described in Exhibit D attached hereto.

17. This Agreement is effective as of the date set forth above, and shall continue for a period of five (5) years. Thereafter, it shall continue from month to month and may be terminated by either party by giving the other party thirty (30) days written notice of its intent to terminate.

18. The rates for service set forth herein shall be increased by agreement of the parties hereto if there is a substantial change in economic conditions affecting fuel prices and which cause an increase of more than twenty percent (20%) in such prices. If economic conditions affecting these prices cause a decrease of more than twenty percent (20%) in such prices, such rates shall be decreased upon agreement by the parties hereto. Carrier may increase the rates set forth in Exhibit C.

19. In the event of a breach of this Agreement by either party, such party shall have ten (10) days within which to cure such breach after receipt of written notice thereof from the other party. If such breach is not cured within such period, the non-breaching party may terminate this Agreement.

20. In the event of a breach of this Agreement by either party, the party adjudicated to be in breach thereof by any court of competent jurisdiction shall pay all reasonable actual expenses, including reasonable attorney's fees, in connection with the enforcement by the other party of this Agreement. All overdue payments shall bear interest at the rate of one and one-half (1.5%) per month. In the event of a dispute on any bill or bills, no late charges shall be assessed by Carrier against Client until the dispute over said bill or bills has been resolved to the mutual satisfaction of the parties and an additional thirty (30) days has elapsed without payment. Client agrees to pay any undisputed portion of the bill within thirty (30) days from the time of receipt.

21. This Agreement shall be construed pursuant to the laws of the State of New York and all parties consent to the jurisdiction of the courts of the State of New York.

## Page Four

22. This Agreement contains the entire understanding of the parties hereto and cannot be modified

or terminated unless in writing executed by both parties.

23. Upon termination by either party, all sums due under this Agreement become immediately payable. Any cash or other property of Client in the possession of Carrier shall be returned immediately upon termination.

24. All notice by either party with respect to this Agreement shall be given, if sent to the other party, by Federal Express or other form of national overnight delivery with a signature required by the recipient.

**Actors Federal Credit Union**

_____
Approved By – Signature

Jeff Rodman
Print Name

President
Title

12/09/2009
Date

**Mt. Vernon Money Center**

_____
Approved By – Signature

Robert F Egan
Print Name

President
Title

12-10-09
Date

**Exhibit A**

**Breadth of Services**

1. **CASH REPLENISHMENTS/SETTLEMENTS**

   Carrier will load currency into cassettes in accordance with a predetermined schedule approved by the Client.

   Carrier may store loose currency in an ATM with the prior approval of the Client.

   Carrier will deliver sealed cassettes and or provide cash adds to the respective ATM"s in accordance with the cash replenishment/cash add schedule outlined in Exhibit B.

   Carrier will perform a settlement at the time of replenishment and retrieve the necessary documentation required by Client.

   Carrier will ensure that each ATM is fully operational prior to leaving the ATM site.

   Carrier will perform upon loading cassettes two (2) dispense tests and verify proper configuration of canisters.

   Carrier will replenish all necessary supplies as needed during each site visit (receipt and journal paper and ribbons).

   Carrier will transport the empty or partially spent cassettes to Carrier's vault the same day of replenishment/settlement and transmit the necessary settlement documentation to Client the following business day.

   Carrier will complete the actual cash verification before 3:00 P.M. the following business day after settlement and communicate any cash discrepancies to the Client upon completion of the verification process.

   Carrier will place all unopened currency in Client's cash inventory in the Carrier's vault and shall not commingle such vault cash with Carrier's funds.

   Carrier will transmit to Client a daily report of the cash position of Client's cash inventory maintained at Carrier's vaulting facility within forty-eight (48) hours of any cash inventory change.

   Carrier will deliver or cause to be delivered journal tapes and retained cards to the location identified by Client within two (2) business days of cash load. Carrier will reimburse Client for Regulation E losses in the event an initial electronic journal was not provided to Client and/or Client requested but did not receive the missing electronic journal in sufficient time to file and/or deny a claim.

   Carrier shall hold any cash remaining in its vault on Client's behalf at no additional charge to Client.

EXHIBIT A.
(Con't)

2.   FIRST LINE MAINTENANCE SERVICE

Carrier agrees to perform the following services in accordance with response times mutually agreeable to both parties.  Such response times will be two (2) hours unless otherwise noted. Carrier will accept service calls on Carrier's 800 number (1-800-232-4414) directly from Client's ATM retail location site managers.  Client will provide Carrier with a current listing of all managers for each location listed in Exhibit B.

It is understood that the hours of coverage for First Line Maintenance services are 7:00 A.M. – 11:00 P.M. (Monday through Sunday).

Non-technical fixes include but are not limited to the following:

- Simple paper jams
- Card jams
- Currency jams
- Deposit jams
- Low currency conditions
- Receipt failures
- Journal failures
- Dispenser malfunctions
- Replenishment of consumables*

Note: *  Carrier will order all consumables in sufficient quantities to ensure inventory is never depleted.  The cost of these consumables will be passed on to the Client.  The quality of the paper used on Client's ATMs will be equal to or will exceed that manufactured by Nextran.

3.   SECOND LINE MAINTENANCE

Carrier agrees to perform or cause to be performed  second line maintenance service for the locations listed in Exhibit B  in accordance with the fee structure noted in Exhibit C. The fees noted in Exhibit C are inclusive of parts.  Second line maintenance services include the following.

- Correct hardware maintenance and return ATM to operational condition
- Coordinate, manage and perform preventative maintenance
- Install new or reconditioned parts
- Perform all engineering changes
- Comply with all governmental and regulatory agencies

## Exhibit B

| # | Term ID | Location Address | Merchant | Borough | FLM Aniv. |
|---|---------|------------------|----------|---------|-----------|
| 206 | NY000371 | 234 West 42nd bet 7th/8th Ave NYC 10036 | Ripleys Believe It or Not | NYC | Jun |
| 207 | NY000372 | 2170 White Plains Rd @ Pelham Expy Bronx 10462 | McDonald's | Bronx | Jan |
| 208 | NY000373 | 300 E 204th St @ Perry Ave Bronx 10467 | McDonald's | Bronx | Feb |
| 209 | NY000374 | 1865 Bruckner Blvd off White Plains Rd Bronx 10472 | McDonald's | Bronx | Feb |
| 210 | NY000398 | 2630 Jerome Ave @ 193rd St Bronx 10468 | McDonald's | Bronx | Feb |
| 211 | NY000399 | 341 Fifth Ave @ 33rd St New York, NY 10016 | McDonald's | Midtown | Mar |
| 212 | NY000400 | 36 West Fordham Rd bt Grand/Davidson Ave Bronx 10468 | McDonald's | Bronx | Jun |
| 213 | NY000404 | 77 Seventh Avenue @ 16th Street NYC 10011 | Westside Market NYC | NYC | May |
| 214 | NY000409 | 154 W 14th St @ 7th Ave NYC 10011 | McDonald's | Downtown | Jun |
| 215 | NY000410 | 289 9th St. bet 4th & 5th Ave. Bklyn 11215 | McDonald's | Bronx | Jun |

December 1, 2009

Page Four

$127.05 Per Service – Less Than 24 Hours Notice – Available Funds (06/01/12 thru 05/31/13)
$63.60 Per Service – Less Than 48 Hours Notice – – Available Funds

$130.85 Per Service – Less Than 24 Hours Notice – Available Funds (06/01 thru 05/31/14)
$65.50 Per Service – Less Than 48 Hours Notice – Available Funds

**Emergency Cash Replenishment/ Settlement (Over 200 ATMs)**

$104.75 Per Service – Less Than 24 Hours Notice – Available Funds (12/01/09 thru 11/30/10)
$52.40 Per Service – Less Than 48 Hours Notice – Available Funds

$107.90 Per Service – Less Than 24 Hours Notice – Available Funds (12/01/10 thru 11/30/11)
$53.95 Per Service – Less Than 48 Hours Notice – Available Funds

$111.15 Per Service – Less Than 24 Hours Notice – Available Funds (12/01/11 thru 11/30/12)
$55.60 Per Service – Less Than 48 Hours Notice – Available Funds

$114.45 Per Service – Less Than 24 Hours Notice – Available Funds (12/01/12 thru 11/30/13)
$57.25 Per Service – Less Than 48 Hours Notice – Available Funds

$117.90 Per Service – Less Than 24 Hours Notice – Available Funds (12/01/13 Thru 11/30/14)
$59.00 Per Service – Less Than 48 Hours Notice – Available Funds